J. Erik Heath, Esq. (SBN 304683)
J. ERIK HEATH, ATTORNEY AT LAW
369 Pine St., Ste. 410
San Francisco, CA 94104
Tel.:     (415) 426-7850
Fax:     (415) 449-6556
erik@heathlegal.com

Attorney for Plaintiff
OSKAR LIZARRAGA-DAVIS

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSKAR LIZARRAGA-DAVIS,<br>     Plaintiff,<br><br>v.<br><br>TRANSWORLD SYSTEMS, INC.;<br>     Defendant. | Civil Action No. 5:18-cv-4081-BLF<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        July 25, 2019<br>Time:       9:00 a.m.<br>Courtroom:  3, 5th Floor<br>Judge:     Hon. Beth L. Freeman |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

I. INTRODUCTION ............................................................................................................ 1

II. FACTS ............................................................................................................................ 1

    A.   Plaintiff Oskar Lizarraga-Davis ................................................................. 1

    B.   Defendant Transworld and the NCSLT Accounts ........................................ 3

III. LEGAL STANDARD ..................................................................................................... 5

IV. ARGUMENT ................................................................................................................... 5

A. Defendant's Own Exhibits Raise Genuine Issues of Material
Fact Regarding Its "Debt Collector" Status. ........................................................ 5

    1.   Defendant Does Not Address Whether It Is A Debt
    Collector For Its Post-Default Servicing Activity. ........................................... 6

    2.   The Loan Was Already In Default When It Was
    Purportedly Transferred to NCSLT 2006-4. ................................................... 8

B. There Are Issues Of Material Fact Regarding Defendant's FDCPA Violations. ................ 10

    1.   Defendant's Evidence Raises Factual Issues Concerning
    The Sufficiency Of Its Documentation. .......................................................... 10

    2.   Defendant Has Not Shown That It Is Entitled To
    Judgment On The Merits Of The FDCPA Claim As Matter Of Law. ................. 13

C. At A Minimum, The Court Should Allow Additional Discovery
Before Granting Any Part Of The Summary Judgment Motion. ............................ 15

V. EVIDENTIARY OBJECTIONS PER L.R. 7-3(C) ........................................................ 16

VI. CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Brenner v. Am. Educ. Servs,*
2014 U.S. Dist. LEXIS 2067 (E.D. Mo. Jan. 8, 2014) ............................................................ 6

*Bridge v. Ocwen Fed. Bank, FSB,*
681 F.3d 355 (6th Cir. 2012) ................................................................................................... 6

*Brown v. Ball,*
123 Cal.App. 758 (1932) ......................................................................................................... 6

*Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Ft. Peck Reservation,*
323 F.3d 767 (9th Cir. 2003) ............................................................................................. 5, 16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................................................. 5

*Cockerell v. Title Ins. & Tr. Co.,*
42 Cal.2d 284 (1954) ................................................................................................. 10, 11, 12

*Cobb v. San Francisco Residential Rent Stabilization & Arbitration Bd.,*
98 Cal.App.4th 345 (2002) ..................................................................................................... 10

*Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Tr. (NCSLT Litigation),*
2018 U.S. Dist. LEXIS 179914 (D. Del. Oct. 19, 2018) ...................................................... 4, 7

*De Dios v. Int'l Realty & RC Invs.,*
641 F.3d 1071 (9th Cir. 2011) ................................................................................................. 8

*Delisi v. Midland Funding, LLC,*
2015 U.S. Dist. LEXIS 92441 (E.D. Mo. July 16, 2015) ..................................................... 15

*Don Rose Oil Co. v. Lindsley,*
160 Cal.App.3d 752 (1984) .................................................................................................... 10

*Donohue v. Quick Collect, Inc.,*
592 F.3d 1027 (9th Cir. 2010) ............................................................................................... 14

*Finley v. Dynamic Recovery Sols. LLC,*
2015 U.S. Dist. LEXIS 77999 (N.D. Cal. June 15, 2015) ................................................. 4, 16

*Fox v. Citicorp Credit Servs., Inc.,*
15 F.3d 1507 (9th Cir. 1994) ................................................................................................. 14

*Freyermuth v. Credit Bureau Services, Inc.,*
248 F.3d 767 (8th Cir. 2001) ................................................................................................. 15

*Hoffman v. Transworld Sys.,*
2018 U.S. Dist. LEXIS 188158 (W.D. Wash. Nov. 2, 2018) ......................................... passim

*Kuria v. Palisades Acquisition XVI, L.L.C.*,
    752 F. Supp. 2d 1293 (N.D. Ga. 2010)...................................................... 15

*Lyons v. Michael & Assocs.*,
    824 F.3d 1169 (9th Cir. 2016) ............................................................... 14

*Mission Valley E., Inc. v. Cty. of Kern*,
    120 Cal.App.3d 89 (1981) ........................................................... 10, 11, 12

*Nat'l Collegiate Student Loan Trust 2005-3 v. Dunlap*,
    2018-Ohio-2701 (2018) ........................................................................ 12

*Natividad v. Wells Fargo Bank, N.A.*,
    2013 U.S. Dist. LEXIS 74067 (N.D. Cal. May 24, 2013)........................... 9

*Perry v. Stewart Title Co.*,
    756 F.2d 1197 (5th Cir. 1985) ................................................................. 6

*Reed v. Select Portfolio Servicing, Inc.*,
    2017 U.S. Dist. LEXIS 21763 (E.D. Tenn. Feb. 16, 2017)........................ 6

*Taymuree v. Nat'l Collegiate Student Loan Tr. 2007-2*,
    2017 U.S. Dist. LEXIS 35824 (N.D. Cal. Mar. 13, 2017) ........................ 8

*Tourgeman v. Collins Fin. Servs.*,
    755 F.3d 1109 (9th Cir. 2014) ........................................................ 13, 14

*Wadlington v. Credit Acceptance Corp.*,
    76 F.3d 103 (6th Cir. 1996) ..................................................................... 6

*Weber v. Great Lakes Educ. Loan Servs.*,
    2014 U.S. Dist. LEXIS 59064 (W.D. Wis. Apr. 29, 2014) ....................... 6

**Statutes & Regulations**

15 U.S.C. § 1692(a) ..................................................................................... 13

15 U.S.C. § 1692(e) .....................................................................................13

15 U.S.C. § 1692a(6) ................................................................................... 14

15 U.S.C. § 1692a(6)(F)(iii) ........................................................................... 6

15 U.S.C. § 1692e ....................................................................................... 14

15 U.S.C. § 1692e(2) ................................................................................... 14

15 U.S.C. § 1692f ........................................................................................ 14

Fed. R. Civ. P. 56(a) ..................................................................................... 5

Fed. R. Civ. P. 56(d) ................................................................................... 15

Fed. R. Civ. P. 106 ................................................................................ 16, 17

Fed. R. Civ. P. 901(a) ............................................................................ 16, 17

Fed. R. Civ. P. 1003 .................................................................................... 16

# I. INTRODUCTION

This Court should deny Defendant's early motion for summary judgment, which relies primarily on an argument that it is not a "debt collector" regulated by the Fair Debt Collection Practices Act (FDCPA). In this argument, Defendant insists it cannot be a debt collector because the loan at issue was not in default when it was purportedly transferred to National Collegiate Student Loan Trust 2006-4 in December 2006. In Defendant's view, that was "prior to any payment becoming due." But Defendant's documents show several payments due before that time, as well as a potential default. But even more fatal to Defendant's motion is that it does not even mention the alternative (even clearer) way it is a debt collector – that, regardless of the status of the loan in 2006, the loan was apparently in default when it obtained the servicing rights many years later. Defendant's motion and supporting evidence do far more to suggest it is a debt collector than it is not.

In a less full-throated argument, Defendant also argues that it did not violate the FDCPA. But there remain disputed facts on this point, including facts concerning the status of its documentation. Further, Defendant's arguments that its conduct did not violate the FDCPA are unavailing.

Defendant's motion ultimately fails because it could not make out its initial burden. But, in the unlikely event that the Court finds it did so, then it should at a minimum allow further discovery before granting summary judgment – especially at this early stage in the case.

# II. FACTS

## A. Plaintiff Oskar Lizarraga-Davis

For years, Mr. Lizarraga-Davis was a stay-at-home father in Hollister, California. (Declaration of Oskar Lizarraga-Davis ("Lizarraga-Davis Decl."), at ¶ 25.) In early 2017, he received correspondence from the Law Office of Patenaude & Felix ("P&F"), informing him that he had an outstanding balance of more than $30,000 for a student loan debt owed to the National Collegiate Student Loan Trust 2006-4 ("NCSLT 2006-4"). (*Id.*, at ¶ 2.) He did not recognize the

name of the creditor, so he requested that P&F provide him with verification of the debt. (*Id.*, at ¶ 3.)

The identity of NCSLT 2006-4 was important to Mr. Lizarraga-Davis. He did not want to skirt any obligations he may owe, but after hearing about so many data leaks and scams, he wanted to ensure that he was dealing with a legitimate company with a legitimate right to collect money from him. (*Id.*, at ¶ 4.) He did not want (and could not afford) to pay them money that he was not legally obligated to pay someone. (*Id.*)

P&F provided a response dated April 21, 2017, purporting to attach documents supporting the obligation, but those documents did little to identify any ownership rights to his loan by NCSLT 2006-4. (*Id.*, at ¶ 5-6, Ex. 1.) Mr. Lizarraga-Davis requested further documentation on May 15, 2017, but received largely the same boilerplate response from P&F. (*Id.*, at ¶ 7-8, Ex. 2-3.) Around May 31, 2017, Mr. Lizarraga-Davis sent another request (his third) to P&F, who never responded. (*Id.*, at ¶ 9-10, Ex. 4.)

The next time Mr. Lizarraga-Davis heard from NCSLT 2006-4 was Sunday, July 16, 2017, when he was served with a summons to a lawsuit filed by it. (*Id.*, at ¶ 11, Ex. 5.) Attached to the complaint were some of the same documents P&F initially sent Mr. Lizarraga-Davis. (*Id.*) Days later, P&F sent him a letter, pressuring him to settle the case, so that it could "discontinue" the pending litigation. (*Id.*, at ¶ 12, Ex. 6.) After conducting some research, Mr. Lizarraga-Davis filed an answer, paying the filing fee of over $400, to raise the issue he had repeatedly notified P&F about – that NCSLT 2006-4 lacked standing to sue him. (*Id.*, at ¶ 13, Ex. 7.)

Mr. Lizarraga-Davis had recently rejoined the workforce prior to being served with the lawsuit. (*Id.*, at ¶ 25.) He thus had to take time off from his busy work to attend case management conferences, such as the one taking place on October 4, 2017. (*Id.*, at ¶¶ 15, 22.) At that conference, in the presence of P&F, he again raised his concerns that NCSLT 2006-4 has not been able to prove ownership. The judge explained to him that a company should not be suing him unless they had proof. Mr. Lizarraga-Davis referenced the CFPB case against NCSLT

1  2006-4, which he had come across in his research, and he was requested to bring a copy with him

2  to court for the next conference.  (*Id.*, at ¶ 15.)

3      Mr. Lizarraga-Davis attended the second case management conference, approximately six

4  weeks later, bringing along a copy of the CFPB filings against NCSLT 2006-4.  Mr. Lizarraga-

5  Davis compared his lawsuit to that case, and was eventually urged by the judge to hire an

6  attorney because he could not defend the case on his own.  (*Id.*, at ¶ 16.)  A trial was scheduled

7  soon afterwards for May 18, 2018.  (*Id.*, at ¶ 17, Ex. 8.)  Not wanting to face the trial on his own,

8  especially after hearing the judge's advice, Mr. Lizarraga-Davis began saving money for an

9  attorney, and eventually hired the undersigned counsel to represent him in the case.  (*Id.*, at ¶ 18.)

10  After Mr. Lizarraga-Davis hired an attorney, and shortly before trial, however, NCSLT 2006-4

11  suddenly dismissed its case against him. (*Id.*, at ¶ 20, Ex. 9.)

12      Although the case had been dismissed, it was hardly a satisfying result for Mr. Lizarraga-

13  Davis.  By the time NCSLT 2006-4 walked away from its case, much of the harm to him had

14  already been done.  He spent money on filing fees, attorney fees, and took time off work to deal

15  with the case.  The lawsuit also instilled a great deal of fear in him.  He tries to do the right thing,

16  but after being sued, he became worried about garnishment, or even losing his job or

17  professional license because of the public record.  (*Id.*, at ¶¶ 21-24.)  He was concerned that his

18  entire career would be derailed, and that he would no longer be able to provide for his family.

19  He lost sleep, and at times felt nauseous from worry about the lawsuit.  (*Id.*, at ¶ 24.)  He was

20  embarrassed to be seen in the local courthouse, which is in a small town where people gossip.

21  (*Id.*, at ¶ 26.)  And he came away from this process feeling that it was all done to strong arm him

22  into either settling with them, or paying money to fight them off – all for a dispute that he had

23  been raising for months.  (*Id.*, at ¶¶ 21, 27.)

24      **B.    Defendant Transworld and the NCSLT Accounts**

25      Mr. Lizarraga-Davis is not alone, but is one of many affected consumers by Defendant's

26  abusive collection tactics.

27

28

Defendant, through a nationwide attorney network, routinely initiates lawsuits against consumers in the name of various Delaware statutory trusts, known as the National Collegiate Student Loan Trusts ("NCSLTs"). (Request for Judicial Notice in Support of Defendant's Motion for Summary Judgment ("Def.'s RJN"), Ex. 1, at I. Overview, ¶ 4 .)[1] "The Trusts do not have any employees and all actions taken by the Trusts in connection with loan servicing and collecting Debt are carried out by third parties." (*Id.*, at ¶ 5.) All "[d]ebt-collection activities on behalf of the Trusts are carried out by the successor special servicer's sub-servicer…" (*Id*, at ¶ 6.) Defendant has been the sub-servicer since November 1, 2014, and is tasked with engaging a national network of law firms to file and prosecute collection lawsuits on behalf of the trusts. (*Id.*, at ¶¶ 11-12; *see also Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Tr. (NCSLT Litigation)*, 2018 U.S. Dist. LEXIS 179914, at *4-5 (D. Del. Oct. 19, 2018) (Defendant "is responsible for the collection of delinquent debts and oversight of collection lawsuits against borrowers.").

Since November 2014, the law firms hired by Defendant have filed approximately 40,000 such collection lawsuits. (Def.'s RJN, at ¶ 15.) Defendant initiates these lawsuits, even though it does not possess the documentation necessary to prove these cases. (*Id.*, at ¶¶ 25-27.) Further, in these cases, Defendant representatives routinely make false attestations about their knowledge of consumer's records and debts. (*Id.*, at ¶¶ 15-24.)

The Consumer Financial Protection Bureau (CFPB) has taken enforcement action against Defendant itself, as well as the NCSLT entities, for this precise conduct. (*See generally*, *id*.; *see also NCSLT Litigation*, 2018 U.S. Dist. LEXIS 179914.)[2] The CFPB specifically found, for

---

[1] Because discovery is not yet complete, many of this factual content comes from Defendant's tendered Ex. 1 in its Request for Judicial Notice.

[2] Defendant goes to great lengths to argue that this loan was not covered by the CFPB Consent Order, asserting that "[t]he only period covered by the Consent Order was from 'November 1, 2014 to April 25, 2016.'" (Def.'s MPA, at 3 (citing Def.'s RJN, Ex. 1, at ¶¶ 2, 15, m ("Relevant Period")).). But the terms of the Consent Order say otherwise. For example, its provisions apply to "all Collections Lawsuits that were filed between November 1, 2014 and the Effective Date," (*see* Def.'s RJN, Ex. 1, at ¶ 45.c,) which is defined as the entry date of the order, or September 18, 2017, (*see id.*, at ¶ 2.h.) Thus, the lawsuit against Plaintiff, which was pending as of summer 2017, is undoubtedly included within the scope of the Order. The term "Relevant Period," which

example, that Defendant engaged in unfair and deceptive conduct by regularly filing lawsuits without adequate documentation to prove ownership of their claims if contested. (Def.'s RJN, at ¶¶ 37-44.) At a minimum, these enforcement actions illustrate that Defendant is well aware of the unfair practices in which it engages.

## III.    LEGAL STANDARD

The well-known standard for summary judgment assigns the moving party the initial burden of identifying the portions of the record demonstrating an absence of a material fact, and explaining why it is entitled to judgment on those facts as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also* Fed. R. Civ. P. 56(a). "The deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party." *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017). Further, when a summary judgment motion is filed early in a case, it is usually preferable to allow additional summary judgment than to grant the motion. *See Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Ft. Peck Reservation*, 323 F.3d 767, 773-74 (9th Cir. 2003); *Finley v. Dynamic Recovery Sols. LLC*, 2015 U.S. Dist. LEXIS 77999, at *3-5 (N.D. Cal. June 15, 2015).

## IV.    ARGUMENT

Defendant's summary judgment motion should be denied in its entirety. It specifically attacks two elements of Plaintiff's FDCPA claim, arguing that it is not a "debt collector" and that it did not violate the FDCPA. But Defendant's own exhibits raise many factual questions on these two elements – questions that its legal arguments largely overlook or misapply. Further, in the unlikely event any of Defendant's arguments have some merit, some additional discovery remains appropriate.

### A.    Defendant's Own Exhibits Raise Genuine Issues of Material Fact Regarding Its "Debt Collector" Status.

The primary weakness in Defendant's motion is its reliance on a red herring issue. Specifically, in Defendant's view, it cannot be a "debt collector" under the FDCPA because

---

Defendant cites, appears to refer to an entirely different timeframe, probably the time period of the investigation. (*See e.g.*, *id.*, at ¶ 25.)

Plaintiff's loan was not in default when it was transferred to NCSLT. That may or may not be true – although, as explained below, it appears to be false.

But even if it were true, it does not warrant summary judgment. As Defendant concedes, a "servicer" is still a "debt collector" if it began servicing a debt after default.

### 1. Defendant Does Not Address Whether It Is A Debt Collector For Its Post-Default Servicing Activity.

It is well-established that the ultimate question to determine whether a servicer is a "debt collector" is not simply *whether* Defendant is a servicer, but *when* it became a servicer. As succinctly described by the Sixth Circuit, a "loan servicer [] can either stand in the shoes of a creditor or become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred." *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012) (citing *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 106-8 (6th Cir. 1996) and *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985)); *see also* 15 U.S.C. § 1692a(6)(F)(iii); *Reed v. Select Portfolio Servicing, Inc.*, 2017 U.S. Dist. LEXIS 21763, at *10 (E.D. Tenn. Feb. 16, 2017) (servicer who received servicing rights after default was a "debt collector"). This concept is so fundamental that even Defendant's own authorities recognize it. *See e.g.*, *Brenner v. Am. Educ. Servs.*, 2014 U.S. Dist. LEXIS 2067, at *5 (E.D. Mo. Jan. 8, 2014) (AES not debt collector because it "began servicing the loans prior to any delinquency or default"); *Weber v. Great Lakes Educ. Loan Servs.*, 2014 U.S. Dist. LEXIS 59064, at *14 (W.D. Wis. Apr. 29, 2014) ("to determine whether Great Lakes is a debt collector, the court must determine: (1) the date it "obtained" Weber's loan; and (2) the date Weber defaulted").

Defendant's brief is a moving target on this point of law – at times overlooking this concept entirely, and at other times conceding it. For example, at multiple points Defendant makes the unsupported leap that simply because "Defendant was acting in its capacity as 'the loan servicer,'" that "Defendant is not a 'debt collector' under the statute." (Def.'s MPA, at 7; *see also id.*, at 9 ("Plaintiff's FDCPA claim fails as a matter of law because, as Plaintiff admits, Defendant is the servicer for the NCSLT 2006-4, and is therefore not a 'debt collector.'").) Not

only is this argument undercut by the above authority, but elsewhere Defendant even concedes that a loan servicer actually can be a "debt collector" when faced with "'an allegation that plaintiff's loan was in default' when the defendant began servicing" it.  (Def.'s MPA, at 8.) Although Defendant ignores it, such an allegation is at issue here.  (*See* FAC, at ¶ 46.)

From a factual perspective, Defendant's evidence tiptoes around these two crucial issues: the date it obtained the loan, and the date of Plaintiff's default.  Although Defendant makes repeated claims that the loan was not in default in 2006, it never provides the Court or Plaintiff with any clear information as to when it believes the loan actually did go into default.  Nor does it clearly explain when it began servicing the loan.  Its failure to provide these facts when it own authority requires them is remarkable.

Defendant's own submitted evidence does, however, raise factual questions regarding these dates.  For example, Mr. Luke refers to the "prior servicer, AES," who apparently serviced the loan as early as 2010.  (Declaration of Bradley Luke ("Luke Decl."), ¶¶ 17-18.)  Although the Luke Declaration is far from precise on this point, it also sounds like AES was still the servicer "when the last payment posted on February 13, 2015."  (*See id*., ¶ 19 (ostensibly referring to some AES servicing records that do not actually appear in Exhibit 7, as cited).)  Defendant also produces Exhibit 15, which while not authenticated, appears to be the records of another servicer – presumably Defendant – that start March 31, 2015, apparently after the last payment and default occurred.  (*See id*., Ex. 15.)   Yet another exhibit purports to show certain servicing activity on AES's records, and is dated at the top as September 14, 2016 – raising even further questions as to when exactly the transfer took place.  (*Id*., Ex. 5.)  But whenever the transfer from AES to Defendant was, it appears to have been after February 2015 – after the loan was apparently already in default.

The probable transfer of the loan from AES to Defendant after the "last payment posted on February 13, 2015" is also consistent with every publicly available description of Defendant's role in the NCSLT accounts.  *See e.g*., *NCSLT Litigation*, *supra*, 2018 U.S. Dist. LEXIS 179914, at *4-5 (Defendant "is one of the Trusts' Sub-servicers and is responsible for the collection of

delinquent debts and oversight of collection lawsuits against borrowers"). Other cases have also either found Defendant to be a debt collector under the FDCPA, or Defendant did not challenge its applicability. *See Taymuree v. Nat'l Collegiate Student Loan Tr. 2007-2*, 2017 U.S. Dist. LEXIS 35824 (N.D. Cal. Mar. 13, 2017); *see also Hoffman v. Transworld Sys*., 2018 U.S. Dist. LEXIS 188158, at *18-20 (W.D. Wash. Nov. 2, 2018).

At the end of the day, Defendant's motion should be denied because it has not shown that it is excluded from the definition of "debt collector."

### 2. The Loan Was Already In Default When It Was Purportedly Transferred to NCSLT 2006-4.

Even putting aside the above fatal flaw in Defendant's motion, its primary argument fails on its own. Defendant's own evidence indicates that the loan may have been in default as far back as 2006.

In order to determine whether a debt is in "default," courts look to "any underlying contracts and applicable law governing the debt at issue." *De Dios v. Int'l Realty & RC Invs*., 641 F.3d 1071, 1074 (9th Cir. 2011). Here, the contract quite simply defines default as "fail[ing] to make any monthly payment [] when due." (Luke Decl., Ex. 1, at p. 3, ¶ I.) Thus, in order to determine "default," one must resort to the loan's payment schedules and records.

According to the payment schedule that Defendant provided, the following payments were due in the beginning five months of the loan:

- $203.51 on July 26, 2006;
- $203.51 on August 26, 2006;
- $200.72 on September 25, 2006;
- $241.53 on October 25, 2006; and
- $241.53 on November 25, 2006.

(Luke Decl., Ex. 2.) According to Mr. Luke, the loan was then transferred to NCSLT on December 7, 2006 – after the November 2006 installment came due. (*See* Luke Decl., ¶ 15.)

This payment schedule provides two important lessons. First, the crux of Defendant's argument lacks *any* factual basis. In Defendant's view, it was not possible for this loan to be in default at the time of its transfer to NCSLT because no payments had become due at the time of

transfer.  Defendant makes this point multiple times.  (*See* Luke Decl., ¶ 15; Def.'s MPA, at 4, 5 ("Plaintiff's loan was transferred… prior to any payment becoming due."), 7 (loan transferred "before any were due").)  But even a cursory glance at Defendant's own documents shows that by the time of the alleged December 7, 2006, transfer, *five* payments had already come due – totaling $1,090.80.  For Defendant to repeatedly insist that no payments were due at that time is outright false.

Second, this deficiency is even more glaring when it is lined up against the loan repayment schedule.  Defendant produces Exhibit 14, which appears to be a payment history on the loan, but is not authenticated.  Assuming the document to be the payment history, it shows that no payment is recorded for the initial July 26, 2006, installment.  Instead, the first payment appears to have been posted August 11, 2006.  Thus, already by the time of the first payment, the loan was in default because there was an apparent "fail[ure] to make any monthly payment []  when due."  Nor were these payments fully caught up by the time the loan was purportedly transferred to NCSLT, as the total payments through that time total only $1,079.33 – just shy of the amount required to become current at the time of the transfer December 7, 2006, transfer.

According to the contract, default is a black or white issue.  Either the payments are made "when due" or they are not.  Here, they clearly were not.  That payment history is sufficient for the loan to be in "default" for FDCPA purposes.  *See Natividad v. Wells Fargo Bank, N.A.*, 2013 U.S. Dist. LEXIS 74067, at *12-14 (N.D. Cal. May 24, 2013) (depending on the circumstances defining default, "mere overdue payments may constitute a debt that is 'in default'").

Defendant is not entitled to summary judgment because it is likely is a "debt collector" in at least two ways.  Not only was the loan in default when Defendant began servicing it (a legal point ignored by Defendant), but it was apparently in default even when it was initially assigned to NCSLT (a factual point that Defendant has wrong).

//

//

//

**B.     There Are Issues Of Material Fact Regarding Defendant's FDCPA Violations.**

After focusing on its status as a "debt collector," Defendant makes a perfunctory argument that it did not violate the FDCPA. But there are still quite a few material facts on that issue, and potentially even more as discovery progresses.

**1.     Defendant's Evidence Raises Factual Issues Concerning The Sufficiency Of Its Documentation.**

Defendant's primary line of attack on Plaintiff's FDCPA allegations appears to be its factual assertion that it has "complete documentation" proving the ownership of NCSLT 2006-4. (*See* Def.'s MPA, at 5.) But even after nearly two years of disputes, these documents are still deficient.

As a threshold matter, it is important to explain what is necessary to prove ownership of a debt. This requirement goes back to the fundamental rule that a legal "action must be prosecuted in the name of the real party in interest." *Don Rose Oil Co. v. Lindsley*, 160 Cal.App.3d 752, 759 (1984). Under California law, any assignment of such a claim "must describe the subject matter of the assignment with sufficient particularity to identify the rights assigned." *Mission Valley E., Inc. v. Cty. of Kern*, 120 Cal.App.3d 89, 97 (1981). "[T]he measure of sufficiency requires that the evidence of assignment be clear and positive to protect an obligor from any further claim by the primary obligee." *Cockerell v. Title Ins. & Tr. Co.*, 42 Cal.2d 284, 292 (1954).

Such a showing requires proof that the specific obligation at issue was intended to be assigned. *See Mission Valley East*, 120 Cal.App.3d at 96-97 ("Proof of the intent to assign must be 'clear and positive' [and] describe the subject matter of the assignment with sufficient particularity to identify the rights assigned."); *see also Cobb v. San Francisco Residential Rent Stabilization & Arbitration Bd.*, 98 Cal.App.4th 345, 352 (2002). Finally, a valid assignment also requires proof that the individuals who allegedly assigned the account were actually authorized to do so. *Brown v. Ball*, 123 Cal.App. 758, 765-66 (1932) (refusing to recognize a "resumption of... due execution and the authority of the person purporting to have executed" certain assignments); *see also Cockerell*, 42 Cal.2d at 292 (party claiming to be an assignee must

not only prove that an assignment occurred, but that the signature of the assignor was by an authorized party).  The ultimate "burden of proving an assignment falls upon the party asserting [those] rights." *Cockerell*, 42 Cal.2d at 292.

Applying these standards, the two main documents produced by Defendant fall far short of proving NCSLT 2006-4's ownership of this account.

1)  **Defendant's Exhibit 3 (the purported assignment from GMAC Bank to The National Collegiate Funding LLC):**  It is first important that this document is incomplete, as it is only select pages that "form[] a part of that certain Note Purchase Agreement."  The rest of that agreement, which often contains terms and other important limits on an assignment, is missing.[3]  Second, even just looking at the terms on this specific document, it is clear the document only includes those loans "described in the attached Schedule 1."  Of course, there is no attached Schedule 1, which breaks this purported chain of assignment.  Nor is Plaintiff's specific loan referenced anywhere else in this agreement.  The only specific reference to Plaintiff comes in a page attached to the end of the exhibit that apparently comes from a different source. Notably, past productions of this exhibit, such as the exhibit attached to the state court complaint, have not included this page.  (*See e.g.*, Lizarraga-Davis Decl., at Ex. 1, 3, 5.)  That raises the question of whether this page truly forms part of Exhibit 3, and if indeed it does, when did Defendant obtain it?  But without Schedule 1, or the rest of this document, it is impossible to tell what specific rights and what specific accounts were transferred from GMAC Bank.  This is hardly the "clear and positive" proof required to show assignment. *See Mission Valley East*, 120 Cal.App.3d at 96-97.

2)  **Defendant's Exhibit 4 (the purported assignment from The National Collegiate Funding LLC to NCSLT 2006-4):**  This document has its own deficiencies.  First, the document also fails to identify Plaintiff's loan.  The closest pass is in Schedule A, when it refers to "loans that were originated under GMAC Bank's Alternative Loan Program."  But it is

---

[3] Many of the terms in this document hinge on language from the rest of the agreement.  For example, "[t]he Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement

not at all clear that Plaintiff's loan is part of "GMAC Bank's Alternative Loan Program."

Second, it is also noteworthy that this document, which purports to assign assets from The

National Collegiate Funding LLC to NCSLT 2006-4 bears no actual signature, and contains only

typewritten signatures of GATE Holdings, Inc., and Wilmington Trust Company.  The

agreement says nothing about the validity of typewritten signatures, and nothing about the

authority of, for example, GATE Holdings, Inc., to enter the agreement.  This document raises

questions about the authority of those signing it, see *Cockerell*, 42 Cal.2d at 292, as well as the

specificity needed to identify Plaintiff's loan as forming part of the assignment, *see Mission*

*Valley East*, 120 Cal.App.3d at 96-97.

Attempting to argue that these documents were sufficient to sue Plaintiff in California,

Defendant cites an Ohio case.  (*See* Def.'s MPA, at 6 (citing *Nat'l Collegiate Student Loan Trust*

*2005-3 v. Dunlap*, 2018-Ohio-2701 (2018).)  But *Dunlap* does not further Defendant's cause.

Not only is it unclear what lessons one could draw from Ohio to California, but there may have

simply been better documentation in that case.  For example, the Court explains that "Schedule 1

of the pool supplement" was produced – something missing here.  (*Id*., at P21.)  It is also not

unimportant that the debtor in that case was *pro se*.  Ownership of a loan can be a tricky issue to

unravel, and it not surprising that, with tens of thousands of lawsuits, Defendant may have a few

examples of success with litigants, especially *pro se* ones.  But those outliers say nothing about

its practices more generally, or even here.

These problems with Defendant's chain of ownership are hardly a technicality or trivial

matter (or "specious," as Defendant explains).  If NCSLT 2006-4 happened to obtain a judgment

against Plaintiff, and he was later sued by GMAC Bank, or even another NCSLT entity, or any

other collector whatsoever, he would have no defense.  He certainly would not be able to rely on

Defendant's Exhibits 3 and 4 to show that the account had actually been transferred to NCSLT

2006-4.  The ability to prove ownership is thus crucial if a debt collector is going to commence

litigation against a consumer.  The widespread inability of debt collectors to establish the most

basic proof of ownership has been the subject of enforcement by the Federal Trade

Commission,[4] and has even prompted California to enact the greater protections of the Fair Debt Buying Practices Act, Stats. 2013 c. 64 (S.B. 233). Here, Defendant's inability to meet these standards has even been targeted by the CFPB.

Defendant's documents are therefore far from the "complete" proof of ownership Defendant portrays, and they certainly do not merit summary judgment in Defendant's favor at this stage. Some of the pages – if authentic – even raise questions about when Defendant received the documents.

### 2. Defendant Has Not Shown That It Is Entitled To Judgment On The Merits Of The FDCPA Claim As Matter Of Law.

Defendant's argument that it is entitled to summary judgment on the merits of the FDCPA is misguided. First, these FDCPA claims are valid as a matter of law. *See Hoffman*, 2018 U.S. Dist. LEXIS 188158, at *20-22 (this precise conduct was covered under the FDCPA against this same defendant). And Defendant has not even negated all of the potential ways it may have violated the FDCPA. Further, no discovery has been completed by either party to fully flesh out this issue.

"The FDCPA comprehensively regulates the conduct of debt collectors, and is a strict liability statute." *Tourgeman v. Collins Fin. Servs.*, 755 F.3d 1109, 1119 (9th Cir. 2014), superseded on other grounds in *Tourgeman v. Nelson & Kennard*, 735 F. App'x 340 (9th Cir. 2018). In enacting the FDCPA, Congress expressly aimed "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). These practices were of great concern to Congress because they "contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. § 1692(a).

To accomplish its goal, Congress equipped consumers with broad protections, including full bans on "false, deceptive, or misleading representation[s] or mean[s] in connection with the collection of any debt," as well as the "use [of] unfair or unconscionable means to collect or

---

[4] *See* Federal Trade Commission, *The Structure and Practices of the Debt Buying Industry*, Jan. 2013, available at https://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf (last visited Feb. 1, 2019).

attempt to collect any debt." 15 U.S.C. §§ 1692e, 1692f. The statute even includes a list of non-exhaustive sampling of acts that constitute such violations. *See id*; *see also Tourgeman*, 755 F.3d at 1119 (9th Cir. 2014) (noting the non-exhaustive nature of the subsections). Not surprisingly, these provisions are to be construed liberally in favor of the consumer. *Lyons v. Michael & Assocs*., 824 F.3d 1169, 1172 (9th Cir. 2016).

The operative complaint broadly alleges Defendant violated the FDCPA, and gives three potential (but expressly non-exhaustive) examples of legal theories that could support that cause of action. (*See* FAC, ¶ 48.)[5] It may develop, for example, that Defendant's conduct is most closely aligned to the general ban on unfair practices at 15 U.S.C. § 1692f. It is simply too early to say. But the facts of this case are so reflective of the abusive practices of which Defendant has a well-documented history, that they deserve further development. *See Hoffman*, 2018 U.S. Dist. LEXIS 188158, at *20-22 (Defendant's conduct could be covered under Sections 1692e(2)(A), (10), and 1692f).

Moreover, Defendant's motion does little to further its argument that its conduct was not unfair and deceptive under the FDCPA as a matter of law. It does not even directly address one of the potential legal theories Plaintiff cited in his complaint, 15 U.S.C. § 1692e(2). It attempts to escape liability on the basis that the state-court lawsuit was filed by a "California law firm," and that there is no allegation "any collection activity by Defendant." (Def.'s MPA, at 9.) But not only is Defendant is responsible for its attorneys actions, *see Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1516 (9th Cir. 1994), it is also liable for its "indirect" debt collection activity, *see* 15 U.S.C. § 1692a(6). And litigation is a quintessential debt collection activity. It is thus completely irrelevant if its debt collection activity was conducted through a law firm.

This "indirect" collection activity easily fits the least sophisticated consumer standard. *See Tourgeman*, 755 F.3d at 1119. A falsehood meets this standard if it "may frustrate a consumer's ability to intelligently choose his or her response." *Id* (quoting *Donohue v. Quick*

---

[5] A plaintiff is not required to plead legal theories. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 346-47 (2014) (per curiam); *see also Albert v. Carovano*, 851 F.2d 561, 571, n.3 (2d Cir. 1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.").

*Collect, Inc.*, 592 F.3d 1027, 1034 (9th Cir. 2010).  Here, the lack of a proper chain of ownership prevented Plaintiff from "intelligently choos[ing]" whether to try to settle the claim or not.  (*See* Lizarraga-Davis Decl., at ¶ 4.)

Finally, this case presents far more than a "common evidentiary challenge," as characterized by Defendant.  (Def.'s MPA, at 9 (citing *Delisi v. Midland Funding, LLC*, 2015 U.S. Dist. LEXIS 92441 (E.D. Mo. July 16, 2015).)  Even the *Delisi* Court, which did not concern a widespread business practice, recognized that some courts find FDCPA liability on the basis that "if there is no actual intent to prosecute the case, the filing of the debt collection suit amounts to a misrepresentation that the intent exists."  *Id.*, at *17.  Indeed, many cases find FDCPA violations in similar circumstances.  *See Freyermuth v. Credit Bureau Services, Inc.*, 248 F.3d 767, 771 (8th Cir. 2001)  (filing a lawsuit on a time-barred debt violates FDCPA); *Hoffman v. Transworld Sys.*, at *20-22; *Kuria v. Palisades Acquisition XVI, L.L.C.*, 752 F. Supp. 2d 1293 (N.D. Ga. 2010) (Consumer stated FDCPA claim based on allegations that the defendant's collection suit was part "of a pattern and practice of abusive, scattershot litigation to collect debts" where debt buyer lacked knowledge of, or intent to verify, the debt's validity).

Add these deficiencies in Defendant's argument to the other potential ways this conduct causes FDCPA liability, such as Section 1692f, and it is clear that Defendant is not entitled to judgment as a matter of law on the case – and especially not at this stage.

### C.    At A Minimum, The Court Should Allow Additional Discovery Before Granting Any Part Of The Summary Judgment Motion.

As the above points show, Defendant's motion for summary judgment fails on its own accord, and should be denied outright.  In the unlikely event the Court finds otherwise, then, at a minimum, it should allow additional time for discovery before granting any aspect of the motion pursuant to Fed. R. Civ. P. 56(d); *see* Declaration of J. Erik Heath ("Heath Decl."), ¶ 8.)

When a summary judgment motion is filed early in the case, Ninth Circuit policy prefers to allow the parties to conduct additional discovery rather than granting summary judgment on

an incomplete record.  *See Burlington N. Santa Fe*, 323 F.3d at 773-74; *Finley*, 2015 U.S. Dist.

LEXIS 77999, at *3-5 (denying early summary judgment in FDCPA case).

Here, there are many questions that would be aided by discovery.  For example, given the

issues Defendant raises, it is important to know more information about when the loan went into

default, and when Defendant acquired the servicing rights to it.  Plaintiff also expects to conduct

discovery on (a) what documentation Defendant has, and has ever received, concerning this debt,

and when; (b) what Defendant's procedures are in reviewing that documentation; (c) any

changes in those procedures since the CFPB Consent Order; (d) the extent of Defendant's review

of this specific account in response to the Consent Order; (e) any policies and procedures to

determine what accounts to send to litigation, as well as any guidelines to determine when to

cease litigation; (f) Defendant's intent to follow-through with contested litigation; and (g)

statistics of Defendant's litigation tactics.  In the event that the Court finds that Defendant has

satisfied its initial burden, then these facts would be essential to Plaintiff's opposition.  (*See*

Heath Decl., ¶ 8.)  At the time of this motion, no responses have been received (or become due)

to the initial set of discovery propounded by Plaintiff on January 17, 2019.  (*Id.*, at 3-5, 7.)

## V.   EVIDENTIARY OBJECTIONS PER L.R. 7-3(c)

### A.   Objection No. 1

Plaintiff objects to Exhibits 9 through 15, attached to the Declaration of Bradley Luke.

**Grounds:** Lacks authentication and foundation.  Fed. R. Evid. 901(a).  These numbered

exhibits are not authenticated by any witness.  Even Bradley Luke's declaration stops at Exhibit

8.  (*See* Luke Decl., at ¶ 20.)

### B.   Objection No. 2

Plaintiff objects to Exhibits 6 through 12, attached to the Declaration of Bradley Luke.

**Grounds:** Inadmissible duplicates and rule of completeness.  Fed. R. Evid. 106, 1003.

These copies contain content that has clearly been distorted.  Each of these exhibits has portions

that are blocked out by the appearance of seemingly random characters in different fonts, sizes,

and typeface.  For example, whole pages of Exhibit 8 are blocked out by this distortion.  These

distortions are so bad as to render the exhibits useless.  Even the few portions of the exhibits that are legible are inadmissible by the rule of completeness.

### C.    Objection No. 3

Plaintiff objects to Exhibits 6 through 8, attached to the Declaration of Bradley Luke.

**Grounds:** Lacks authentication and foundation.  Fed. R. Evid. 901(a).  These exhibits do not appear to be the exhibits to which Mr. Luke testifies.  First, Mr. Luke identifies Exhibit 6 as a letter from AES to Plaintiff on February 27, 2010.  But Exhibit 6 – which has been distorted – does not appear to be such a letter, and in fact apparently bears a date stamp of 2008.  Mr. Luke also identifies Exhibit 7 as a copy of AES servicing records, including the Loan Financial History.  Again, Exhibit 7 does not appear to be such records, and is instead identified as a form labeled "Detrirydant Option Firm [sic]."  Finally, Exhibit 8 does not appear to be a copy of "Plaintiff's post-default Loan Payment History Report," and is instead a jumbled collection of pages that may be some kind of borrower form.

### D.    Objection No. 4

Plaintiff objects to Exhibit 3, attached to the Declaration of Bradley Luke.

**Grounds:** Rule of completeness.  Fed. R. Evid. 106.  This exhibit is a selection of pages from a much larger document that has not been made available to Plaintiff.  As the document describes, the pages "form[] a part of that certain Note Purchase Agreement… dated as of May 30, 2003."  Many terms in these pages refer to specific parts of the rest of the document, such as Paragraph 3.01 ("The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement.").

### E.    Objection No. 5

Plaintiff objects to page 6 of Exhibit 2, page attached to the Declaration of Bradley Luke.

**Grounds:** Lacks authentication and foundation.  Fed. R. Evid. 106.  This page is not a part of the document that forms the rest of the exhibit.  For example, when Defendant attached the document "2006-4 Pool Supplement" to its correspondence with Plaintiff and the Court, it

did not include this page.  (See Lizarraga-Davis Decl., at Ex. 1, 2, 5.)  Further, the page appears to be from a different source, and is not referenced by name in the pages that precede it.

**VI.      CONCLUSION**

      For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.


Dated: <u>February 1, 2019</u>               J. ERIK HEATH, ATTORNEY AT LAW

                                                  */s/ Jon Erik Heath*
                                                  J. Erik Heath
                                                  Attorney for Plaintiff
                                                OSKAR LIZARRAGA-DAVIS