James K. Schultz, Esq. (SBN 309945)
Debbie P. Kirkpatrick, Esq. (SBN 207112)
SESSIONS, ISRAEL & SHARTLE, L.L.P.
1550 Hotel Circle South, Suite 260
San Diego, CA  92108-3426
Tel:   619/758-1891
Fax:   877/334-0661
jschultz@sessions.legal
dkirkpatrick@sessions.legal

*Attorneys for Defendant Transworld Systems Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSKAR LIZARRAGA-DAVIS, | Case No.   5:18-cv-04081-NC |
| Plaintiff, | DEFENDANT TRANSWORLD |
| | SYSTEMS INC.'S DECLARATION |
| vs. | IN SUPPORT OF RENEWED |
| | MOTION FOR SUMMARY |
| TRANSWORLD SYSTEMS, INC., | JUDGMENT |
| Defendant. | |

I, Bradley Luke, hereby declare:

1.     I am Director of Operations for Transworld Systems Inc. ("TSI"), a servicer for National Collegiate Student Loan Trust 2006-4 ("NCSLT"). Specifically, TSI is the post-default Subservicer for NCSLT regarding the student loan forming the subject matter of this action filed by plaintiff, Oskar Lizarraga-Davis ("Plaintiff").

2.     TSI is currently under contract as the Subservicer for NCSLT by U.S.

Bank, National Association ("U.S. Bank"), the Special Servicer for NCSLT.[1] Attached as **Exhibit 1** to this Declaration is a true and correct copy of the notification from U.S. Bank confirming TSI's role and capacity as Subservicer for NCSLT. As Subservicer, TSI is the Custodian of Records for NCSLT.

3.      I am over the age of 18 and competent to testify to the matters stated herein. I have been employed by TSI since November 2014. From January 2010 until November 2014, I was employed by NCO Financial Systems, Inc. ("NCO"), which, for purposes of servicing NCSLT, became TSI in November 2014. In my role as Director of Operations, and for the majority of my employment with both NCO and my entire employment with TSI, I have worked directly on the servicing of loans owed to NCSLT. Accordingly, I am familiar with the NCSLT business records and related maintenance thereof. I am duly authorized to make the representations contained in this Declaration for and on behalf of both TSI and NCSLT.

4.      My statements herein are based on personal knowledge of the educational loans owned by NCSLT, including Plaintiff's loan, which I obtained

---

[1] National Collegiate Student Loan Trust 2006-4 was part of a structured loan program (discussed below) which ultimately consisted of multiple separate, but functionally identical, trusts. TSI is the post-default Subservicer and dedicated record custodian for 15 of those trusts, which are: National Collegiate Master Student Loan Trust I, National Collegiate Student Loan Trust 2003-1, National Collegiate Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2, National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-2, National Collegiate Student Loan Trust 2006-3, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-1, National Collegiate Student Loan Trust 2007-2, National Collegiate Student Loan Trust 2007-3, and National Collegiate Student Loan Trust 2007-4.

through my training, experience, investigation and review of the business records that are kept and maintained by TSI as records custodian for NCSLT. My statements herein are also based on my understanding of the structured loan program by which Plaintiff's loan was originated, funded, documented and ultimately sold to NCSLT.[2]

5.      The records I reviewed and relied upon in giving this Declaration, including the business records attached as exhibits, consist of electronically stored documents and electronic data that is within TSI's care, custody or control.  These business records include electronic data that prior servicers of the educational loans were contractually required to, and did, provide to TSI.

6.      As a loan servicer and Custodian of Records for NCSLT, TSI maintains the dedicated system of records pertaining to NCSLT student loans subject to TSI's administration on NCSLT's behalf, which records include documents pertaining to the Plaintiff's loan origination and NCSLT's purchase and acquisition of the loan.  These records include, but are not necessarily limited to, student loan agreements, terms, loan origination and assignment documents, and electronic records of transactions pertaining to the loan, including disbursements, payments, credits, deferments, interest accrual, collections, and any other transactions impacting the loan that occurred at any time, including such transactions that occurred before TSI began servicing the loan and afterwards.

7.      American Education Services ("AES") was the pre-default servicer of Plaintiff's loan.  AES began servicing the loan when the loan was disbursed until it

---

[2] The structured loan program is discussed at ¶¶ 14-24.

was charged-off on March 2, 2015. Upon charge-off, TSI began servicing Plaintiff's loan. TSI (and NCO before it) works collaboratively with AES to ensure a smooth transition of servicing NCSLT loans, including Plaintiff's loan, from pre-charge off to post-charge off. Accordingly, I have real-time access to, training, experience using, and personal knowledge of the system of record utilized by AES to enter, maintain and access loan records during its role as servicer.

8.     Upon charge-off, the records relating to Plaintiff's loan were transmitted to TSI. It is TSI's regularly conducted business practice to incorporate prior servicers' loan records into the system of record TSI maintains on NCSLT's behalf when TSI begins servicing. I am familiar with the process by which TSI receives access to and/or copies of loan records from NCSLT's prior servicer and incorporates those records into TSI's system of record.

9.     These records, including those referenced below and attached as exhibits to this Declaration, were created, compiled and recorded as part of regularly conducted business activity at or near the time of the event and from information transmitted from a person with personal knowledge of said event and a business duty to report it, or from information transmitted by a person with personal knowledge of the accounts or events described within the business record. Such records are created, kept, maintained, and relied upon in the course of the ordinary and regularly conducted business activity of NCSLT and TSI as servicer and Custodian of Records for NCSLT.

10.     NCSLT has no employees and relies instead on its pre-default servicer and post-default servicer to maintain its records and on various third-party debt

collectors and collection firms to collect on its loans.

**Plaintiff's NCSLT 2006-4 Student Loan**

11.   On June 10, 2006, Plaintiff executed a "Loan Request/Credit Agreement" with GMAC Bank, N.A. in order to fund his undergraduate enrollment at the University of California-Davis ("UC-Davis"), during the academic period from May 2006 through December 2006, in the amount of $25,000.

12.   The loan is subject to the terms and conditions affixed to the Credit Agreement. The first paragraph on page 1 of the terms and conditions states, "The words "you", "your", "yours", and "Lender" mean GMAC Bank, its successors and assigns, and any other holder of this Credit Agreement." On page 3, ¶ L(4) Plaintiff agrees to the term that his lender "may assign this Credit Agreement at any time." The loan program is identified as GMAC Bank's Undergraduate Alternative Loan Program. *See* page 1 and page 3, ¶ C(3)(a). Attached as **Exhibit 2** to this Declaration is a true and correct copy of the Credit Agreement signed by Plaintiff.

13.   The Credit Agreement includes certain information and terms specific to Plaintiff and the loan: his name, contact information, social security number (ending in -4043), and date of birth; the "Loan Amount Requested" ($25,000.00); a 4.75% deferral and repayment period margin; and the 5.00% loan origination fee. *See* Exhibit 2, page 1.

14.   On June 26, 2006, the student loan was approved and $25,000.00 in student loan funds were disbursed exclusively for the purposes of Plaintiff's enrollment at UC-Davis. This is confirmed in the Note Disclosure Statement. *See* Exhibit 2, page 2, ¶ B(2)

("If you approve this request and agree to make this loan, you will notify me in writing and provide me with a Disclosure Statement…at the time the Loan proceeds are disbursed."). Like the Credit Agreement, the Note Disclosure Statement contains information specific to Plaintiff and the loan: his name, the "Total Amount Financed" ($25,000.00), and the "Principal Amount of the Note," *i.e.*, the Amount Financed plus the Origination Fee ($26,315.79). The Credit Agreement (Exhibit 2) is identified on the Note Disclosure Statement as "Loan Note disbursed on June 26, 2006" And further confirmed by the Loan No. 03826471 on the top left of the Note disclosure Statement and bottom of the Credit Agreement. None of the loan proceeds were returned or refunded. Attached as **Exhibit 3** to this Declaration is a true and correct copy of the Note Disclosure Statement. Exhibits 2 and 3 were made in the regular course of a business and prepared by NCSLT's Program Lender, GMAC Bank, N.A., and are now kept in the ordinary course of business within the NCSLT's loan servicing system maintained by TSI.

**Plaintiff's Loan Was Sold and Assigned to NCSLT 2006-4**

15.     The Loan was made pursuant to a structured loan program ("Loan Program") whereby it was previously agreed that GMAC Bank would sell loans to a "Purchaser Trust" formed for the purpose of purchasing the loans. A true and correct copy of the related Note Purchase Agreement as filed with the Securities and Exchange Commission ("SEC") is attached hereto as **Exhibit 4**. The sales of GMAC Bank loans were to be memorialized by a "Pool Supplement," which would include a Schedule of "GMAC Bank Conforming Loans." *Id*. at § 2.03.

16.     On December 7, 2006, Plaintiff's student loan was transferred, sold,

and assigned to NCSLT for valuable consideration, in the regular course of the Loan Program.  The student loan was in good standing and not in default on December 7, 2006, when it was transferred, sold and assigned to NCSLT, as Plaintiff was still enrolled at UC-Davis and the student loan had not yet become due.

17.     Pursuant to the Loan Program, the sale and assignment of Plaintiff's student loan to NCSLT was effectuated through two near-simultaneous transfers (hereinafter and respectively, "Part 1" and "Part 2").

18.     In Part 1, GMAC Bank, the Program Lender, sold and assigned the loan to an intermediary "Depositor," The National Collegiate Funding, LLC ("Funding"), as part of a bundled sale of loans pursuant to a Pool Supplement, dated December 7, 2006, and associated Schedule, true and correct copies of which are kept in the ordinary course of business within the loan servicing system maintained by TSI and which are attached hereto as **Exhibit 5**.

19.     Article 1 of the Pool Supplement states, in pertinent part:

> In consideration of the Minimum Purchase Price set forth below, the Program Lender [*i.e.*, GMAC Bank] hereby transfers, sells, sets over and assigns to The National Collegiate Funding, LLC (the "Depositor") . . . each GMAC Bank Conforming Loan described in the attached Schedule 1 (the "Transferred GMAC Bank Loans") . . . . The Depositor in turn will sell the Transferred GMAC Bank Loans to The National Collegiate Student Loan Trust 2006-4 (the "Trust").  The Program Lender [*i.e.*, GMAC Bank] hereby transfers and delivers to the Depositor each GMAC Bank Note evidencing such GMAC Bank Conforming Loan and all Origination Records relating thereto[.]

*See* Exhibit 5, p. 1, Art. 1: Purchase and Sale.

20.    Plaintiff's loan is included on the electronic schedule ("Schedule") referred to in the above-quoted language from the Pool Supplement, which shows all the Transferred GMAC Bank Loans.  The last page of Exhibit 5 is an excerpt of the Schedule showing that Plaintiff's loan is included in the pool.[3]  The information in the Schedule excerpt mirrors the identifying information in the Credit Agreement and the Note Disclosure Statement.  *See* Exhibit 5 (last page).  For example:

a.    Plaintiff's Social Security Number (-4043) in the Credit Agreement matches the "BSSN" detail in the Schedule;

b.    The Lender name (GMAC Bank) in the Credit Agreement and Note Disclosure Statement matches the "Lender" detail in the Schedule;

c.    The "GUARREF" is identified as 03826471 which is the Loan No. identified on the Credit Agreement and Note Disclosure Statement;

d.    The principal amount of the note, *i.e.*, the amount of the loan plus origination fee ($26,315.79) in the Note Disclosure Statement matches "Total Gross Disbursed" in the Schedule;

e.    The deferral and repayment period margin in the Credit Agreement of 4.75% matches the "Margin" detail in the Schedule (0.0475).

---

[3] The full Schedule includes sensitive consumer information and social security numbers relating to other borrowers and loans that are not relevant to the present lawsuit.  The attachment as part of Exhibit 5 includes two copies of the excerpt.  The first is from the raw printout of the Schedule where the subject Loan is listed.  All information from all other Transferred Loans is redacted.  The pages not included would, accordingly, be completely redacted.  The second is the exact same information concerning Plaintiff's loan, but isolated and in a larger, more readable print.  NCSLT is willing to submit the full Schedule to the Court for *in camera* review if necessary.

The Schedule confirms Plaintiff's loan was included in the sale and assignment of pooled loans from GMAC Bank to Funding. Plaintiff's Credit Agreement and Note Disclosure Statement were records made a part of the transfer per the terms of the Pool Supplement.

21. In Part 2 of the assignment, Funding sold and assigned the "Transferred Loans" referred to in the Pool Supplement, including Plaintiff's loan, to NCSLT, through the parties' Deposit and Sale Agreement, which is also dated December 7, 2006. A true and correct copy of the Deposit and Sale Agreement, which is kept in the ordinary course of business within the loan servicing system maintained by TSI, is attached hereto as **Exhibit 6**.

22. In particular, the sale and assignment of the Plaintiff's loan to NCSLT is set forth in Articles 1 (Terms) and III (Sale and Purchase) of the Deposit and Sale Agreement, which state:

## ARTICLE I
## TERMS

This Sale Agreement sets forth the terms under which the Seller [*i.e.*, Funding] is selling and the Purchaser [*i.e.*, NCSLT 2006-4] is purchasing the student loans listed on Schedule 1 or Schedule 2, as applicable, to each of the Pool Supplements set forth on <u>Schedule A</u> attached hereto (the "<u>Transferred Student Loans</u>").

. . . .

## ARTICLE III
## SALE AND PURCHASE

Section 3.01.     <u>Sale of Loans</u>.  The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

> Section 3.02.  <u>Assignment of Rights</u>.  The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on <u>Schedule A</u> attached hereto and the related Student Loan Purchase Agreements listed on <u>Schedule B</u> attached hereto.

*See* Exhibit 6, Art. I & III.

23.    Schedule A, as referred to in the above-quoted language from the Deposit and Sale Agreement, identifies the Pool Supplements containing the scheduled loans being sold and assigned by Funding to NCSLT under the Deposit and Sale Agreement. *See* Exhibit 6, Schedule A.  In other words, the loans sold in Part 2 of the transaction are identified by reference to the Pool Supplements in which they are scheduled and sold in Part 1.

24.    The December 7, 2006 Pool Supplement in which Plaintiff's loan is scheduled is identified on Schedule A to the Deposit and Sale Agreement, as follows:

**SCHEDULE A**

*Pool Supplements*

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

. . .

• GMAC Bank, dated December 7, 2006, for loans that were originated under GMAC Bank's Alternative Loan Program.

*See* Exhibit 6.

25.    As evidenced by the foregoing and in simplest chain-of-title terms, Plaintiff's loan originated with GMAC Bank in June 2006 pursuant to the GMAC Bank Alternative Loan Program.  On December 7, 2006, GMAC sold and assigned the loan to Funding through the Pool Supplement.  Funding, in turn, and on the same day, sold and assigned the Loan to NCSLT.

26.    I am certain Plaintiff's loan was included in the above-described transfers based upon the identifying details contained in the documents as described above.

27.    Since Plaintiff's loan was sold and assigned to NCSLT on December 7, 2006, the loan has not been sold, transferred, or assigned, and all ownership right, title, and interest remains with NCSLT.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of March, 2022, at Peachtree Corners, Georgia.

Bradley Luke

# Exhibit 1

Exhibit 1

*National Collegiate Trust*

Date: 11/3/14

RE:

National Collegiate Master Student Loan Trust-I
National Collegiate Student Loan Trust-2004-1
National Collegiate Student Loan Trust-2005-1
National Collegiate Student Loan Trust-2005-3
National Collegiate Student Loan Trust-2006-2
National Collegiate Student Loan Trust-2006-4
National Collegiate Student Loan Trust-2007-2
National Collegiate Student Loan Trust-2007-4

National Collegiate Student Loan Trust-2003-1
National Collegiate Student Loan Trust-2004-2
National Collegiate Student Loan Trust-2005-2
National Collegiate Student Loan Trust-2006-1
National Collegiate Student Loan Trust-2006-3
National Collegiate Student Loan Trust-2007-1
National Collegiate Student Loan Trust-2007-3

To whom it may concern:

U.S. Bank, as Special Servicer for the above referenced Trust(s), confirms that Transworld Systems Inc. is its Subservicer, authorized to file Proofs of Claim (POC) on behalf of the above Trust(s) with respect of student loans owned by the Trust(s). Transworld Systems Inc. is also the dedicated record custodian with respect to all student loan accounts owned by the Trust(s) and is fully authorized to execute affidavits regarding account documents, verify responses to discovery and provide testimony on behalf of the Trust(s).

Any questions regarding the above referenced processes should be directed to Transworld Systems Inc. at 1-800-209-9161

Sincerely,

U.S. Bank National Association
As Special Servicer to the National Collegiate Student Loan Trust(s)

By:

　Brian C Tri
　Vice President
Title

Acknowledged,
By: GSS Data Services, Inc.
Not in its individual capacity and solely as
administrator for and on behalf of the Trust(s)

By: Kenneth L. Ruggiero.

President and CEO
Title

TSI0026

# Exhibit 2

Exhibit 2

(Page 2 of 2)

56208 065315

---

**\* Cosigned \*    Loan Request/Credit Agreement – Signature Page**

**NON-NEGOTIABLE CREDIT AGREEMENT – THIS IS A CONSUMER CREDIT TRANSACTION**

**LOAN PROGRAM INFORMATION**

GMAC Bank Undergraduate Loan                                     Academic Period: 05/2006-12/2006

Lender: GMAC Bank                    School: UNIVERSITY OF CALIFORNIA DAVIS

Loan Amount Requested: $25000.00        Repayment Option: Interest Only
Deferral Period Margin: 4.75            Repayment Period Margin: 4.75        Loan Origination Fee Percentage: 5.00
                                                                            This fee may vary – see paragraph F, page 3 –
                                                                            Bank will always assess the fee at origination.

**STUDENT BORROWER INFORMATION** (Must be old enough to enter into a binding contract)

Borrower Name: Oskar A Lizarragadavis         Home Address: ▊▊▊ San Diego, CA 92103
Social Security #: ▊▊-4043                     Date of Birth: ▊/1983          Home Telephone: ▊▊▊4267

Student Citizenship (check one box):   ☒ U.S. Citizen    ☐ Eligible Non-Citizen(Attach front & back copy of CIS or student visa card)
Note: Personal reference name and address cannot match that of the Cosigner.
Personal Reference Name: Magdalena Anderson        Reference Home Tel #: (▊▊)-7152        Work Tel #: ▊▊▊8616
Reference Street Address: ▊▊▊▊▊
Reference City/State/Zip:   La Mesa, CA 91942

**COSIGNER INFORMATION** (Must be old enough to enter into a binding contract)

Cosigner Name: Consuelo B Hayes        Home Address: 2▊▊▊ San Diego, CA 92139
Social Security #: ▊▊▊0110             Date of Birth: ▊/1924          Home Telephone: ▊▊▊8388
Have you ever defaulted on a student loan or declared bankruptcy?  ☒ No   ☐ Yes
Current Employer: UNITED STATES FEDERAL GOVERNME                          Employer Telephone: ▊▊▊8388
Current Position: Retired             Years There: 30 Years
Years at Previous Employment: 30 Years

Alimony, child support, or separate maintenance incomes do not have to be revealed if you do not want them considered for repaying this
obligation. If you are relying on such additional income, please provide details on a separate sheet of paper.

Cosigner Citizenship (check one box):   ☒ U.S. Citizen    ☐ Eligible Non-Citizen (Attach front & back copy of CIS)
Note: Personal reference name and address cannot match that of the Student.
Personal Reference Name: Esther Goodwall        Reference Home Tel #: ▊▊▊-2221        Work Tel #: ▊▊▊8998
Reference Street Address: ▊▊▊▊▊
Reference City/State/Zip:   National City, CA 91950

By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all four (4) pages of this Loan Request/Credit
Agreement GM.05-06.CSX1.20.0406 ("Credit Agreement"). I understand that any person who knowingly makes a false statement or misrepresentation on this form is
subject to penalties, which may include fines or imprisonment. This Credit Agreement is signed under seal. I understand that I am not required to fax my signature on
nor to sign electronically this Credit Agreement and any related notices that require signature. If I choose to fax my signature on or to sign electronically this Credit
Agreement and any related notices that require signature, I intend: (i) my fax or electronic signature to be an electronic signature under applicable federal and state law,
(ii) any fax printout or printout of Lender's electronic record of this Credit Agreement and related notices to be an original document, (iii) to conduct business with the
Lender by electronic records and electronic signatures, and (iv) that this Credit Agreement will not be governed by Article 3 of the Uniform Commercial Code, and my
obligations under this Credit Agreement will not be subject to, but any transfer of my obligations will be subject to, Article 9 of the Uniform Commercial Code.

**PLEASE SIGN BELOW – RETURN** This Page With Proof of Income and Other Information (if applicable) – FAX TO: 800-704-9408

Signature of Borrower  *[signature]*                          Date  6-10-06

**BY SIGNING THIS CREDIT AGREEMENT BELOW, I CERTIFY THAT I INTEND TO (i) APPLY FOR
JOINT CREDIT AND (ii) BE JOINTLY LIABLE WITH THE BORROWER FOR THIS LOAN.**

X  Signature of Cosigner  *Consuelo B Hayes*                  Date 6-15-06

---

GM.05-06.CSX1.20.0406                    LENDER COPY
PN01_GM_05-06_CSX1_F_X_LIZARRAGAD_A103826471.pdf                    GMCUIO

In this Credit Agreement, the words "I", "me", "my", and "mine" mean the person(s) who signed this Credit Agreement as Borrower and Cosigner. The words "you", "your", "yours", and "Lender" mean GMAC Bank, its successors and assigns, and any other holder of this Credit Agreement. "School" means the school named at the top of the first page of this Credit Agreement. The "servicer" means the Lender or any entity it designates to service my loan.

**A. PROMISE TO PAY:** I promise to pay to you the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) ("Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum and late fees (see Paragraph E.6).

**B. IMPORTANT – READ THIS CAREFULLY:**
1. When you receive my signed Credit Agreement, you are not agreeing to lend me money. If you decide to make a loan to me, you will electronically transfer the loan funds to the School for me, mail a loan check to the School for me, or mail a loan check directly to me. You have the right to not make a loan or to lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me. You have the right to disburse my loan through an agent. At your option, you may also make any loan check co-payable to me and the Cosigner.
2. **HOW I AGREE TO THE TERMS OF THIS LOAN.** By signing this Credit Agreement, and submitting it to the Lender, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. If you approve this request and agree to make this loan, you will notify me in writing and provide me with a Disclosure Statement, as required by law, at the time the Loan proceeds are disbursed. The Disclosure Statement is incorporated herein by reference and made a part hereof. The Disclosure Statement will tell me the amount of the loan which you have approved, the amount of the Loan Origination Fee, and other important information. I will let you know that I agree to the terms of the loan as set forth in this Credit Agreement and in the Disclosure Statement by doing either of the following: (a) endorsing or depositing the check that disburses the loan proceeds; or (b) allowing the loan proceeds to be used by or on behalf of the Student without objection. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice within ten (10) days after I receive the Disclosure Statement. If loan proceeds have been disbursed, I agree that I will immediately return the loan proceeds to you, will not endorse any check which disburses the loan proceeds and will instruct the School to return any loan proceeds to you. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.2, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.)

**C. DEFINITIONS:**
1. "Disbursement Date" means the date or dates on which you lend money to me in consideration for my Credit Agreement and will be the date(s) shown on any loan check you prepare or the date(s) you initiate any electronic funds transfer.
2. The "Deferment Period" will begin on the Disbursement Date and end on the Deferment End Date.
3. "Deferment End Date" means the date specified below for the applicable loan program (the applicable loan program is stated on the first page of this Credit Agreement).
(a) *Undergraduate Alternative Loan Program:* If I have elected the "Immediate Repayment" option (the applicable repayment option is stated on the first page of this Credit Agreement), there is no Deferment Period, and my first payment will be 30-60 days after the disbursement of my loan. If I have elected the "Interest Only" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then interest payments will begin 30-60 days after the disbursement of my loan, the "Deferment End Date" will be the date the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this loan program), and principal and interest payments will begin 30-60 days after that date. In any event, if I have elected the "Interest Only" repayment option, the Deferment End Date will be no more than 5 years after the Disbursement Date. If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then the "Deferment End Date" will be 180 days after the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this Loan Program). In any event, if I have elected the "Full Deferral" repayment option, the Deferment End Date will be no more than 5½ years after the Disbursement Date.
(b) *Graduate Professional Education Loan Program:* 180 days after the Student graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan Program), but no more than 4½ years after the Disbursement Date; provided, however, that if the Student begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 180 days after the day the residency or internship ends, but no more than 8½ years after the Disbursement Date.
4. The "Repayment Period" begins the day after the Deferment Period ends. If there is no Deferment Period for my loan, the Repayment Period will begin when my loan is fully disbursed. The Repayment Period is 20 years unless monthly payments equal to the minimum monthly payment amount (see Paragraph E.2) will repay all amounts

owed in less than 20 years, in which case the Repayment Period will be the number of months necessary to pay in full the amount I owe at the minimum payment.
**D. INTEREST:**
1. Accrual – Beginning on the Disbursement Date, interest will be calculated at the Variable Rate (Paragraph D.2) and charged on the Principal Sum, and on any unpaid interest later added to the Principal Sum according to Paragraph D.3. During the Repayment Period, interest will be calculated at the Variable Rate and charged on the outstanding balance of this Credit Agreement until all amounts are paid in full. Interest will be calculated on a daily simple interest basis. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by the number of days in that calendar year.
2. Variable Rate – The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the Commonwealth of Pennsylvania. The Variable Rate will change quarterly on the first day of each January, April, July and October (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar quarter beginning on a Change Date (or for any shorter period beginning on any Disbursement Date and ending on the last day of a calendar quarter) is based on the one-month London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of *The Wall Street Journal*. The index for each calendar quarter (or for any shorter period beginning on a Disbursement Date and ending on the last day of a calendar quarter) will equal the average of the LIBOR rates published on the first business day of each of the three (3) immediately preceding calendar months, rounded to the nearest one-hundredth percent (0.01%). If *The Wall Street Journal* is not published or the Current Index is not given on that date, then the Current Index will be determined by using the immediately preceding published Current Index. If the Current Index is no longer available, you will choose a comparable index.
3. Capitalization – If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), I am not obligated to make any payments until the loan enters the Repayment Period and you will add unpaid accrued interest to the principal loan balance as of the last day of each calendar quarter (the last day of December, March, June and September) during the Deferment Period and as of the last day of my Deferment Period. Interest that is added to principal is called "Capitalized" interest. Capitalized interest will be treated as principal. In addition, **if** I am in default (see Paragraph I) and the loan has been sold to TERI (see Paragraph L.12), TERI may capitalize accrued and unpaid interest as of the date it purchases my loan. I understand that you will also add all accrued and unpaid interest to the principal balance of my loan at the end of any forbearance period (see Paragraph H).
**E. TERMS OF REPAYMENT:**
1. Deferment Period – If I have elected either the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), you will send statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). You reserve the right to send statements or notices to either the Borrower or the Cosigner. Statements will be sent to the address shown on your records. If I have elected the "Interest Only" repayment option, I agree to make payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement. If I have elected the "Full Deferral" repayment option I may, but am not required to make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in Paragraph D.3.
2. Repayment Period – The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send me monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. You reserve the right to send monthly statements to the Borrower and/or the Cosigner. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.
3. Repayment Terms - My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that

this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "Interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.

4. Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full.

5. Payments – Payments will be applied first to late fees, other fees and charges, accrued interest, and the remainder to principal.

6. Other Charges - If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorney's fees and court costs and other collection costs.

**F. LOAN ORIGINATION FEE:** If you charge me, I will pay you a Loan Origination Fee at the time my loan is disbursed. The dollar amount of any Loan Origination Fee will be determined by multiplying the Principal Sum times the Loan Origination Fee Percentage shown on the first page of this Credit Agreement. The percentage would be higher if computed only on the amount advanced rather than on the entire Principal Sum (Loan Origination Fee plus the loan amount advanced). For example, a nominal Loan Origination Fee of 6.5% on the entire principal amount would equal 6.9519% of the amount advanced. The Loan Origination Fee I will pay, if any, will be shown on my Disclosure Statement and included with the Principal Sum. To the extent permitted by law, and unless I timely cancel this Credit Agreement (see Paragraph B.2), I will not be entitled to a refund of any Loan Origination Fee after my loan has been disbursed.

**G. RIGHT TO PREPAY:** I have the right to prepay all or any part of my loan at any time without penalty.

**H. FORBEARANCE:** If I am unable to repay my loan in accordance with the terms established under this Credit Agreement because of a hardship such as financial or medical difficulty, I may request that you modify these terms. I understand that such modification would be at your option. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you will add any interest that I do not pay during any forbearance period to the principal balance, as described in Paragraph D.3.

**I. WHOLE LOAN DUE:** To the extent permitted by applicable law, I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure my default) if: (1) I fail to make any monthly payment to you when due, (2) I die, (3) I break any of my other promises in this Credit Agreement, (4) any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefits of my creditors, or (5) I make any false written statement in applying for this loan or any other loan or at any time during the Deferment or Repayment Periods. If I default, I will be required to pay interest on this loan accruing after default. The interest rate after default will be subject to adjustment in the same manner as before default. Upon default, you may also capitalize any interest and fees (i.e., add accrued and unpaid interest and fees to the principal balance), and increase the Margin used to compute the Variable Rate by two percentage points (2%).

**J. NOTICES:**

1. I will send written notice to you, any subsequent holder of this Credit Agreement, and the servicer within ten days after any change in name, address, or enrollment status (for example, if the Borrower withdraws from the School or transfers to another school participating in this loan program).

2. Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me. Unless required by applicable law, you need not give a separate notice to the Cosigner, if any.

**K. INFORMATION:**

1. I must update the information I provided to you whenever you ask me to do so.

2. I authorize you from time to time to request and receive from others credit related information about me (and about my spouse if I live in a community property state).

3. CREDIT BUREAU REPORTING

> **You may report information about my account to credit bureaus. Late payments, missed payments, or other defaults in my account may be reflected in my credit report.**

I understand that the reporting of information about my account to credit bureaus may adversely affect my credit rating and my ability to obtain other credit. You may also report the status of my loan and my payment history, including information about a late payment, missed payment or other defaults, to the School and others in accordance with applicable law.

**L. ADDITIONAL AGREEMENTS:**

1. I understand that you are located in Pennsylvania and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO CONFLICT OF LAW RULES.

2. The proceeds of this loan will be used only for my educational expenses at the School. The Cosigner, if any, will not receive any of the loan proceeds.

3. My responsibility for paying the loan evidenced by this Credit Agreement is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Credit Agreement you may accept (a) late payments, (b) partial payments or (c) payments marked "paid in full" or with other restrictions. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. I WILL NOT SEND YOU PAYMENTS MARKED "PAID IN FULL", "WITHOUT RECOURSE" OR WITH OTHER SIMILAR LANGUAGE UNLESS THOSE PAYMENTS ARE MARKED FOR SPECIAL HANDLING AND SENT TO THE ADDRESS IDENTIFIED FOR SUCH PAYMENTS ON MY BILLING STATEMENT, OR TO SUCH OTHER ADDRESS AS I MAY BE GIVEN IN THE FUTURE.

4. I may not assign this Credit Agreement or any of its benefits or obligations. You may assign this Credit Agreement at any time.

5. The terms and conditions set forth in this Credit Agreement and Instructions and the Disclosure Statement constitute the entire agreement between you and me.

6. If any provision of this Credit Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Credit Agreement without affecting the validity or enforceability of the remainder of this Credit Agreement.

7. A provision of this Credit Agreement may only be modified if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder of this Credit Agreement.

8. To the extent permitted by law, you have the right to apply money from any of my deposit account(s) with you to pay all or a portion of any amount overdue under this Credit Agreement. I hereby authorize you to obtain from the School all amounts which may be owed to me by the School, including any refund due to overpayment, early termination of enrollment, or otherwise.

9. If this Credit Agreement is executed by more than one Borrower, each Borrower agrees that any communication between you and any of the Borrowers will be binding on all of the Borrowers. I intend to be treated as a principal of this Credit Agreement and not as a surety. To the extent I may be treated as a surety, I waive all notices to which I might otherwise be entitled as such by law, and all suretyship defenses that might be available to me (including, without limitation, contribution, subrogation and exoneration). I agree that the Borrower may agree to any forbearance or other modification of the repayment schedule and that such agreement will be binding on me. It shall not be necessary for you to resort to or exhaust your remedies against the borrower before calling upon me to make repayment. For purposes of this paragraph only, "I" and "me" refer to the Cosigner only.

10. All dollar amounts stated in this Credit Agreement are in United States dollars. I will make all payments in United States Dollars with no deduction for currency exchange.

11. If the Student fails to complete the education program paid for with this loan, the Cosigner and I are not relieved of any obligation within or pursuant to this Credit Agreement.

12. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523 (a) (8) of the United States Bankruptcy Code. Specifically, I understand that you have purchased a guaranty of this loan, and that this loan is guaranteed by The Education Resources Institute, Inc. ("TERI"), a non-profit institution.

13. I authorize any school that I may attend to release to you, and any other persons designated by you, any requested information pertinent to this loan (e.g., enrollment status, prior loan history, and current address).

14. I authorize the Lender, any subsequent holder of this Credit Agreement, and their agents to: (1) advise the School of the status of my application and my loan, (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Credit Agreement and related documents, (3) release information and make inquiries to the persons I have given you as references, for the purposes of learning my current address and telephone number, (4) check my credit and employment history and to answer questions about their credit experience with me, and (5) disclose to TERI, the Borrower, and/or the Cosigner either in connection with this transaction or any future transaction all information (including status information and non-public personal information) of the Borrower and/or the Cosigner provided in connection with this Credit Agreement. If in the future I apply for a loan that is guaranteed by TERI and funded by another lender, I also authorize the sharing of application information for this loan (other than information in a consumer report) with the other lender and TERI and the reuse of such information by such new lender and TERI in my new application.

15. Waiver by Lender: You waive (give up) any right to claim a security interest in any property to secure this Credit Agreement. This does not affect any right to offset as a matter of law.

16. If I fax my signature(s) on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement. You and I agree that all copies of

this Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement.

17.  If any Borrower or Cosigner elects to sign electronically an electronic record of this Credit Agreement, then the following will apply as between Lender and such person: (a) Lender will keep a non-modifiable electronic record of this document and provide a copy to me upon request, (b) I can and have downloaded and/or printed a copy of this document for my records or notified the Lender to mail me a copy of this document, and (c) the Lender's electronic record of this document and any printout from that record shall be an original for all purposes, including any lawsuit to collect amounts that I owe.  If I physically sign a copy of this document that has been electronically signed by any other Cosigner or Borrower, as between me and the Lender the copy I sign (and any fax of that copy I may send to Lender) will be an original.  However, the electronic signature of another party to this Credit Agreement and the Lender's electronic record of this document containing that signature will be as valid against me as an original, physical document that is physically signed by all parties.

**M.  DISCLOSURE NOTICE**

---

**ALL APPLICANTS:**
**IMPORTANT FEDERAL LAW NOTICE—**

*Important information about procedures for opening a new account:*
**To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.**

*What this means for you:*
**When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.**

---

**N. BORROWER'S CERTIFICATION:**  I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that all information I provided to you in connection with this loan, including without limitation, the information contained in this Credit Agreement, is true, complete and correct to the best of my knowledge and belief and is made in good faith.  I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the School for the academic period stated. I certify that I am not now in default on a Federal Perkins Loan, a Federal Stafford Loan, a Federally Insured Student Loan, a Federal Supplemental Loan for Students (SLS), a Federal PLUS Loan, an Income Contingent Loan, a Federal Consolidation Loan, a Federal Ford Direct Loan, or any other education loan received for attendance at any school.

## FEDERAL COSIGNER NOTICE

For the purposes of these Notices, the words "you" and "your" refer to the Cosigner, not the Lender.

**NOTICE TO COSIGNER:**
You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The holder of the loan can collect this debt from you without first trying to collect from the borrower. The holder of the loan can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of your credit record.

This notice is not the contract that makes you liable for the debt.

# Exhibit 3

Exhibit 3

# NOTE DISCLOSURE STATEMENT

$ 26315.79

Loan No. 03826471

Borrower(s) Oskar A Lizarragadavis
Consuelo B Hayes

Student: Oskar A Lizarragadavis
Date: 06/26/2006
Lender Name and Address:
GMAC Bank
3710 Kennett Pike
Wilmington, DE 19807

This disclosure statement relates to your Loan Note disbursed on June 26, 2006.
Because your Loan is either being disbursed or entering repayment, or the repayment terms are being modified, the following information about your Loan is being given to you.

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments scheduled. |
| 10.006 % | $ 33574.94 | $ 25000.00 | $ 58574.94 |

Your payment schedule will be:

| Number of Payments | Amount of Payments* | When Payments are due |
|---|---|---|
| 002 | $ 203.51 | On the 26th day of each month beginning July 2006 |
| 001 | $ 200.72 | On the 25th day of each month beginning September 2006 |
| 240 | $ 241.53 | On the 25th day of each month beginning October 2006 |
| | | |

**VARIABLE RATE:** The Annual Percentage Rate, which is based on an index plus a margin, may increase during the term of the loan if the index rate increases. The index is (check one):

- ☐ Prime Rate Index Adjusted Monthly – The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the last business day of each calendar month.
- ☐ Prime Rate Index Adjusted Quarterly – The highest U.S. bank prime rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the last business day of each calendar quarter.
- ☒ LIBOR Index Adjusted Quarterly – The average of the one-month London Interbank Offered Rates published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the first business day of each of the three (3) calendar months immediately preceding the first day of each calendar quarter.
- ☐ LIBOR Index Adjusted Monthly – The one-month London Interbank Offered Rate published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) on the first business day of each calendar month.

Any increase in the index and the Annual Percentage Rate which occurs while principal payments are deferred will increase the amount of any current and all future payments. Any increase in the index and the Annual Percentage Rate which occurs while principal and interest payments are deferred will increase the amount of all future payments. Any increase in the index and the Annual Percentage Rate which occurs after you have begun to make principal and interest payments on your loan will increase the amount of your future principal and interest payments beginning with your next annual payment adjustment date. For example, assume you obtain a loan in your junior year, in the amount of $10,000, at an interest rate of 11%, and you defer principal and interest payments until after your graduation, and the repayment term of the loan is 20 years. If the interest rate increased to 12% on January 1st of your senior year, the interest which accrues while principal and interest payments are deferred will increase by $91.01, and your monthly principal and interest payments would increase by $9.37.

**LATE CHARGES:** If a payment is more than 15 days late, you may be charged $5.00 or 5% of the payment, whichever is less. If you default, Lender (or any subsequent holder of your Loan Note) may increase the margin used to compute the Annual Percentage Rate by two percentage points (2%).
**PREPAYMENT:** If you pay off early, you will not have to pay a penalty.

Estimates: All numerical disclosures except the late payment disclosure are estimates.

See your contract documents for any additional information about non-payment, default, any required repayment in full before the scheduled date, any security interest and prepayment refunds and penalties.

| | | |
|---|---|---|
| Principal Amount of Note (Amount Financed plus Prepaid Finance Charge) | | $ 26315.79 |
| Itemization of Amount Financed | $ | |
| Amount paid to Oskar A Lizarragadavis and | $ 25000.00 | |
| Amount paid to Consuelo B Hayes | | |
| Total Amount Financed | | $ 25000.00 |
| Itemization of Prepaid Finance Charge | | |
| Origination Fee | $ 1315.79 | |
| Total Prepaid Finance Charge(s) | | $ 1315.79 |

# Exhibit 4

Exhibit 4

EX-99 6 national-ex996_061206.htm EXHIBIT 99.6

**CONFIDENTIAL MATERIALS OMITTED AND FILED SEPARATELY WITH THE
SECURITIES AND EXCHANGE COMMISSION.
ASTERISKS DENOTE OMISSIONS.**

Execution Draft

## NOTE PURCHASE AGREEMENT
## TERI-GUARANTEED GMAC BANK LOAN PROGRAM
## GMAC BANK

This Note Purchase Agreement, by and between GMAC Bank ("Program Lender"), a federal savings bank having a principal office located at 3710 Kennett Pike, Greenville, DE 19807, and THE FIRST MARBLEHEAD CORPORATION, a Delaware corporation having a principal place of business at 30 Little Harbor, Marblehead, Massachusetts ("FMC"), is made as of May 30, 2003;

**W I T N E S S E T H:**

WHEREAS, Program Lender is in the business of making education loans under the GMAC Bank Loan Program (as defined in Section 1); and

WHEREAS, FMC exists to provide funds for education loans for the benefit of students at Participating Institutions (as defined in Section 1); and

WHEREAS, in order to facilitate funding of GMAC Bank Conforming Loans (as defined in Section 1), Program Lender has agreed to sell, from time to time, pools containing GMAC Bank Conforming Loans originated by Program Lender to FMC or a Purchaser Trust (as defined in Section 1); and

WHEREAS, the GMAC Bank Conforming Loans are made by Program Lender and purchased by FMC on the condition that they qualify for and in fact are covered by a guaranty issued by The Education Resources Institute, Inc. ("TERI").

NOW, THEREFORE, in consideration of these presents and the covenants contained herein, the parties hereto hereby agree as follows:

**I.     Definitions**. Capitalized terms used herein without definition have the meanings set forth in the Program Guidelines.

"Affiliate" shall mean, as to any person, any other person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such person. A person shall be deemed to control another person if the controlling person possesses, directly or indirectly, the power to direct or to cause the direction of the management and policies of the other person, whether through the ownership of voting securities, by contract or otherwise.

"Agent" means State Street Bank & Trust Company, or a successor agent under the Deposit and Security Agreement.

TSI0472

"Ambac" means Ambac Assurance Corporation.

"Business Day" shall mean any day other than: (a) a Saturday or Sunday, or (b) a day on which banking institutions charter by the Office of Thrift Supervision are required or authorized by law or executive order to be closed.

"Collateral" has the meaning set forth in the Deposit and Security Agreement.

"Deposit and Security Agreement" means the agreement of that name among Program Lender, Agent, FMC and TERI dated as of May 30, 2003

"First Marblehead" or "FMC" shall mean The First Marblehead Corporation, a Delaware corporation.

"GMAC Bank Conforming Loans" shall mean Loans (a) made in accordance with and conforming to the requirements of the Program Guidelines at the time the Loans were made, (b) serviced by the Servicer in accordance with the Program Guidelines, and (c) covered by and subject to all the benefits of the Guaranty Agreement.

"GMAC Bank Loan Pool" or "Pool" shall mean and refer to a group of GMAC Bank Notes purchased and pledged or intended to be purchased and pledged as collateral in a particular Securitization Transaction.

"GMAC Bank Notes" shall mean notes or other forms of consumer debt instruments, evidencing GMAC Bank Conforming Loans.

"GMAC Bank Program" shall mean the GMAC Bank Loan Program described in the Program Guidelines.

"Guaranty Agreement" means the Guaranty Agreement between Program Lender and TERI dated May 30, 2003, as it may be amended from time to time.

"Loan" shall mean a loan of funds, including all disbursements thereof, made by the Program Lender to a Borrower (as defined in the Guaranty Agreement) under the GMAC Bank Program.

"Market Disruption Event" means any of the following: (a) any suspension or limitation on trading in securities generally on the New York Stock Exchange or the National Association of Securities Dealers National Market system; (b) any banking moratorium declared by federal, Massachusetts, or New York authorities or authorities of the state in which GMAC Bank is headquartered; (c) any outbreak or escalation of major hostilities or armed conflict, or any declaration of war by Congress; (d) any change in federal or state law or regulations; or (e) the closing of the market for commercial paper or asset-backed securities or significant disruption in the functioning of those markets, if, in the reasonable judgment of FMC, the effect of any such event in (a) – (e) above makes it impractical or inadvisable to proceed with the completion of a Securitization Transaction; or (f) the occurrence of a TERI Insolvency Event.

"MBIA" means MBIA Insurance Corporation.

"Minimum Purchase Price" has the meaning set forth in Section 2.04.

"Note Insurer" means Ambac, MBIA, or any other provider of credit insurance or note insurance with

respect to the obligations of the Purchaser Trust.

"Origination Agreement" refers to (a) the Origination Agreement to be entered into between TERI and Program Lender with respect to origination of GMAC Bank Conforming Loans, as amended from time to time, and (b) any subsequent agreement relating to origination services provided to Program Lender with respect to GMAC Bank Notes purchased under this Agreement that is acceptable in form and substance to each of FMC and TERI.

"Origination Records" means and refers to the original GMAC Bank Loan Application and Note, a form of cosigner notice when required under 16 C.F.R. § 444, and any other standardized documentation specified from time to time in the Program Guidelines as required to be received by the Servicer from the Program Lender in order to service GMAC Bank Conforming Loans adequately and accurately.

"Participating Institution" means an educational institution approved by TERI for receipt of GMAC Bank Conforming Loan funds.

"PHEAA" shall mean the Pennsylvania Higher Education Assistance Agency, a public corporation and government instrumentality organized under the laws of the Commonwealth of Pennsylvania, and having an address at 1200 North Seventh Street, Harrisburg, PA 17102.

"Pledged Account" has the meaning set forth in the Deposit and Security Agreement.

"Program Guidelines" means the Program Guidelines attached to the Guaranty Agreement as Exhibit A.

"Purchase Date" shall mean (a) the date of consummation of a Securitization Transaction with respect to a particular Pool of Seasoned Loans originated by Program Lender, which date: (i) shall be set by written notice from FMC to Program Lender, given to Program Lender not less than five (5) Business Days in advance of the specified date, and (ii) shall occur during the Purchase Period for each loan in such Pool in question, or (b) the date on which FMC or a designee Purchaser Trust purchases a GMAC Bank Conforming Loan during the Right of First Refusal Period.

"Purchase Period" means, with respect to any particular GMAC Bank Loan, the period beginning on the first date such loan becomes a "Seasoned Loan" and ending on the later of (a) the date which is [**] thereafter or (b) the date of the next scheduled Securitization Transaction (provided that at least [**] such Securitization Transactions are scheduled each calendar year).

"Purchaser Trust" shall mean and refer to a trust or other SPE formed by FMC or by any Affiliate of FMC for the purpose of purchasing, directly or indirectly, GMAC Bank Conforming Loans. Any action required or permitted to be taken by FMC hereunder may be taken by a Purchaser Trust with respect to a particular Pool. If FMC elects to finance the purchase of loans on an interim basis by using an Affiliate SPE as an interim holder, the Purchaser Trust includes both the initial purchaser SPE and, for purposes of the representations, warranties and indemnities made by the Program Lender to the Purchaser Trust hereunder, any Affiliate SPE to whom the Loans are ultimately transferred in a Securitization Transaction.

"Rating Agencies" shall mean and refer to Standard and Poor's Corporation and/or Moody's Investors Service, Inc., and/or Fitch Investors Services.

"Right of First Refusal Period" means for GMAC Bank Loan, the period ending on the earlier of (i) [**]

days after expiration of the relevant Purchase Period or (ii) [**] days after notice that a bona fide written offer has been received by GMAC Bank under Section 2.02 with respect to such GMAC Bank Loan, provided that no such notice may be given until after expiration of the relevant Purchase Period.

"Seasoned Loan" means a GMAC Bank Conforming Loan as of [**] after completion of all scheduled disbursements on the GMAC Bank Conforming Loan. For purposes of computation of the Minimum Purchase Price, the term also includes defaulted GMAC Bank Conforming Loans not yet purchased by TERI.

"Securitization Costs" means the actual costs and expenses incurred by FMC, the Purchaser Trust, and all others entitled to payment for expenses by the Purchaser Trust or FMC, in connection with a Securitization Transaction including, without limitation, the following:

(Structuring and Origination Fees; Copy/Binding Costs)
(Underwriting Expenses)
(Rating Fee)
(Owner Trustee and Indenture Trustee Transaction and First Year Fees; Expenses)
(Counsel for Indenture Trustee)
(Counsel for FMC)
(Servicer Auditor)
(Bond Insurer)

"Securitization Transaction" shall mean and refer to the purchase of a Pool of Seasoned Loans by FMC or a Purchaser Trust funded through the issuance and sale of commercial paper, certificates, bonds or other securities or evidences of indebtedness, the repayment of which is supported by payments on the Seasoned Loans included in such Pool. A Securitization Transaction may include, without limitation, a continuing series of transactions occurring on a periodic basis in which Program Lender makes a sale of then-outstanding Seasoned Loans to a Purchaser Trust, which Purchaser Trust in turn either utilizes the Pool directly as collateral for its own debt or resells the Pool (in whole or in part) in further sales to a securitization conduit providing financing to the Purchaser Trust or to another Purchaser Trust that issues financial instruments.

"Servicer" shall mean and refer to PHEAA or such other servicer as may be approved by FMC and TERI and retained by the holder of GMAC Bank Conforming Loans in accordance with the terms hereof and of the Guaranty Agreement.

"Servicing Agreement" refers to: (a) the Servicing Agreement to be entered into between Servicer and Program Lender with respect to servicing of GMAC Bank Conforming Loans, as amended from time to time, and (b) any subsequent servicing agreement between Program Lender and the Servicer governing servicing of GMAC Bank Conforming Loans purchased under this Agreement, in either case such agreement and any amendment thereto to be satisfactory in form and substance to Program Lender, FMC and their respective counsel.

"SPE" means a special purpose entity formed and operated for the purpose of acting as purchaser and owner of GMAC Bank Conforming Loans and other education loans.

"TERI Insolvency Event" means (1) the commencement by TERI of a voluntary petition under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy,

TSI0475

insolvency or other similar laws, (2) the consent by TERI to the appointment of or taking possession by a receiver, liquidator, trustee, custodian (or other similar official) of or for TERI or for any substantial part of its property, (3) the making by TERI of any assignment for the benefit of creditors, (4) the insolvency or the failure of TERI generally to pay its debts as such debts become due, (5) the downgrading of TERI's credit worthiness below the rating on January 2, 2003 or the placement of a negative watch on TERI by one of the Rating Agencies, or (6) a default under one or more Guaranty Agreements to which TERI is a party because of a failure to pay claims, or the taking of action by TERI in furtherance of any of the foregoing.

"Term" shall mean the period commencing on the effective date hereof and ending upon termination hereof, all as set forth in Article X.

"Total Principal Amount" means the total principal amount of Seasoned Loans available to be sold and purchased from Program Lender.

"Trust Agreement" means, with respect to any particular Securitization Transaction, the agreement pursuant to which a Purchaser Trust is formed.

"Trust Indenture" means, with respect to any particular Securitization Transaction, the agreement pursuant to which FMC or a Purchaser Trust issues evidences of indebtedness secured by the payments on the related GMAC Bank Conforming Loans.

## II.   <u>Agreement for Purchase and Sale of Notes</u>.

### 2.01.  <u>Purchase and Sale</u>.

On each Purchase Date during the Term of this Agreement and subject to the conditions set forth herein, Program Lender shall sell to FMC or a designee Purchaser Trust, and FMC or such Purchaser Trust shall purchase, every Seasoned Loan owned by Program Lender on the Purchase Date.

### 2.02.  <u>Pre-Closing Information; FMC Purchase.</u>

(a)  <u>Loan Information</u>. GMAC Bank will cause Servicer to inform FMC periodically of information reasonably requested by FMC in anticipation of a Securitization Transaction, including, without limitation, the number of Seasoned Loans ready for purchase, the amount of paid and unpaid principal and accrued interest with respect to each such Seasoned Loan, payment status (including defaulted loans presented for guaranty payment), and the identity of Participating Institutions affected by the Securitization, together with the information contained in PHEAA's MR-50 and MR-53 reports and TERI's weekly origination report, which reports shall be provided in electronic media in the Servicer's or TERI's standard format.

(b)  <u>Purchase Scheduling</u>. FMC will use its best efforts to specify Purchase Dates that fall within [**] and each [**] (commencing in [**] 2003), but in any event will, from and after [**] 2003 and subject to Sections 2.02(c) and 3.01(b), purchase or cause a Purchaser Trust to purchase within a Purchase Period all of the Seasoned Loans held by GMAC Bank prior to the expiration of the Purchase Period for any loan in the Pool. FMC shall have the sole and exclusive right to purchase such GMAC Bank Loans during the Purchase Period, which right may be assigned to one or more Purchaser Trusts. FMC may reschedule the Purchase Date without penalty of any kind, provided that the Purchase Date occurs prior to the conclusion of the Purchase Period. The Purchase Period with respect to any Loan may be extended for a failure to comply with one or more

conditions as set forth in Section 3.01(b). GMAC Bank agrees, in consideration of FMC's undertaking pursuant to this section, not to sell or offer to sell to any third person any interest in any GMAC Bank Loan originated by GMAC Bank prior to the end of the Purchase Period with respect to such Loan. During the Right of First Refusal Period, if Program Lender receives any bona fide third-party written offer to purchase such GMAC Bank Conforming Loan, Program Lender shall provide a copy of same to FMC, and FMC (or a Purchaser Trust) shall have the sole and exclusive right to purchase such GMAC Bank Conforming Loan on the terms of such third-party offer or other mutually acceptable terms within the Right of First Refusal Period for such GMAC Bank Conforming Loan. If FMC (or a Purchaser Trust) fails to exercise such right prior to the end of the Right of First Refusal Period with respect to such Loan, Program Lender shall within its sole discretion be entitled to: (i) sell such GMAC Bank Conforming Loan to any third party or to retain such GMAC Bank Conforming Loan, in whole or in part, for its own account, free and clear of any claim under this Agreement; and/or (ii) immediately terminate this Agreement.

(c)  <u>Securitization and Purchase Commitment Based Upon Volume</u>. FMC's obligation to schedule a Purchase Date is subject to the following additional conditions and limitations. In the event that the Total Principal Amount of Seasoned Loans held by Program Lender is:

(1)  Less than [**] Dollars ($[**]), FMC shall [**] purchase or cause the purchase, or [**] to purchase or cause the purchase, of any Seasoned Loans in a Securitization Transaction;

(2)  Greater than [**] dollars ($[**]) but less than [**] dollars ($[**]), FMC will [**] to purchase or cause the purchase of all Seasoned Loans in a Securitization Transaction, but will have no obligation to do so if FMC is unable to do so [**];

(3)  Greater than [**] Dollars ($[**]) but less than [**] Dollars ($[**]), FMC shall purchase or cause the purchase of all Seasoned Loans; <u>provided, however</u>, that such obligation shall be effective only if lenders (including the Program Lender) whose loans aggregate [**] Dollars ($[**]) or more in principal amount agree to have their loans included in the same Securitization Transaction (FMC shall [**] under this Section 2.02(c)(2) to cause lenders to permit the addition of Seasoned Loans in a Securitization Transaction) and execute a Co-Lender Indemnification Agreement, substantially in the form attached to this Agreement as <u>Exhibit B</u>;

(4)  Greater than [**] Dollars ($[**]), FMC shall purchase or cause the purchase of all Seasoned Loans in a Securitization Transaction.

In the event that the Purchase Period with respect to a particular Seasoned Loan expires at a time when FMC is excuse from scheduling a Purchase Date for any reason set forth above, FMC shall have no obligation to pay damages under section 2.02 (d) hereof nor otherwise be in breach of this Agreement for failure to purchase such loan. The Right of First Refusal period with respect to such loan shall continue to apply, however, as if such excuse had not existed (i.e., FMC shall have the rights provided in Subsections 2.02 (b) and 2.02(d) with respect to such loan to exercise the Right of First Refusal).

(d)  Damages from Failure to Purchase. If FMC or a Purchaser Trust fails to purchase within a Purchase Period one or more Seasoned Loans prior to the end of the Purchase Period with respect to such Loans, to the extent such failure is not excused under Section 2.02(c) or Section 3.01(b), FMC shall pay to GMAC Bank as liquidated damages [**] of the Total Principal Amount of all Seasoned Loans (including any accrued and unpaid or capitalized interest on such Loans) as to which the Purchase Period has expired; provided, however, that if

FMC pays said [**] liquidated damages amount and GMAC Bank subsequently sells the Loans in question to FMC, Purchaser Trust or any third party during the Right of First Refusal Period, the [**] liquidated damages amount shall be refunded to FMC to the extent the sum of (i) the [**] liquidated damages amount and (ii) the total amount received by GMAC Bank for such Loans exceeds the Minimum Purchase Price (as defined in Section 2.04 and computed as of the actual purchase date). If a failure to purchase is continuing, additional damages may become payable at thirty day intervals as the Purchase Period expires as to additional loans. Such payments shall constitute liquidated damages in full satisfaction of FMC's obligations with respect to the purchase of such loans, and FMC shall have no further liability to GMAC Bank with respect thereto. Once the Right of First Refusal Period for a GMAC Bank Loan has expired, GMAC Bank shall be under no further obligation to offer such GMAC Bank Loan to FMC (or a Purchaser Trust) for purchase.

(e)   FMC Reliance on Program Guidelines. GMAC Bank further agrees, in consideration of FMC's undertaking pursuant to this section, that no change will be made in either the Program Guidelines or the interest rate and terms, as well as other consumer loan terms and conditions of GMAC Bank Loans without FMC's prior written consent, which consent shall not be unreasonably withheld.

2.03.   Pool Supplement.

Each purchase and sale of the Seasoned Loans included in a Pool on a Purchase Date shall be made pursuant to a Pool Supplement substantially in the form of Exhibit A which shall: (1) set forth the Minimum Purchase Price for the Seasoned Loans included in the Pool, (2) incorporate by reference the terms and conditions of this Agreement applicable to sales of GMAC Bank Conforming Loans, and (3) include a Schedule of Seasoned Loans setting forth the details and characteristics of each such Seasoned Loan included in the Pool. Each Pool Supplement shall be executed by an authorized agent of each Purchaser Trust and the Program Lender and shall be delivered on the related Purchase Date. The Purchaser Trust shall provide a preliminary settlement sheet in the form of Schedule 1 to the Pool Supplement not less than two (2) Business Days prior to the Purchase Date.

2.04.   Minimum Purchase Price.

On the Purchase Date, Program Lender shall assign and convey all Seasoned Loans included in the Pool to FMC, or a Purchaser Trust, in consideration of receipt of the Minimum Purchase Price therefor. For purposes of this Agreement the term "Minimum Purchase Price" shall mean the sum of the following amounts with respect to each of the GMAC Bank Conforming Loans to be purchased:

(a)   The unpaid principal amount [**] of the Seasoned Loans in the Pool including, without limitation, [**]; plus

(b)   All accrued and unpaid interest on such Seasoned Loans, in accordance with the terms of the Notes, [**]; plus

(c)   [**] fees paid by Program Lender to TERI with respect to such Seasoned Loans pursuant to the Origination Agreement; plus

(d)   A marketing fee and loan premium, computed [**] of the Seasoned Loans as follows:

1.   [**] with respect to Continuing Education Creditworthy Direct to Consumer Loans in [**];

2.   [**] with respect to Undergraduate Creditworthy Direct to Consumer Loans in [**]; and

3.   [**] with respect to Graduate Creditworthy Direct to Consumer Loans in [**].


## III.      Procedures and Conditions for Transfer.

3.01.   Conveyances of GMAC Bank Conforming Loans; Conditions to Purchase.

(a)   On each Purchase Date, upon execution and delivery of the related Pool Supplement, Program Lender shall sell, transfer, assign, set over and otherwise convey to FMC or the Purchaser Trust, without recourse, all right, title and interest of Program Lender in and to:

(1)   The Seasoned Loans included in the related Pool originated by Program Lender and all payments due or to become due thereon;

(2)   Any claims against TERI and proceeds of such claims with respect to origination of the Seasoned Loans included in the Pool;

(3)   Any claims against Servicer with respect to servicing of the Seasoned Loans prior to the Purchase Date.

(4)   The proceeds of any and all of the foregoing received after the Purchase Date or received prior thereto and not credited against the Minimum Purchase Price as computed on the Purchase Date; and

(5)   All rights of Program Lender under the Guaranty Agreement with respect to the Seasoned Loans in the Pool.

(b)   The obligation of FMC and/or any Purchaser Trust to purchase the Seasoned Loans on the related Purchase Date shall be subject to satisfaction of the following conditions (any of which may be waived by FMC or such Purchaser Trust, in whole or in part in its sole discretion):

(1)   Program Lender shall have delivered to the Purchaser Trust a duly authorized and executed Pool Supplement;

(2)   Each of the representations and warranties made by Program Lender with respect to the Seasoned Loans included in such Pool shall be true and correct in all material respects as of the related Purchase Date;

(3)   Program Lender shall have entered into an Origination Agreement and a Servicing Agreement satisfactory in form and substance to FMC and such agreements shall be in full force and effect as of the Purchase Date and shall not have been modified except with the express prior written consent of FMC and Program Lender;

(4)   (a) Program Lender shall have performed and observed the terms and conditions of this Agreement in all material respects;

(b)   Program Lender and TERI shall have performed and observed the terms and conditions of

the Origination Agreement in all material respects and there shall not have occurred a default thereunder;

(c)   Program Lender and Servicer shall have performed and observed the terms and conditions of the Servicing Agreement in all material respects and there shall not have occurred a default thereunder;

(5)   The Seasoned Loans to be purchased shall have been originated and serviced in conformity with the Program Guidelines in all material respects and shall be covered by the Guaranty Agreement;

(6)   If requested by FMC, TERI shall have executed and delivered a confirmation of guaranty in the form of a Certificate of Guaranty, covering all Seasoned Loans being purchased, for the benefit of the Purchaser Trust and the indenture trustee in the Securitization Transaction;

(7)   The Agent, acting pursuant to the Deposit and Security Agreement, shall have transferred to the indenture trustee in the Securitization Transaction the portion of the Pledged Account and the Collateral specified in Section 4 of the Deposit and Security Agreement;

(8)   Program Lender shall have delivered the opinion of its counsel confirming the matters set forth in subsections 5.02(a) and (b), such opinion to be satisfactory in form and substance to counsel for FMC;

(9)   Program Lender shall have, at its own expense, on or prior to the Purchase Date, indicated in computer files relating to GMAC Bank Conforming Loans that the Seasoned Loans identified in the related Pool Supplement have been sold to the Purchaser Trust pursuant to this Agreement and such Pool Supplement;

(10)   Program Lender hereby authorizes the filing of a UCC-1 financing statement with respect to the Seasoned Loans included in such Pool in the appropriate office of the jurisdiction in which the Program Lender is located (or, in the event of a change of law, Program Lender shall have taken, but at no additional cost or expense to the Program Lender, such action as may be reasonably required by the Purchaser Trust); provided, in any event, that Program Lender shall have the right to review any such financing statement to reasonably assure that the description of collateral contained therein is not overly broad and is appropriately tailored to the transaction under this Agreement;

(11)   As of such Purchase Date: (i) Program Lender was not insolvent and will not become insolvent as a result of the sale and transfer of Seasoned Loans on such Purchase Date, (ii) Program Lender did not intend to incur or believe that it would incur debts that would be beyond Program Lender's ability to pay as such debts matured, (iii) such transfer was not made with actual intent to hinder, delay or defraud any Person, and (iv) Program Lender was "Well Capitalized," as such term is defined by the rules and regulations promulgated by the Office of Thrift Supervision as in effect on the Purchase Date;

(12)   In the reasonable judgment of FMC, no Market Disruption Event has occurred; provided that if satisfaction of the condition set forth in this Section 3.01(b)(12) is the only outstanding condition to closing, FMC shall schedule a new Purchase Date as soon as is reasonably practicable after the Market Disruption Event has ceased;

(13)   If requested by FMC, Program Lender shall have executed a Co-Lender Indemnification Agreement substantially in the form attached to this Agreement as Exhibit B; and

(14)   None of the Guaranty Agreement, Loan Origination Agreement or Deposit and Security Agreement shall have been terminated by the Office of Thrift Supervision on account of a finding by such agency

TSI0480

that Program Lender is a "troubled" institution (as that term is defined in 12 C.F.R. §563.555).

(c)   The obligation of Program Lender to sell the Seasoned Loans included in the Pool on a related Purchase Date is subject to satisfaction of the following conditions (any of which may be waived by Program Lender in whole or in part, in its sole discretion):

(1)   Purchaser Trust shall have delivered to Program Lender a duly authorized and executed Pool Supplement; and

(2)   Purchaser Trust shall have paid the Minimum Purchase Price to Program Lender by wire transfer of immediately available funds.

3.02.   Delivery of Documents.

On the Purchase Date, Program Lender shall deliver to the Servicer, as agent for the Purchaser Trust, and/or to the trustee of the Trust Indenture, each GMAC Bank Note evidencing a Seasoned Loan included in the Pool and the related Origination Records.

3.03.   Confirmation of Representations and Warranties.

In each Pool Supplement, Program Lender shall confirm and certify its representations and warranties contained herein as if fully set forth in the Pool Supplement.

3.04.   Rights Transferred.

The transfer of funds by or on behalf of FMC pursuant to Section 2.04 hereof shall constitute, and the delivery to FMC, or its designated Purchaser Trust of each Pool Supplement shall evidence, a sale and assignment to FMC or the Purchaser Trust of the related Seasoned Loans and of all of Program Lender's interest in such Seasoned Loans. As purchaser of such Seasoned Loans, FMC or the Purchaser Trust shall receive: (i) interest on such Seasoned Loans from and after the Purchase Date, and (ii) any and all other payments and recoveries received by the Servicer or Program Lender from the borrowers and co-signers of such Seasoned Loans, or others pursuant to, or in respect of, such Seasoned Loans from and after the Purchase Date, and all proceeds thereof.

3.05.   Subsequent Receipts.

In the event that Program Lender shall receive, subsequent to any such assignment, any amounts whatsoever in respect to the Seasoned Loans so assigned in the nature of those described in Section 3.04 above, such amounts shall be held by Program Lender in trust for FMC or the Purchaser Trust to which it has sold the Notes, and the Program Lender shall deliver such amounts within one business day to the trustee under the Trust Indenture.

3.06.   Assignment of Origination Rights.

Program Lender shall insure that Program Lender's rights under the Servicing Agreement and the Origination Agreement with respect to any matters occurring prior to the Purchase Date and affecting the Seasoned Loans included in each Pool shall be transferred to FMC or the Purchaser Trust by execution and delivery of a Pool Supplement. Program Lender shall require the party who originated each such Seasoned Loan

to complete any loan origination services being performed for Program Lender on the Purchase Date so that complete Origination Records are ready for transfer to the Purchaser Trust (or to Servicer on its behalf).

3.07.   No Assumption of Liability to Fund GMAC Bank Loan Notes.

By their purchase of Seasoned Loans (and any related GMAC Bank Notes), neither FMC nor any Purchaser Trust, shall assume any liability, responsibility or obligation with respect to any disbursements or reimbursements that are due and owing, or which are, or may be alleged to be due and owing, by Program Lender to any Participating Institution or to any Seasoned Loan borrower by reason of the Seasoned Loans included in the Pool and evidenced by the GMAC Bank Notes. Program Lender shall be solely responsible to fulfill its obligations under any agreements it may have with any Participating Institution regarding origination and funding of such Seasoned Loans. Notwithstanding the foregoing, FMC or the Purchaser Trust shall assume from Program Lender any liability to repurchase from TERI a defaulted Loan upon cure of the default, with respect to any Loan that would be a Seasoned Loan but for such default and purchase by TERI. Such repurchase obligation shall be governed by the Certificate of Guaranty described in Section 3.01(b)(6), above.

3.08.   Servicing and Origination Costs.

Program Lender shall be solely responsible for and shall pay all costs due to any third party from Program Lender (including, without limitation, amounts due to TERI or Servicer) with respect to origination of GMAC Bank Conforming Loans and with respect to loan servicing of GMAC Bank Conforming Loans incurred prior to purchase of a GMAC Bank Conforming Loan hereunder. FMC shall be solely responsible for and shall pay any obligations it has incurred in connection with the GMAC Bank Conforming Loans and shall be solely responsible for arranging and paying all costs for servicing of the GMAC Bank Conforming Loans after purchase of such Loans.

3.09.   Securitization Costs. FMC or the Purchaser Trust shall be solely responsible for and shall pay any Securitization Costs and any and all obligations it has incurred in connection with the purchase, financing of purchase and securitization of the Seasoned Loans.

3.10.   Effect of Loan Cancellations. In the event that the Borrower cancels a Seasoned Loan in a manner and at a time permitted under the Program Guidelines, if that Seasoned Loan has already been purchased under this Agreement, Program Lender will return to the Purchaser Trust all amounts received by it with respect to such purchase. FMC shall prepare an accounting of all such cancellations within 30 days after the last date permitted for cancellation of Seasoned Loans purchased on a particular Purchase Date.

**IV.      [RESERVED]**

**V.      Representations and Warranties**.

5.01.   Representations and Warranties of FMC.

FMC makes the following representations and warranties as of the date hereof, as of the date of each purchase of Seasoned Loans and as of any other date specified below. FMC shall cause each Purchaser Trust to make substantially the same representations and warranties in a Pool Supplement as of the date of each purchase of Seasoned Loans:

(a)   FMC represents and warrants that it is and shall remain a Delaware corporation duly organized,

FSI0482

validly existing and in good standing under the laws of the State of Delaware, and has the requisite corporate authority to conduct all activities and consummate all transactions contemplated by this Agreement.

(b)   FMC has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, and has duly authorized the execution, delivery and performance of, and has duly executed and delivered this Agreement, and this Agreement constitutes the legal, valid and binding obligation of FMC enforceable against FMC in accordance with its terms, except that such enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws.

(c)   Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions hereof, will conflict with, or result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any legal restriction or any agreement or instrument to which FMC is now a party or by which it is bound.

(d)   There is no action before any state or federal court specifically naming FMC pending or, to the knowledge of FMC, threatened, relating to (1) any voluntary or involuntary petition in bankruptcy or the appointment of a receiver or custodian for FMC or its assets or (2) in which an adverse result would have a material adverse effect upon the ability of FMC to consummate the transactions contemplated by this Agreement.

5.02.   Representations and Warranties of Program Lender.

Program Lender makes the following representations and warranties as of the date hereof, as of the date of each sale of Seasoned Loans to FMC or a Purchaser Trust, and as of any other date specified below:

(a)   Program Lender represents and warrants that it is, and shall continue to be, a federal savings bank duly organized, validly existing and in good standing and has the requisite authority to conduct all activities and consummate all transactions contemplated by this Agreement.

(b)   Program Lender has all requisite power and authority to execute, deliver and perform its obligations under this Agreement, and has duly authorized the execution, delivery and performance of, and has duly executed and delivered this Agreement, and this Agreement, together with each Pool Supplement executed pursuant hereto, constitutes the legal, valid and binding obligation of Program Lender enforceable against Program Lender in accordance with its terms, except as such enforceability may be limited by (i) receivership, conservatorship and supervisory powers of bank regulatory agencies generally, (ii) applicable bankruptcy, receivership, conservatorship, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally from time to time in effect, or (iii) general principles of equity.

(c)   Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions hereof, will conflict with, or result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any legal restriction or any agreement or instrument to which Program Lender is now a party or by which it is bound.

(d)   Each of the GMAC Bank Conforming Loans originated by Program Lender and sold to FMC or a Purchaser Trust pursuant to any Securitization Transaction (i) is the valid, binding and enforceable obligation of the borrower executing the same, and of any cosigner thereto, enforceable against each borrower, any student maker named therein, and any cosigner thereunder in accordance with its terms except as enforceability may be

TSI0483

affected by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and by equitable principles, (ii) is covered by and entitled to the benefits of the Guaranty Agreement, and (iii) is a Seasoned Loan.

(e)   Each GMAC Bank Conforming Loan originated by Program Lender sold hereunder and any accompanying notices and disclosures conforms to all applicable state and federal laws, rules and regulations and each GMAC Bank Conforming Loan was documented on forms set forth in the Program Guidelines and contained consumer loan terms and involved guaranty fees payable to TERI in strict conformity with the Program Guidelines. The origination of each GMAC Bank Conforming Loan was conducted in accordance with the Program Guidelines and all applicable state and federal laws including, without limitation, the Equal Credit Opportunity Act. No application to Program Lender for a GMAC Bank Conforming Loan shall be, or has been, rejected, approved or discouraged by Program Lender on the basis of race, sex, color, religion, national origin, age (other than laws limiting the capacity to enter a binding contract) or marital status, the fact that all or a part of the borrower's or co-signer's, income derives from any public assistance program, or the fact that the applicant, borrower or any co-signer has, in good faith, exercised any right under the Consumer Credit Protection Act.

(f)   Each GMAC Bank Conforming Loan originated by Program Lender sold to FMC or Purchaser Trust is in compliance with any applicable usury laws at the time made and of the time of assignment to FMC or a Purchaser Trust.

(g)   At the time of origination, there was no defense to payment, counterclaim or setoff with respect to any GMAC Bank Conforming Loan sold under this Agreement. To the knowledge of the Program Lender, there is no action before any state or federal court, administrative or regulatory body, pending or threatened against Program Lender in which an adverse result would have a material adverse effect upon the validity or enforceability of GMAC Bank Conforming Loans originated by Program Lender and included in the Pool.

(h)   Each and every GMAC Bank Conforming Loan sold pursuant to this Agreement is owned by Program Lender free and clear of any liens, claims or demands of any person, and Program Lender has the absolute right to transfer the same to FMC or a Purchaser Trust.

(i)   With respect to each GMAC Bank Note originated by Program Lender and included in the Pool: (A) the terms thereof have not been impaired, waived, altered or modified in any respect, except pursuant to written forbearance agreements in accordance with the requirements of and in the terms set forth in the Program Guidelines, and (B) such GMAC Bank Note has been serviced at all times in accordance with the Program Guidelines.

5.03.   Exclusive Representations and Warranties.

The representations and warranties set forth in Section 5.02 above are the sole and exclusive representations and warranties made by the Program Lender with respect to this Agreement, any Pool Supplement, any GMAC Bank Conforming Loan, any obligor, and the sale of any GMAC Bank Conforming Loan to the Purchaser Trust hereunder or otherwise.

5.04.   Remedy for Breach of Representations and Warranties.

In the event any representation or warranty made by Program Lender pursuant to Section 5.02 above shall prove to be inaccurate or incomplete as of the date when made, Program Lender shall have the right (but

not the obligation) to elect by written notice to FMC to be given by Program Lender no later than sixty (60) days after receipt of written notice from FMC of such alleged breach to repurchase the affected GMAC Bank Conforming Loan or Loans no later than such 60th day for a cash purchase price equal to the outstanding principal balance thereof plus all accrued and unpaid interest. Upon receipt of said repurchase price, FMC shall, or, if applicable, shall cause the Purchaser Trust or the Servicer to, deliver the GMAC Bank Note and the Origination Records relating thereto to Program Lender, duly endorsed or assigned to Program Lender or to such person as Program Lender may direct, in any such case, without recourse to FMC or the Purchaser Trust. Whether or not Program Lender exercises its right of repurchase, Program Lender shall indemnify FMC, any Purchaser Trust and any fiduciary under the Trust Agreement pursuant to Article VIII of this Agreement.

## VI.  Survival of Representations, Warranties and Indemnities.

As to any GMAC Bank Conforming Loans purchased hereunder, the representations and warranties contained herein and the indemnifications and indemnification procedures contained in Article VIII hereof with respect to such GMAC Bank Conforming Loans shall survive until each such GMAC Bank Conforming Loan is paid in full.

## VII.  Miscellaneous.

7.01.  No Assignment.

No party may assign its rights or obligations under this Agreement without the prior written consent of the parties hereto, provided, however, that: (a) Program Lender may assign its rights hereunder to an Affiliate that is a national banking association or state-chartered bank having the legal power and right under applicable law (including, without limitation, usury law in the State where it is located) to make GMAC Bank Conforming Loans, and (b) FMC shall have the right to create a Purchaser Trust to exercise FMC's rights to purchase each Pool. No assignment shall relieve the assignor of liability hereunder. Any assignment in violation of this Section 7.01 shall be automatically null and void.

7.02.  Amendment.

This Agreement may not be amended nor terms or provisions hereof waived unless such amendment or waiver is in writing and signed by all parties hereto.

7.03.  No Waiver.

No delay or failure by any party to exercise any right, power or remedy hereunder shall constitute a waiver thereof by such party, and no single or partial exercise by any party of any right, power or remedy shall preclude other or further exercise thereof or any exercise of any other rights, powers or remedies.

7.04.  Entire Agreement.

This Agreement and the documents and agreements referred to herein embody the entire agreement and understanding among the parties hereto and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

7.05.  Notices.

TSI0485

All notices given by any party to the others under this Agreement shall be in writing delivered: (a) personally, (b) by facsimile transmission, (c) by overnight courier, prepaid, or (d) by depositing the same in the United States mail, certified, return receipt requested, with postage prepaid, addressed to the party at the address set forth below. Any party may change the address to which notices are to be sent by notice of such change to each other party given as provided herein. Such notices shall be effective on the date received. Notices shall be given as follows:

If to Program Lender:

GMAC Bank
3710 Kennett Pike
Greenville, DE 19807
Attention: President
Fax: (215) 682-1467

With a copy to:

GMAC Bank
100 Witmer Road
Horsham, PA 19044
Attention: General Counsel
Fax: (215) 682-1467

If to FMC:

Daniel Maxwell Meyers
The First Marblehead Corporation
30 Little Harbor
Marblehead, MA 01945
Facsimile: (781) 639-4583
E-Mail:
dmeyers@gateloan.com

With a copy to:

Richard P. Hackett, Esq.
Pierce Atwood
One Monument Square
Portland, ME 04101
Facsimile: (207) 791-1350
E-Mail: rhackett@pierceatwood.com

    7.06.  <u>Attorneys' Fees</u>.

In the event of a lawsuit or arbitration proceeding arising out of or relating to this Agreement, the prevailing party shall be entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator.

TSI0486

7.07.  Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (without reference to choice-of-law rules).

7.08.  Counterparts.

This Agreement may be executed in any number of counterparts, all of which together shall constitute one agreement.

7.09.  No Third Parties Benefited.

This Agreement is made and entered into for the protection and legal benefit of the parties, and their permitted successors and assigns (including, without limitation, any Purchaser Trust), and each and every Indemnified Person (all of which shall be entitled to enforce the Indemnity contained in Sections 8.01 and 8.02 hereof), and no other person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement.

7.10.  Opinions.

Concurrent with the execution hereof, each party shall deliver to the other the opinion of its corporate counsel (which may be internal counsel) to the effect that this Agreement has been duly authorized by all necessary corporate or other organizational action, this Agreement is within the corporate or other organizational power of such party and that this Agreement has been duly executed and delivered by an authorized officer of the party.

7.11.  Use of Borrowers' Names.

FMC agrees that it will not use any list of Borrowers of GMAC Bank Conforming Loans for the purpose of soliciting such Borrowers in connection with the sale of any product or service without the express prior written consent of Program Lender.

7.12.  Marketing Materials.

Program Lender agrees that all marketing materials used in connection with the GMAC Bank Program shall comply with all applicable laws, shall not contain any false or misleading statements, shall not use any trademark, service mark or logo of FMC without FMC's prior written consent and shall be subject to the prior review and approval of FMC.

7.13.  Confidentiality.

Each of Program Lender and FMC (each, a "Bound Party") shall hold, and shall cause its respective affiliates, directors, officers, employees, agents, consultants and advisors to hold, in strictest confidence, all non-public records, books, contracts, reports, instruments, computer data and other data and information concerning its performance under this Agreement that were furnished or made available to it by another party to this Agreement, including, but not limited to, information regarding compensation arrangements among the parties (except to the extent required to be disclosed in connection with any Securitization Transaction) and personal information about any Borrower of a GMAC Bank Conforming Loan (collectively "Information").

TSI0487

Notwithstanding anything to the contrary in this Agreement, with reference to a particular Bound Party, Information shall not include any information that such party can show to be:

(a)   Previously known by such Bound Party on a non-confidential basis,

(b)   Available to such Bound Party on a non-confidential basis from a source other than the Disclosing Party (as defined below),

(c)   In the public domain through no fault of such Bound Party,

(d)   Later lawfully acquired from other sources by such Bound Party, and/or

(e)   Related to individual, potential or actual Borrowers solicited under the GMAC.

Bank Program, unless such information (i) is nonpublic personal information as defined in Title V of the Gramm-Leach-Bliley Act and Federal Reserve Board Regulation P ("Nonpublic Personal Information") that relates to the GMAC Bank and is obtained by FMC from Program Lender in the performance of its obligations under this Agreement or (ii) is necessary to service or collect the GMAC Bank Conforming Loans after purchase. The parties agree that Program Lender intends to solicit its employees, the families of its employees, and other persons who have an existing and continuing relationship with Program Lender (all such persons, the "Affinity Group") for this program, and nothing contained in this Section 7.13 is intended to limit Program Lender's rights to continue to maintain its relationship with such Affinity Group, to the fullest extent permitted by applicable law.

Each of the Bound Parties shall not use, or permit any of their affiliates, directors, officers, employees, agents, consultants or advisors to use, any Information for any purpose other than performance of such Bound Party's obligations under this Agreement. Each Bound Party shall not release or disclose Information to any person without the prior written consent of the person who provided such information (the "Disclosing Party"), except (i) to its auditors, attorneys, financial advisors, bankers and other consultants and advisors and/or those who would normally have access to such information in the regular course of the performance of their duties, subject in all cases to the agreement of the person to whom the Information is provided to be bound by the confidentiality restrictions of this Section 10, and (ii) to the extent required by law or legal process. In the event that a Bound Party determines that it is required by law, or receives notice that it will be compelled by legal process, to disclose any Information, the Bound Party shall provide the Disclosing Party with prompt prior written notice of such requirement (if permitted by applicable law or subpoena), so that the Disclosing Party may seek a protective order or other appropriate remedy and/or waive the terms of any confidentiality agreement applicable to such Information.

## VIII.   Indemnification.

8.01.  By Program Lender.

Regardless of the exercise or nonexercise of the repurchase right under Section 5.04, Program Lender shall indemnify and hold harmless FMC, each Purchaser Trust and any fiduciary under any Trust Indenture, and any officer, director, employee or agent of any of the foregoing (herein, collectively referred to as the "Indemnified Persons") against any and all liabilities, losses, costs, damages and expenses, including, without limitation, attorneys' fees and legal expenses and sums paid, liabilities incurred or expenses paid or incurred in

TSI0488

connection with settling claims, suits or judgments or obtaining or attempting to obtain release from liability under the Trust Indenture or this Agreement which such Indemnified Person may sustain or incur by reason of any breach of any representation, warranty or covenant of Program Lender contained herein. This section shall survive any termination of this Agreement.

8.02.  By FMC.

FMC or the applicable Purchaser Trust, as the case may be, shall indemnify and hold harmless Program Lender and any officer, director, employee or agent of Program Lender (herein, collectively referred to as "Indemnified Persons") against any and all liabilities, losses, costs, damages, and expenses, including, without limitation, attorneys' fees and legal expenses and sums paid, liabilities incurred or expenses paid or incurred in connection with settling claims or judgments or obtaining or attempting to obtain release from liability, which such Indemnified Person may sustain or incur by reason of any breach of any representation, warranty or covenant of FMC or the applicable Purchaser Trust, as the case may be, contained herein. This section shall survive any termination of this Agreement.

8.03.  Indemnity Procedures.

(a)  In the event that any claim or demand for which an indemnifying party would be liable to an Indemnified Person hereunder is asserted against or sought to be collected from an Indemnified Person by a third party (an "Action"), the Indemnified Person shall promptly notify the indemnifying party of such Action, specifying the nature of such claim or demand and the amount or the estimated amount thereof to the extent feasible (which estimate the parties agree shall not be conclusive of the final amount of such claims and demand) (the "Claim Notice"). The failure to provide the Claim Notice to the indemnifying party promptly will not relieve the indemnifying party of any liability it may have to the Indemnified Person giving the Claim Notice, except to the extent that the indemnifying party demonstrates that the defense of such action is actually and materially prejudiced by the indemnifying party's failure to give such Claim Notice promptly. The indemnifying party shall have ten (10) days from the delivery of the Claim Notice (the "Notice Period") to notify the Indemnified Person, (1) whether or not the indemnifying party disputes liability to the Indemnified Person hereunder with respect to such claim or demand and (2) notwithstanding any such dispute, whether or not the indemnifying party desires, at its sole cost and expense, to defend the Indemnified Person against such claim or demand in which case the indemnifying party shall assume all past and future responsibility for such action and shall reimburse the Indemnified Person for all expenses in connection with the Action. Notwithstanding the assumption by the indemnifying party of the defense of any Action, the Indemnified Person shall be permitted to participate in such defense at its cost and expense.

(b)  Pending the resolution of any dispute by the indemnifying party of its liability with respect to any claim or demand, such claim or demand shall not be settled without the prior written consent of the Indemnified Person, which consent shall not be unreasonably withheld so long as the Indemnified Person suffers no economic loss thereby and such settlement includes an unconditional term thereof given by the claimant or plaintiff of a release of the Indemnified Person from all liability with respect to the claim or demand. Notwithstanding the foregoing, if it is reasonably likely that damages in such Action would result in an injunction or other equitable relief then the Indemnified Person may, by notice to the indemnifying party, assume the right to defend, compromise or settle such Action; provided, the indemnifying party may participate in such Action at its expense and; provided, further, no such Action shall be settled without the consent of both the Indemnified Person and the indemnifying party.

TSI0489

(c)   In the event that an indemnifying party notifies the Indemnified Person within the Notice Period that the indemnifying party desires to defend the Indemnified Person against such claim or demand, then, except as hereinafter provided, the indemnifying party shall have the right and obligation to defend the Indemnified Person by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the indemnifying party to a final conclusion in such a manner as to avoid any risk of the Indemnified Person becoming subject to liability for any other matter; provided, however, the indemnifying party shall not, without the prior written consent of the Indemnified Person, consent to the entry of any judgment against the Indemnified Person or enter into any settlement or compromise which does not include, as an unconditional term thereof, the giving by the claimant or plaintiff to the Indemnified Person of a release, in form and substance satisfactory to such Indemnified Person, as the case may be, from all liability with respect to such claim or litigation. If any Indemnified Person desires settlement without the prior consent of the indemnifying party, which consent shall not be unreasonably withheld, it may do so at its sole cost and expense.

(d)   If the indemnifying party elects not to defend the Indemnified Person against such Action, whether by not giving the Indemnified Person timely notice as provided above, or otherwise, then the Action may be defended by the Indemnified Person at the indemnifying party's cost and expense (without imposing any obligation on any Indemnified Person to defend any such claim or demand), in which case it may defend such Action in such a manner as it may deem appropriate (including settlement) and then that portion thereof as to which such defense is unsuccessful, in each case, shall be conclusively deemed to be a liability of the indemnifying party hereunder; provided that if the indemnifying party shall have disputed its liability to the Indemnified Person hereunder, as provided in Section 8.03(a) above, then such determination or settlement shall not affect the right of the indemnifying party to dispute the Indemnified Person's claim for indemnification.

(e)   In the event an Indemnified Person should have a claim against the indemnifying party hereunder that does not involve a claim or demand being asserted against or sought to be collected from it by a third party, the Indemnified Person shall promptly send a Claim Notice with respect to such claim to the indemnifying party. If the indemnifying party disputes its liability with respect to such claim or demand, the Indemnified Person shall have the right to pursue all of its legal and equitable remedies against the indemnifying party for indemnity hereunder.

8.04.  Payment.

Upon the determination of the liability under Section 8.03 hereof, the indemnifying party shall pay to the Indemnified Person within ten (10) days after such determination, the amount of any claim for indemnification made hereunder, subject to the limitations set forth herein. Upon payment in full of any claim, either by set off or otherwise, the entity making payment shall be subrogated to the rights of the Indemnified Person against any Person, with respect to the subject matter of such claim.

# IX.   Dispute Resolution

9.01.  Informal Dispute Resolution.

Any controversy or claim between the parties arising from or in connection with this Agreement or the relationship of the parties under this Agreement whether based on contract, tort, common law, equity, statute, regulation, order or otherwise, and whether arising before or after the termination of this Agreement ("Dispute") shall be resolved as follows:

TSI0490

(a)   Upon written request of either party, the parties will each appoint a designated representative whose task it will be to meet for the purpose of endeavoring to resolve such Dispute.

(b)   The designated representatives shall meet as often as the parties reasonably deem necessary to discuss the problem in an effort to resolve the Dispute without the necessity of any formal proceeding.

(c)   Arbitration proceedings for the resolution of a Dispute under Section 9.02 may not be commenced until the earlier to occur of the following:

> (i) the designated representatives conclude in good faith that amicable resolution through continued negotiation of the matter does not appear likely; or
>
> (ii) the expiration of the thirty (30) day period immediately following the initial request to negotiate the Dispute.

9.02.   <u>Arbitration</u>.

If the provisions of Section 9.01 have been satisfied, but the Dispute has not been resolved, then the Dispute shall be settled pursuant to the following:

(a)   Any controversy or claim between or among the parties arising out of or relating to this Agreement or any agreements or instruments relating hereto or delivered in connection herewith and any claim based on or arising from an alleged tort, shall at the request of any party be determined by arbitration. The arbitration shall be conducted in accordance with the United States Arbitration Act (Title 9, U.S. Code), notwithstanding any choice of law provision in this Agreement, and under the Commercial Rules of the American Arbitration Association ("AAA"). The arbitrator(s) shall give effect to statutes of limitation in determining any claim. Any controversy concerning whether an issue is arbitrable shall be determined by the arbitrator(s). Judgment upon the arbitration award may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

(b)   No provision of this Section shall limit the right of any party to this Agreement to exercise self-help remedies such as setoff, foreclosure against or sale of any real or personal property collateral or security, or obtaining provisional or ancillary remedies from a court of competent jurisdiction before, after, or during the pendency of any arbitration or other proceeding. The exercise of a remedy does not waive the right of either party to resort to arbitration or reference. At the option of any party holding a deed of trust, foreclosure under such deed of trust or mortgage may be accomplished either by exercise of power of sale under the deed of trust or mortgage or by judicial foreclosure.

9.03.   <u>Permissible Legal Proceedings</u>.

Notwithstanding anything contained in Sections 9.01 and 9.02, (a) a party may institute legal proceedings to seek a temporary restraining order or other temporary or preliminary injunctive relief to prevent immediate and irreparable harm to such party, and for which monetary damages would be inadequate, pending final resolution of the dispute, controversy or claim pursuant to arbitration, and (b) a party may institute legal proceedings if

necessary to preserve a superior position with respect to other creditors. Such conduct shall not constitute a waiver of the right of either party to resort to arbitration to obtain relief other than that specified in this Section 9.03.

## X.      **Term and Termination**.

10.01.  Term and Termination.

(a)  Termination by FMC. FMC may terminate this Agreement if:

(1)  The Guaranty Agreement is terminated by reason of a breach thereof by Program Lender; or

(2)  Program Lender materially breaches this Agreement, and fails to cure such material breach, within 30 days of written demand for cure; or

(3)  Program Lender shall file any proceeding under the U.S. Bankruptcy Code or similar state insolvency act, or shall be the subject of any involuntary bankruptcy proceeding, including without limitation a seizure of assets by the FDIC, which proceeding is not dismissed within 60 days after the filing thereof; or

(4)  the Guaranty Agreement expires or is not renewed or a TERI Insolvency Event occurs.

(b)  Termination by Program Lender. Program Lender may terminate this Agreement:

(1)  If the Guaranty Agreement is terminated by reason of a breach thereof by TERI; or

(2)  If FMC materially breaches this Agreement, and fails to cure such material breach, within 30 days of written demand for cure; provided, however, that in the event termination is due to the unexcused failure of FMC or a Purchaser Trust to purchase within a Purchase Period one or more Seasoned Loans prior to the end of the Purchase Period with respect to such Loans, Program Lender may terminate this Agreement only if FMC or a Purchaser Trust fails to purchase such Loans prior to the end of the Right of First Refusal Period with respect to such Loans; or

(3)  If FMC shall file any proceeding under the U.S. Bankruptcy Code or similar state insolvency act, or shall be the subject of any involuntary bankruptcy proceeding, which proceeding is not dismissed within 60 days after the filing thereof.

(4)  Notwithstanding the foregoing, if Program Lender is determined to be a "troubled" institution (as that term is defined in 12 C.F.R. §563.555), the Office of Thrift Supervision may terminate this Agreement upon reasonable notice and without penalty.

(c)  Termination by Reason of Expiration or Termination of Guaranty Agreement.

Unless earlier terminated under Sections 10.01(a) or (b), this Agreement shall remain in full force and effect until the later of (i) the first anniversary of the date of this Agreement or (ii) July 31, 2004. Thereafter, this Agreement shall automatically renew for additional one-year periods unless either party shall give the other notice of nonrenewal at least 90 days prior to the expiration of the then-effective term.

(d)  Effect of Termination.

TSI0492

(1)   In the event of termination under any of Sections 10.01(a)(1), (2), or (3) or 10.01(b), neither party shall have any further obligations to purchase or sell Loans under this Agreement, but the nonbreaching party shall have whatever remedies are provided by law.

(2)   In the event of termination under Section 10.01(a)(4) or 10.01(c), the Agreement (i) shall continue in full force and effect with respect to GMAC Bank Conforming Loans made prior to such termination until the expiration of the Right of First Refusal Period (under Section 2.02 hereof) for all GMAC Bank Loans guaranteed pursuant to the Guaranty Agreement, and (ii) FMC or a designee Purchaser Trust has the right to purchase any GMAC Bank Conforming Loans originated prior to such termination, on the terms set forth in this Agreement, until the end of the Right of First Refusal Period with respect to such loans.

(3)   After termination of this Agreement, certain obligations hereunder shall survive as provided in Article VI hereof.

(4)   After notice of termination or expiration of this Agreement is given (including, without limitation, notice under section 10.02), the parties shall meet to develop a transition plan to deal with applications and approved loans that have not been fully processed and/or funded. Such plan shall require all parties to fulfill any legal commitments already made to borrowers or applicants. Subject in all cases to binding legal rights of borrowers, unless termination notice has been given under Sections 10.01(a)(4) or 10.01(b), Program Lender shall continue to process applications until an agreed date not later than 30 days before the effective date of termination, approvals shall cease to be granted on an agreed date not later than 15 days before termination, and loan disbursements shall be completed not later than 90 days after termination. In the case of a termination notice given under subsections 10.01(a)(4) or 10.01(b), Program Lender may elect to take only those further actions as are required to fulfill the legal rights of borrowers and applicants.

10.02.  <u>Effect of Change in Control or Other Transaction Involving Program Lender</u>. If Program Lender consolidates with or merges into another person or entity, or conveys, transfers, or leases all or substantially all of its property to any person or entity, or any person or entity consolidates with or merges into Program Lender or conveys, transfers, or leases all or substantially all of its property to Program Lender, FMC may terminate this Agreement upon [**] Business Days prior written notice; provided, however, that prior to delivering such notice, Program Lender will arrange for FMC to meet with representatives of the Program Lender's successor entity and engage in good faith negotiations for the continuation of this Agreement upon mutually acceptable terms and conditions.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

WITNESS:                                                      GMAC BANK

_____                    _____

/s/ Richard T. Sultzer                                      By: /s/ Michael P. DiComo
Print Name: Richard T. Sultzer                          Print Name: Michael P. DiComo
                                                              Title: Senior Vice President

TSI0493

THE FIRST MARBLEHEAD CORPORATION

/s/ Jane Dixon
Print Name: Jane Dixon

By: /s/ Ralph James
Print Name: Ralph James
Title: Title: President

Note Purchase Agreement
Index to Exhibits

Exhibit A   Pool Supplement

Exhibit B   Co-Lender Indemnification Agreement

EXHIBIT A TO NOTE PURCHASE AGREEMENT

[Form of Pool Supplement]

This Pool Supplement ("Supplement") is entered into pursuant to and forms a part of that certain Note Purchase Agreement (the "Agreement") dated as of _____, by and between The First Marblehead Corporation ("FMC") and GMAC Bank. This Supplement is dated _____. Capitalized terms used in this Supplement without definitions have the meaning set forth in the Agreement.

Article 1:  Purchase and Sale.

In consideration of the Minimum Purchase Price set forth in Schedule 1 attached hereto, Program Lender hereby transfers, sells, sets over and assigns to [name of purchasing entity] ("Purchaser Trust"), upon the terms and conditions set forth in the Agreement (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each GMAC Bank Conforming Loan described in the attached Schedule 2 ("the Transferred GMAC Bank Loans") along with all of Program Lender's rights under the Guaranty Agreement relating to the Transferred GMAC Bank Loans. Program Lender hereby transfers and delivers to the Purchaser Trust each GMAC Bank Note evidencing such GMAC Bank Conforming Loan and all Origination Records relating thereto, in accordance with the terms of the Agreement. Purchaser Trust hereby purchases said GMAC Bank Notes on said terms and conditions.

Article 2:  Price.

The amount paid pursuant to this Supplement is the Minimum Purchase Price, as that term is defined in Section 2.04 of the Agreement.

Article 3:  Representations and Warranties.

3.01 By Program Lender.

Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement

TSI0494

and confirms the same are true and correct as of the date hereof with respect to the Agreement and to this Supplement.

3.02  By Purchaser Trust.

The Purchaser Trust hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Purchaser Trust:

(a)   The Purchaser Trust is duly organized and validly existing as a business trust under the laws of the State of Delaware with the due power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred GMAC Bank Loans.

(b)   The Purchaser Trust is duly qualified to do business and has obtained all necessary licenses and approvals, in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c)   The Purchaser Trust has the power and authority to execute and deliver this Pool Supplement and to carry out its respective terms; the Purchaser Trust has the power and authority to purchase the Transferred GMAC Bank Loans and rights relating thereto as provided herein from the Program Lender and the Purchaser Trust has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Pool Supplement has been duly authorized by the Purchaser Trust by all necessary action on the part of the Purchaser Trust.

(d)   This Pool Supplement, together with the Agreement of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Purchaser Trust, enforceable in accordance with its terms.

(e)   The consummation of the transactions contemplated by the Agreement and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Purchaser Trust or any indenture, agreement or other instrument to which the Purchaser Trust is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Purchaser Trust of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Purchaser Trust or its properties.

(f)   There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Purchaser Trust or its properties: (1) asserting the invalidity of the Agreement or this Pool Supplement, (2) seeking to prevent the consummation of any of the transactions contemplated by the Agreement or this Pool Supplement, or (3) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Purchaser Trust of its obligations under, or the validity or enforceability of the Agreement or this Pool Supplement.

Article 4:  Cross Receipt.

Program Lender hereby acknowledges receipt of the Minimum Purchase Price. Purchaser Trust hereby acknowledges receipt of the Transferred GMAC Bank Loans included in the Pool.

<u>Article 5:  Assignment of Origination, Guaranty and Servicing Rights</u>.

[OPTION ONE – Purchaser Assures Program Lender's Servicing Agreement] Program Lender hereby assigns and sets over to Purchaser Trust so much of its rights under the Guaranty Agreement, [the Origination Agreement,] and the Servicing Agreement as relate to the Transferred GMAC Bank Loans described in Schedule 2, including, without limitation, the right to continued loan servicing under the Servicing Agreement pursuant to a Servicing Assignment and Servicer consent Letter delivered herewith.

[OPTION TWO – Purchaser Has Direct Servicing Agreement in Place]. Program Lender hereby assigns and sets over to Purchaser Trust any claims it may now or hereafter have under the Guaranty Agreement [the Origination Agreement,] and the Servicing Agreement to the extent the same relate to the Transferred GMAC Bank Loans described in Schedule 2, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in Purchaser Trust any claim of Program Lender relating to defects in [origination,] guaranty, or servicing of the loans purchased hereunder in order to permit Purchaser Trust to assert such claims directly and obviate any need to make the same claims against Program Lender under this Agreement.

<u>Article 6:  Owner Trustee</u>.

It is expressly understood and agreed by the parties hereto that (a) this Pool Supplement is executed and delivered by _____ (the "Owner Trustee") not individually or personally, but solely as owner trustee of the Purchaser Trust under the Trust Agreement dated as of _____, with _____, in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Purchaser Trust are made and intended not as personal representations, undertakings and agreements by the Owner Trustee, but are made and intended for the purpose for binding only the Purchaser Trust, (c) nothing herein contained shall be construed as creating any personal or individual liability on the Owner Trustee, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereby and by any person claiming by, through, or under the parties hereto, and (d) under no circumstances shall the Owner Trustee be personally liable for the payment of any indebtedness or expenses of the Purchaser Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Purchaser Trust under this Supplement or any other documents related to the GMAC Bank Notes.

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION


By: _____
Name: _____
Title: _____

GMAC BANK:


By: OWNER TRUSTEE

TSI0496

By:_____
Name:_____
Title:_____

PROGRAM LENDER:

_____

By:_____
Name:_____
Title:_____

Schedule 1 to Pool Supplement
(SAMPLE)

SETTLEMENT SCHEDULE
FMC 200\_\_-CP-\_\_

PROGRAM NAME LOANS

| # of Loans | Total Principal | Accrued Interest at Note Rate |
|---|---|---|

EXHIBIT B TO NOTE PURCHASE AGREEMENT
CO-LENDER INDEMNIFICATION AGREEMENT

THIS CO-LENDER INDEMNIFICATION AGREEMENT (the "Agreement") is made as of [DATE], by and between [Names and Addresses of Co-Lenders] ("Co-Lender"), and [LENDER NAME] ("Program Lender"), a [type of bank] organized under the laws of the , with its headquarters and principal place of business located at _____ (Co-Lender and [Lender Name] are sometimes collectively referred to as the "Lenders" and are each sometimes severally referred to as a "Lender").

RECITALS

A.      The Lenders are participants in certain private education loan programs to pay the costs of

attending institutions of education which are themselves participants in the TERI Program (the "Participating Institutions") whereunder such loans (the "TERI Loans") are guaranteed by The Education Resources Institute, Inc. ("TERI") (collectively, the "TERI Programs").

B.    Each of the Lenders, individually, have entered into an agreement (each, a "Purchase Agreement") with The First Marblehead Corporation or The National Collegiate Trust, pursuant to which Purchase Agreements such Lenders have agreed to sell certain TERI Loans to [Name of Purchasing Entity] (the "Purchaser Trust"), each such purchase to be funded through the issuance and sale of certificates, bonds or other evidences of indebtedness, the repayment of which are supported by such TERI Loans (the "Subject Securitization Transaction").

C.    As a condition precedent to the obligation of each Lender to consummate the sale of TERI Loans originated by them to the Purchaser Trust, all Lenders whose TERI Loans will be included in the Subject Securitization Transaction are required to execute and deliver to the other Lenders requesting same a copy of this Agreement.


NOW, THEREFORE, in consideration of the foregoing Recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I
ARTICLE IREPRESENTATIONS AND WARRANTIES

1.01.  Each Lender represents and warrants to each other Lender requesting this Agreement, as to itself, that as of the date hereof:

(a)  It is a national banking association, duly organized, validly existing and in good standing under the laws of the United States and has the power and authority to originate and/or hold TERI Loans, to consummate the transaction contemplated by the Purchase Agreement to which it is a party, and to execute and deliver and perform its obligations under this Agreement;

(b)   This Agreement has been duly authorized, executed and delivered and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms except as enforceability may be limited by (a) the receivership, conservatorship and similar supervisory powers of bank regulatory agencies generally, as well as bankruptcy, insolvency, liquidation, receivership, moratorium, reorganization or other similar laws affecting the enforcement of the rights of creditors; (b) general principles of equity (including availability of equitable remedies), whether enforcement is sought in a proceeding in equity or at law; and (c) applicable securities laws and public policy considerations underlying the securities laws to the extent that such public policy considerations limit the enforceability of the provisions of this Agreement which purport to provide indemnification with respect to securities law liabilities;

(c)   Each TERI Loan included in the Subject Securitization Transaction originated by it is the valid, binding and enforceable obligation of the borrower executing the same, and of any cosigner thereto, enforceable against the borrower and cosigner thereunder in accordance with its terms

except as enforceability may be affected by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and by equitable principles;

(d)  At the time of origination, each TERI Loan included in the Subject Securitization Transaction originated by it and any accompanying notices and disclosures conforms in all material respects to all applicable state and federal laws, rules and regulations and the origination thereof was conducted in material compliance with all applicable state and federal laws concerning the actions of the Lender, including, without limitation, the Equal Credit Opportunity Act;

(e)  At the time of origination, each TERI Loan included in the Subject Securitization Transaction originated by it is in compliance in all material respects with any applicable usury laws at the time made and as of the time of sale to the Purchaser Trust pursuant to the Purchase Agreement to which Lender is a party; and

(f)  The respective Lender has no actual knowledge of any defense to payment with respect to any TERI Loan included in the Subject Securitization Transaction originated by it nor is there any action before any state or federal court, administrative or regulatory body, pending against the Lender with regard to its TERI Loans in which an adverse result would have a material adverse effect upon the validity or enforceability of its TERI Loans.

ARTICLE II

INDEMNIFICATION

2.01.  Cross-Indemnification. Each Lender (an "Indemnifying Party") hereby agrees to indemnify, hold harmless and defend each other and such other Lender's respective officers, directors, employees, attorneys, agents (not including any Participating Institution or the servicer of any TERI Loan) and each person who controls such other Lender within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended (collectively and severally, the "Indemnified Parties"), from and against any and all claims, obligations, penalties, actions, suits, judgments, costs, disbursements, losses, liabilities and/or damages (including, without limitation, reasonable external attorneys' fees and the allocated costs of internal salaried attorneys) of any kind whatsoever which may at any time be imposed on, assessed against or incurred by any such Indemnified Party in any way relating to or arising out of the material inaccuracy or incompleteness of any representation or warranty made by the Indemnifying Lender hereunder or the material inaccuracy or incompleteness of any representation or warranty made by the Indemnifying Lender to any Participating Institution in connection with the TERI Program or the Subject Securitization Transaction. The indemnity provided by each Indemnifying Lender hereunder is in addition to any liability which such Lender may otherwise have to the Indemnified Parties, at law, in equity or otherwise, in connection with the Subject Securitization Transaction.

2.02.  Procedure for Indemnification. In case any proceeding (including any governmental investigation) shall be instituted against any Indemnified Party in respect of which indemnity is sought pursuant to Section 2.01, such Indemnified Party shall promptly notify the applicable Indemnifying Party in writing. The Indemnifying Party, upon request of the Indemnified Party, shall acknowledge its obligation, subject to the terms hereof, to indemnify the Indemnified Party in writing and shall retain counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party and any others the Indemnifying Party may designate in such proceeding and the

Indemnifying Party shall pay the fees and disbursements of such counsel related to such proceeding, within a reasonable period of time after such fees and disbursements are billed by such counsel. If the Indemnifying Party fails to acknowledge its obligation, subject to the terms hereof, to indemnify in writing or fails to retain such counsel within a reasonable period of time after such notice was given, then the Indemnified Party shall have the right to retain its own counsel, and the fees and expenses of such counsel shall be at the expense of the Indemnifying Party. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (a) the preceding sentence is applicable, (b) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel or (c) the named parties to any such proceeding (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the Indemnifying Party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm (in addition to any local counsel) for all such Indemnified Parties, and that all such fees and expenses shall be reimbursed as they are incurred.

2.03.  <u>Settlements of Proceedings</u>. The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Party agrees to indemnify the Indemnified Party from and against any loss or liability by reason of such settlement or judgment. No Indemnifying Party, without the prior written consent of the Indemnified Party, shall effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject of such proceeding.

<u>ARTICLE III</u>
MISCELLANEOUS

3.01.  Notices. All demands, notices and communications upon or to any Lender under this Agreement shall be in writing, personally delivered or mailed by certified mail, return receipt requested, to such Lender at its address set forth below or to such other address as may hereafter be furnished by such Lender to the other Lenders hereunder in writing, and shall be deemed to have been duly given upon receipt.

If to Co-Lender:

_____

_____

_____


with a copy to:

_____

_____

_____

If to Program Lender:

_____

_____

_____

With a copy to:

_____

_____

_____

3.02.  <u>Successors and Assigns</u>. This Agreement is binding on the Lenders and their respective successors and assigns. No Lender shall assign its rights or obligations under this Agreement without the prior written consent of all other Lender hereunder, other than to its wholly owned affiliate, and any assignment in violation of this prohibition shall be automatically deemed null and void.

3.03.  <u>Arbitration</u>. The parties acknowledge that this Agreement evidences a transaction involving interstate commerce. Any controversy or claim arising out of or relating to this Agreement, or the breach of the same, shall be settled through consultation and negotiation in good faith and a spirit of mutual cooperation for up to fifteen (15) days commencing on the date when one party gives written notice to the other party of any controversy or claim. However, if those attempts fail, the parties agree that any misunderstandings or disputes arising from this Agreement shall be decided by binding arbitration which shall be conducted, upon request by either party, in New York, New York or such other mutually agreed upon location, before one (1) arbitrator designated by the American Arbitration Association (the "AAA"), in accordance with the terms of the Commercial Arbitration Rules of the AAA, and, to the maximum extent applicable, the United States Arbitration Act (Title 9 of the United States Code). Notwithstanding anything herein to the contrary, either party may proceed to a court of competent jurisdiction to obtain equitable relief at any time.

3.04.  <u>Severability</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

3.05.  <u>Counterparts</u>. This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

3.06.  <u>Headings</u>. The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

3.07.  <u>Amendment</u>. This Agreement may not be amended nor terms or provisions hereof waived unless

TSI0501

such amendment or waiver is in writing and signed by all parties hereto.

3.08.  <u>No Waiver</u>. No delay or failure by any party to exercise any right, power or remedy hereunder shall constitute a waiver thereof by such party, and no single or partial exercise by any party of any right, power or remedy shall preclude other or further exercise thereof or any exercise of any other rights, powers or remedies.

3.09.  <u>Entire Agreement</u>. This Agreement embodies the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof and thereof.

3.10.  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to its conflict of laws doctrine.

3.11.  <u>No Third Party Beneficiaries</u>. This Agreement is made and entered into for the protection and legal benefit of the parties hereto, their permitted successors and assigns, and each and every Indemnified Party, and no other person shall be a direct or indirect beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

CO-LENDER(S)

_____

By:_____
Print Name:
Title:

[LENDER NAME]

_____

By:_____
Print Name:
Title:

# Exhibit 5

Exhibit 5

## 2006-4 POOL SUPPLEMENT
## GMAC BANK

This Pool Supplement (the "Supplement") is entered into pursuant to and forms a part of that certain Note Purchase Agreement (the "Agreement") dated as of May 30, 2003, as amended or supplemented from the date of execution of the Agreement through the date of this Supplement, by and between The First Marblehead Corporation and GMAC Bank (the "Program Lender"). This Supplement is dated as of December 7, 2006. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreement.

### Article 1:  Purchase and Sale.

In consideration of the Minimum Purchase Price set forth below, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor"), upon the terms and conditions set forth in the Agreement (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each GMAC Bank Conforming Loan described in the attached Schedule 1 (the "Transferred GMAC Bank Loans") along with all of the Program Lender's rights under the Guaranty Agreement, and any agreement pursuant to which TERI granted collateral for its obligations under the Guaranty Agreement, relating to the Transferred GMAC Bank Loans. The Depositor in turn will sell the Transferred GMAC Bank Loans to The National Collegiate Student Loan Trust 2006-4 (the "Trust"). The Program Lender hereby transfers and delivers to the Depositor each GMAC Bank Note evidencing such GMAC Bank Conforming Loan and all Origination Records relating thereto, in accordance with the terms of the Agreement. The Depositor hereby purchases said GMAC Bank Notes on said terms and conditions.

### Article 2:  Price.

The amount paid pursuant to this Supplement is the Minimum Purchase Price, as that term is defined in Section 2.04 of the Agreement.

### Article 3:  Representations and Warranties.

### 3.01.  By Program Lender.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement for the benefit of each of the Depositor and the Trust and confirms the same are true and correct as of the date hereof with respect to the Agreement and to this Supplement.

### 3.02.  By Depositor.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

(a)      The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its

properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred GMAC Bank Loans.

(b)     The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

(c)     The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred GMAC Bank Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

(d)     This Supplement, together with the Agreement of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

(e)     The consummation of the transactions contemplated by the Agreement and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

(f)     There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties: (i) asserting the invalidity of the Agreement or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreement or this Supplement, or (iii) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreement or this Supplement.

Article 4:  Cross Receipt.

The Program Lender hereby acknowledges receipt of the Minimum Purchase Price.  The Depositor hereby acknowledges receipt of the Transferred GMAC Bank Loans included in the Pool.

Article 5:  Assignment of Origination, Guaranty and Servicing Rights.

The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreement, the Origination Agreement, and the Servicing Agreement to the extent the same relate to the Transferred GMAC Bank Loans described in Schedule I, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement. The Program Lender also hereby assigns and sets over to the Depositor any claims it may now have or hereafter have to any collateral pledged by TERI to the Program Lender to secure its obligations under the Guaranty Agreement that relates to the Transferred GMAC Bank Loans, and Program Lender hereby releases any security interest it may have in such collateral. Program Lender hereby authorizes the Depositor, its successors and assigns, to file in any public filing office where a Uniform Commercial Code Filing with respect to collateral pledged by TERI is of record, any partial release or assignment that it deems necessary or appropriate to reflect in the public records the conveyance and assignment effected hereby.

[Remainder of page intentionally blank]

{F0001033.1 }

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: _____
    John A. Hupalo
    Senior Executive Vice President

GMAC BANK

By: _____
    Name:
    Title:

THE NATIONAL COLLEGIATE FUNDING LLC

By:   GATE Holdings, Inc., Member

By: _____
    John A. Hupalo
    President

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: _____
    John A. Hupalo
    Senior Executive Vice President

GMAC BANK

By: _____
Name: _____
Title: _____

THE NATIONAL COLLEGIATE FUNDING LLC

By:    GATE Holdings, Inc., Member

By:_____
    John A. Hupalo
    President

{F0001033.1}



**National Collegiate Student Loan Trust 2006-4**
**Roster:** 0

| Lender | Lender Code | Marketer | Loan Product | BSSN |
|---|---|---|---|---|
| GMAC BANK | 900005IP | GMAC Bank | DTC - Undergraduate | ▮▮▮▮-4043 |

| GUARREF | Disb. Date | Tier | Repay Type | Margin |
|---|---|---|---|---|
| 03826471 | 26-Jun-06 | 1 | IO | 0.0475 |

| Fee to Borrower | TERI Admin Fee | Marketing Fee | Total Gross Disbursed | Total Net Disbursed |
|---|---|---|---|---|
| 0.05 | 0.015 | 0.05 | $26,315.79 | $25,000.00 |

| | Total Capitalized Interest | Total Outstanding Gross Principal | Total Outstanding Unpaid Interest | Administrative Fee Reimbursement on 0% Fee Loans |
|---|---|---|---|---|
| Total Net Principal | | | | |
| $24,917.50 | $0.00 | $26,228.95 | $174.18 | $0.00 |

| | | | Final Reconciliation Settlement Figures | |
|---|---|---|---|---|
| Origination Fee Reimbursement Due Bank | Total Marketing Fees | Marketing Fees Due FMC | Marketing Fees Due Bank | Total Amount Due Bank |
| $100.00 | $1,245.88 | $747.53 | **$498.35** | **$27,001.48** |

# Exhibit 6

Exhibit 6

EX-99.5 7 d587610.htm DEPOSIT AND SALE AGREEMENT

EXHIBIT 99.5

### DEPOSIT AND SALE AGREEMENT
### THE NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4

This DEPOSIT AND SALE AGREEMENT (the "Sale Agreement"), dated as of December 7, 2006, between The National Collegiate Funding LLC, in its capacity as seller (in such capacity, the "Seller"), and The National Collegiate Student Loan Trust 2006-4, as purchaser (the "Purchaser"), shall be effective upon execution by the parties hereto.

WHEREAS, the Seller is the owner of certain student loans; and

WHEREAS, the Seller desires to sell its interest in such student loans and the Purchaser desires to purchase such loans from the Seller.

NOW, THEREFORE, in connection with the mutual promises contained herein, the parties hereto agree as follows:

### ARTICLE I
### TERMS

This Sale Agreement sets forth the terms under which the Seller is selling and the Purchaser is purchasing the student loans listed on Schedule 1 or Schedule 2 to each of the Pool Supplements set forth on Schedule A attached hereto (the "Transferred Student Loans").

### ARTICLE II
### DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the definitions set forth in Appendix A of the Indenture dated as of December 1, 2006 between U.S. Bank National Association (the "Indenture Trustee") and the Purchaser.

### ARTICLE III
### SALE AND PURCHASE

Section 3.01.    Sale of Loans. The Seller hereby sells and the Purchaser hereby purchases the Transferred Student Loans.

Section 3.02.    Assignment of Rights. The Seller hereby assigns to the Purchaser and the Purchaser hereby accepts all of the Seller's rights and interests under each of the Pool Supplements listed on Schedule A attached hereto and the related Student Loan Purchase Agreements listed on Schedule B attached hereto.

Section 3.03.    Settlement of the Payment. The Purchaser shall pay the Seller the purchase price set forth in Article 2 of each of the Pool Supplements by wire transfer in immediately available funds to the account specified by the Seller.

Section 3.04.    Assistance by Seller. Following the execution of this Sale Agreement, the Seller shall provide any reasonable assistance requested by the Purchaser in determining that all required documentation on the Transferred Student Loans is present and correct.

### ARTICLE IV
### REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER

Section 4.01.    <u>General</u>. The Seller represents and warrants to the Purchaser that as of the date of this Sale Agreement:

(a)    The Seller is duly organized and existing under the laws of the State of Delaware; and

(b)    The Seller has all requisite power and authority to enter into and to perform the terms of this Sale Agreement.

Section 4.02.    <u>Loan Representations</u>. The Seller represents and warrants to the Purchaser that with respect to each Transferred Student Loan purchased by the Purchaser pursuant to this Sale Agreement, the Seller is making the same representations and warranties made by the respective program lender with respect to each Transferred Student Loan pursuant to the respective Student Loan Purchase Agreement listed on <u>Schedule B</u> attached hereto.

Section 4.03.    <u>Covenants</u>. The Seller, in its capacity as purchaser of the Transferred Student Loans pursuant to the Pool Supplements, hereby covenants that it will enforce the covenants and agreements of each program lender in the respective Student Loan Purchase Agreement and related Pool Supplement. The Seller further covenants that it will not waive, amend, modify, supplement or terminate any Student Loan Purchase Agreement or Pool Supplement or any provision thereof without the consent of the Purchaser, which consent the Purchaser hereby agrees not to provide without the prior written consent of the Indenture Trustee and the Interested Noteholders in accordance with the Purchaser's covenant in Section 3.07(c) of the Indenture.

**ARTICLE V**
**PURCHASE OF LOANS; REIMBURSEMENT**

Each party to this Sale Agreement shall give notice to the other such parties and to the Servicers, First Marblehead Data Services, Inc., the Indenture Trustee, and Wilmington Trust Company (the "<u>Owner Trustee</u>") promptly, in writing, upon the discovery of any breach of the Seller's representations and warranties made pursuant to this Sale Agreement which has a materially adverse effect on the interest of the Purchaser in any Transferred Student Loan. In the event of such a material breach, the Seller shall cure or repurchase the Transferred Student Loan in accordance with the remedies set forth in the respective Student Loan Purchase Agreement.

**ARTICLE VI**
**LIABILITY OF SELLER; INDEMNITIES**

The Seller shall be liable in accordance herewith only to the extent of the obligations specifically undertaken by the Seller under this Sale Agreement.

(a)    The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any taxes that may at any time be asserted against any such Person with respect to the transactions contemplated herein and in the other Basic Documents (except any such income taxes arising out of fees paid to the Owner Trustee), including any sales, gross receipts, general corporation, tangible and intangible personal property, privilege or license taxes and costs and expenses in defending against the same.

(b)    The Seller shall indemnify, defend and hold harmless the Purchaser and the Owner Trustee in its individual capacity and their officers, directors, employees and agents from and against any and all costs, expenses, losses, claims, damages and liabilities arising out of, or imposed upon such Person through, the Seller's willful misfeasance, bad faith or gross negligence in the performance of its duties under this Sale Agreement, or by reason of reckless disregard of its obligations and duties under this Sale Agreement.

Indemnification under this Section shall survive the termination of this Sale Agreement and shall include reasonable fees and expenses of counsel and expenses of litigation. If the Seller shall have made any indemnity payments pursuant to this

Section and the Person to or for the benefit of whom such payments are made thereafter shall collect any of such amounts from others, such Person shall promptly repay such amounts to the Seller, without interest.

## ARTICLE VII
## MERGER OR CONSOLIDATION OF, OR ASSUMPTION
## OF THE OBLIGATIONS OF, SELLER

Any Person (a) into which the Seller may be merged or consolidated, (b) which may result from any merger or consolidation to which the Seller shall be a party or (c) which may succeed to the properties and assets of the Seller substantially as a whole, shall be the successor to the Seller without the execution or filing of any document or any further act by any of the parties to this Sale Agreement; provided, however, that the Seller hereby covenants that it will not consummate any of the foregoing transactions except upon satisfaction of the following: (i) the surviving Person, if other than the Seller, executes an agreement of assumption to perform every obligation of the Seller under this Sale Agreement, (ii) immediately after giving effect to such transaction, no representation or warranty made pursuant to this Sale Agreement shall have been breached, (iii) the surviving Person, if other than the Seller, shall have delivered an Officers' Certificate and an opinion of counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section and that all conditions precedent, if any, provided for in this Sale Agreement relating to such transaction have been complied with, and that the Rating Agency Condition shall have been satisfied with respect to such transaction, (iv) if the Seller is not the surviving entity, such transaction will not result in a material adverse federal or state tax consequence to the Purchaser or the Noteholders, and (v) if the Seller is not the surviving entity, the Seller shall have delivered an opinion of counsel either (A) stating that, in the opinion of such counsel, all financing statements and continuation statements and amendments thereto have been executed and filed that are necessary fully to preserve and protect the interest of the Purchaser in the Transferred Student Loans and reciting the details of such filings, or (B) stating that, in the opinion of such counsel, no such action shall be necessary to preserve and protect such interests.

## ARTICLE VIII
## LIMITATION ON LIABILITY OF SELLER AND OTHERS

The Seller and any director or officer or employee or agent thereof may rely in good faith on the advice of counsel or on any document of any kind, prima facie properly executed and submitted by any Person respecting any matters arising hereunder (provided that such reliance shall not limit in any way the Seller's obligations under this Sale Agreement). The Seller shall not be under any obligation to appear in, prosecute or defend any legal action that shall not be incidental to its obligations under this Sale Agreement or the Student Loan Purchase Agreements, and that in its opinion may involve it in any expense or liability.

## ARTICLE IX
## SURVIVAL OF COVENANTS

All covenants, agreements, representations and warranties made herein shall survive the consummation of the purchase of the Transferred Student Loans; provided, however, that to the extent any of the same relate to a corresponding covenant, agreement, representation or warranty contained in a Student Loan Purchase Agreement, the same shall survive to the extent that such corresponding covenant, agreement, representation or warranty survives the applicable Student Loan Purchase Agreement. All covenants, agreements, representations and warranties made or furnished pursuant hereto by or for the benefit of the Seller (including without limitation, under Article VI) shall bind and inure to the benefit of any successors or assigns of the Purchaser, including the Indenture Trustee. This Sale Agreement may be changed, modified or discharged, and any rights or obligations hereunder may be waived, only by a written instrument signed by a duly authorized officer of the party against whom enforcement of any such waiver, change, modification or discharge is sought. The waiver by the Indenture Trustee, at the direction of the Noteholders or otherwise pursuant to the Indenture, of any covenant, agreement, representation or warranty required to be made or furnished by the Seller or the waiver by the Indenture Trustee, at the direction of the Noteholders or otherwise pursuant to the Indenture, of any provision herein contained shall not be deemed to be a waiver of any breach of any other covenant, agreement, representation, warranty or provision herein contained, nor shall any waiver or any custom or practice which may evolve between the parties in the administration of the terms hereof, be construed to lessen the right of the Indenture Trustee, at the direction of the Noteholders pursuant to the Indenture, to insist upon the performance by the Seller in strict accordance with said terms.

## ARTICLE X
## COMMUNICATION AND NOTICE REQUIREMENTS

All communications, notices and approvals provided for hereunder shall be in writing and mailed or delivered to the Seller or the Purchaser, as the case may be. Notice given in any such communication, mailed to the Seller or the Purchaser by appropriately addressed registered mail, shall be deemed to have been given on the day following the date of such mailing and shall be addressed as follows:

If to the Purchaser, to:

> The National Collegiate Student Loan Trust 2006-4
> c/o Wilmington Trust Company, as Owner Trustee
> 100 North Market Street
> Wilmington, Delaware 19890-0001
> Attention: Corporate Trust Department

If to the Seller, to:

> The National Collegiate Funding LLC
> c/o First Marblehead Data Services, Inc.
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Ms. Rosalyn Bonaventure

with a copy to:

> First Marblehead Corporation
> The Prudential Tower
> 800 Boylston Street - 34th Floor
> Boston, MA 02199-8157
> Attention: Corporate Law Department

or to such other address as either party shall have provided to the other parties in writing. Any notice required to be in writing hereunder shall be deemed given if such notice is mailed by certified mail, postage prepaid, or hand delivered to the address of such party as provided above.

## ARTICLE XI
## AMENDMENT

This Sale Agreement may be amended by the parties hereto without the consent of the Noteholders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Sale Agreement or of modifying in any manner the rights of such Noteholders; provided that such action will not, in the opinion of counsel reasonably satisfactory to the Indenture Trustee, materially affect the interest of any such Noteholder.

In addition, this Sale Agreement may also be amended from time to time by the Seller and the Purchaser, with the consent of the Noteholders of the Notes evidencing a majority of the Outstanding Amount of the Notes and the consent of the Certificateholders of the Certificates evidencing a majority of the outstanding principal amount of the Certificates, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Sale Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders, respectively; provided, however, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the time of, collections of payments with respect to Transferred Student Loans or distributions that shall be required to be made for the benefit of the Noteholders, or (b) reduce the aforesaid percentage of the Outstanding Amount of the Notes or the Certificates, the Noteholders or the Certificateholders of which are required to consent to any such amendment, without the consent of all

outstanding Noteholders or Certificateholders, respectively.

Promptly after the execution of any such amendment or consent (or, in the case of the Rating Agencies, five Business Days prior thereto), the Purchaser shall furnish written notification of the substance of such amendment or consent to the Indenture Trustee and each of the Rating Agencies.

It shall not be necessary for the consent of Noteholders pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Sale Agreement, the Owner Trustee shall be entitled to receive and rely upon an opinion of counsel stating that execution of such amendment is authorized or permitted by this Sale Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Sale Agreement or otherwise.

## ARTICLE XII
## ASSIGNMENT

The Seller hereby assigns its entire right, title and interest as purchaser under this Sale Agreement and the Student Loan Purchase Agreement thereunder to the Purchaser as of the date hereof and acknowledges that the Purchaser will assign the same, together with the right, title and interest of the Purchaser hereunder, to the Indenture Trustee under the Indenture.

## ARTICLE XIII
## GOVERNING LAW

**THIS SALE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.**

## ARTICLE XIV
## LIMITATION OF LIABILITY OF OWNER TRUSTEE

Notwithstanding anything contained herein to the contrary, this instrument has been executed by Wilmington Trust Company, not in its individual capacity but solely in its capacity as Owner Trustee of the Purchaser, and in no event shall Wilmington Trust Company in its individual capacity or any beneficial owner of the Purchaser have any liability for the representations, warranties, covenants, agreements or other obligations of the Purchaser hereunder, as to all of which recourse shall be had solely to the assets of the Purchaser. For all purposes of this Sale Agreement, in the performance of any duties or obligations of the Purchaser hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VIII, IX and X of the Trust Agreement.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Sale Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

THE NATIONAL COLLEGIATE FUNDING LLC,
as Seller

By:     GATE Holdings, Inc., Member

By:     /s/ John A. Hupalo
Name:   John A. Hupalo
Title:  President

THE NATIONAL COLLEGIATE STUDENT LOAN TRUST
2006-4, as Purchaser

By:     Wilmington Trust Company, not in its individual
        capacity but solely as Owner Trustee

By:     /s/ Michele C. Harra
Name:   Michele C. Harra
Title:  Financial Services Officer

# SCHEDULE A

## *Pool Supplements*

Each of the following Pool Supplements was entered into by and among The First Marblehead Corporation, The National Collegiate Funding LLC and:

- Bank of America, N.A., dated December 7, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Loan Program, Direct to Consumer Loan Program and ISLP Loan Program.

- Charter One Bank, N.A., dated December 7, 2006, for loans that were originated under the following Charter One programs: AAA Southern New England Bank, AES EducationGAIN Loan Program, Asrtive Education Loan Program, AstriveAlliance Education Loan Program, Axiom Alternative Loan Program, CFS Direct to Consumer Loan Program, Citibank Education Assistance Loan Program, College Board Alternative Loan Program, College Loan Corporation Loan Program, Collegiate Solutions Alternative Loan Program, Custom Educredit Loan Program, EdFinancial Loan Program, Extra Credit II Loan Program (North Texas Higher Education), M&I Alternative Loan Program, National Education Loan Program, NextStudent Alternative Loan Program, NextStudent Private Consolidation Loan Program, ThinkFinancial Alternative Loan Program, UPromise Alternative Loan Program, and WAMU Alternative Student Loan Program..

- Citizens Bank of Rhode Island, dated December 7, 2006, for loans that were originated under Citizens Bank of Rhode Island's Compass Bank Loan Program, Alternative Loan Program, Navy Federal Referral Loan Program, Penn State Undergraduate Loan Program, FinanSure Alternative Loan Program, and Xanthus Loan Program.

- First National Bank Northeast, dated December 7, 2006, for loans that were originated under First National Bank Northeast's Nelnet Alternative Loan Program.

- GMAC Bank, dated December 7, 2006, for loans that were originated under GMAC Bank's Alternative Loan Program.

- HSBC Bank USA, National Association, dated December 7, 2006, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated December 7, 2006, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- JPMorgan Chase Bank, N.A. (successor to Bank One, N.A.) dated December 7, 2006, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank, dated December 7, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated December 7, 2006, for loans that were originated under Manufacturers and Traders Trust Company's M&T Alternative Loan Program.

- National City Bank, dated December 7, 2006, for loans that were originated under National City Bank's Alternative Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under National City Bank's Referral Loan Program, including the Astute Private Loan Program.

- PNC Bank, N.A., dated December 7, 2006, for loans that were originated under PNC Bank's PNC Bank Alternative Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, GE Money Bank Alternative Loan Prorgam, Old National Bank Alternative Loan Program, Regions Bank Alternative Loan Program, and Varsity Group Alternative Loan Program.

- Sovereign Bank, dated December 7, 2006, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated December 7, 2006, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated December 7, 2006, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated December 7, 2006, for loans that were originated under U.S Bank's Alternative Loan Program.

## SCHEDULE B

### *Student Loan Purchase Agreements*

Each of the following Note Purchase Agreements, as amended or supplemented, was entered into by and between The First Marblehead Corporation and:

- Bank of America, N.A., dated April 30, 2001, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Alternative Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2006, for loans that were originated under Bank of America's BAGEL Loan Program, TERI Alternative Loan Program and ISLP Loan Program.

- Bank of America, N.A., dated June 30, 2003, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Bank of America, N.A., dated April 1, 2006, for loans that were originated under Bank of America's Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated as of December 29, 2003 for loans that were originated under Charter One's AAA Southern New England Bank Loan Program.

- Charter One Bank, N.A., dated October 31, 2003, for loans that were originated under Charter One's AES EducationGAIN Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's CFS Direct to Consumer Loan Program.

- Charter One Bank, N.A., dated June 30, 2003, for loans that were originated under Charter One's Citibank Education Assistance Loan Program.

- Charter One Bank, N.A., dated July 1, 2002, for loans that were originated under Charter One's College Loan Corporation Loan Program.

- Charter One Bank, N.A., dated December 1, 2003, for loans that were originated under Charter One's Custom Educredit Loan Program.

- Charter One Bank, N.A., dated May 10, 2004, for loans that were originated under Charter One's EdFinancial Loan Program.

- Charter One Bank, N.A., dated September 15, 2003, for loans that were originated under Charter One's Extra Credit II Loan Program (North Texas Higher Education).

- Charter One Bank, N.A., dated September 20, 2003, for loans that were originated under Charter One's M&I Alternative Loan Program.

- Charter One Bank, N.A., dated November 17, 2003, for loans that were originated under Charter One's National Education Loan Program.

- Charter One Bank, N.A., dated May 15, 2002, for loans that were originated under Charter One's NextStudent Alternative Loan Program.

- Charter One Bank, N.A., dated March 26, 2004, for loans that were originated under Charter One's NextStudent Private Consolidation Loan Program.

- Charter One Bank, N.A., dated March 25, 2004, for loans that were originated under Charter One's Astrive and AstriveAlliance Education Loan Programs.

- Charter One Bank, N.A., dated May 15, 2003, for loans that were originated under Charter One's WAMU Alternative Student Loan Program.

- Charter One Bank, N.A., dated February 15, 2005, for loans that were originated under Charter One's Referral Loan Program (including loans in the UPromise Alternative Loan Program, Collegiate Solutions Alternative Loan Program, College Board Alternative Loan Program, Axiom Alternative Loan Program, and ThinkFinancial Alternative Loan Program).

- Citizens Bank of Rhode Island, dated April 30, 2004, for loans that were originated under Citizens Bank of Rhode Island's Alternative Loan Program, Compass Bank Alternative Loan Program, FinanSure Alternative Loan Program, Navy Federal Alternative Loan Program, and Xanthus Alternative Loan Program.

- Citizens Bank of Rhode Island, dated October 1, 2002, for loans that were originated under Citizens Bank of Rhode Island's Penn State Undergraduate Loan Program.

- First National Bank Northeast, dated August 1, 2001, for loans that were originated under First National Bank Northeast's Nelnet Undergraduate Alternative Loan Program.

- GMAC Bank, dated May 30, 2003, for loans that were originated under GMAC Bank's Alternative Loan Program

- HSBC Bank USA, National Association, dated April 17, 2002, as amended on June 2, 2003 and August 1, 2003, for loans that were originated under the HSBC Loan Program.

- The Huntington National Bank, dated May 20, 2003, for loans that were originated under The Huntington National Bank's Huntington Bank Education Loan Program.

- JPMorgan Chase Bank, N.A,, (successor to Bank One, N.A.), dated May 1, 2002, for loans that were originated under Bank One's CORPORATE ADVANTAGE Loan Program, EDUCATION ONE Loan Program, and Campus One Loan Program.

- KeyBank, dated May 12, 2006, for loans that were originated under KeyBank's Private Education Loan Program.

- Manufacturers and Traders Trust Company, dated April 29, 2004, for loans that were originated under Manufacturers and Traders Trust Company's Alternative Loan Program.

- National City Bank, dated November 13, 2002, for loans that were originated under National City Bank's National City Loan Program.

- National City Bank, dated July 21, 2006, for loans that were originated under National City Bank's Referral Loan Program, including the Astute Private Loan Program.

- PNC Bank, N.A., dated April 22, 2004, for loans that were originated under PNC Bank's Alternative Conforming Loan Program, Brazos Alternative Loan Program, Edvisors Alternative Loan Program, GE Money Bank Alternative Loan Porgam, Old National Bank Alternative Loan Program, Regions Bank Alternative Loan Program, and Varsity

Group Alternative Loan Program.

- Sovereign Bank, dated April 30, 2004, for loans that were originated under Sovereign Bank's Alternative Loan Program.

- SunTrust Bank, dated March 1, 2002, for loans that were originated under SunTrust Bank's SunTrust Alternative Loan Program.

- TCF National Bank, dated July 22, 2005, for loans that were originated under TCF National Bank's Alternative Loan Program.

- U.S. Bank, N.A., dated May 1, 2005, for loans that were originated under U.S Bank's Alternative Loan Program.