1   Erika Heath (SBN 304683)
    ERIKA HEATH, ATTORNEY AT LAW
2   369 Pine St., Ste. 410
    San Francisco, CA 94104
3   Tel.:   (415) 426-7850
    erika@heathlegal.com
4

5   Attorney for Plaintiff
    OSKAR LIZARRAGA-DAVIS
6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10

11  OSKAR LIZARRAGA-DAVIS,                Civil Action No. 5:18-cv-4081-BLF
12          Plaintiff,
                                          **PLAINTIFF'S CROSS-MOTION FOR**
13  v.                                    **PARTIAL SUMMARY JUDGMENT**

14  TRANSWORLD SYSTEMS, INC.;             Date:       May 5, 2022
15          Defendant.                    Time:       9:00 a.m.
                                          Courtroom:  virtual
16                                        Judge:      Hon. Beth L. Freeman

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

NOTICE OF MOTION AND MOTION ............................................................................. 1

I. INTRODUCTION ............................................................................................................ 2

II. STATEMENT OF UNDISPUTED FACTS ................................................................... 2

   A.    Plaintiff Oskar Lizarraga-Davis ................................................................... 2

   B.    Enforcement Actions ...................................................................................... 4

   C.    Defendant Transworld and the NCSLT Accounts .................................... 5

      1.    Defendant TSI's Business Generally ................................................... 5

      2.    Defendant TSI Is Assigned Defaulted Accounts from AES and Begins Collection Activity. ............................................................................................................. 6

      3.    Defendant TSI Sends Out Accounts to Law Firms for Litigation. ............................. 7

      4.    Defendant TSI's Collection of Mr. Lizarraga-Davis' Account ................................... 9

      5.    TSI's Lack of Documentation to Prove Mr. Lizarraga-Davis' debt. ........................... 9

III. LEGAL STANDARD ................................................................................................... 11

IV. ARGUMENT .............................................................................................................. 12

   A. Plaintiff Has Been the Object of Collection Activity Arising from a Consumer Debt. ....... 13

   B. TSI Qualifies As a "Debt Collector" Under the FDCPA. ...................................... 14

   C. TSI Engaged in Activity Violating the FDCPA. ..................................................... 16

      1.    Section 1692f ........................................................................................ 16

      2.    Section 1692e (including 1692e(2)(A), 1692e(5), and 1692e(10)) ........................... 17

      3.    TSI's Conduct With Respect to Mr. Lizarraga-Davis ............................................. 18

V. CONCLUSION ............................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*Albino v. Baca,*
    747 F.3d 1162 (9th Cir. 2014) ................................................................. 11

*Bridge v. Ocwen Fed. Bank, FSB,*
    681 F.3d 355 (6th Cir. 2012) ................................................................... 14

*Camacho v. Jefferson Cap. Sys., LLC,*
    No. 14-CV-02728-BLF, 2015 WL 5569082 (N.D. Cal. Sept. 21, 2015) ................. 12

*Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Tr. (NCSLT Litigation),*
    No. CV 17-1323 (MN), 2018 WL 5095666 (D. Del. Oct. 19, 2018) ....................... 5

*Donohue v. Quick Collect, Inc.,*
    592 F.3d 1027 (9th Cir. 2010) ................................................................. 14

*Ellis v. Phillips & Cohen Assocs., Ltd.,*
    No. 5:14-CV-05539-EJD, 2016 WL 3566981 (N.D. Cal. June 30, 2016) ............... 13

*Eul v. Transworld Sys.,*
    No. 15 C 7755, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017) ........................ 16, 17

*First Pac. Networks, Inc. v. Atl. Mut. Ins. Co,*
    891 F. Supp. 510 (N.D. Cal. 1995) ........................................................... 12

*Garcia v. Creditors Specialty Serv., Inc.,*
    No. 14-CV-01806-BLF, 2016 WL 6778681 (N.D. Cal. Nov. 16, 2016) ................. 12

*Grant-Hall v. Cavalry Portfolio Servs., LLC,*
    856 F. Supp. 2d 929 (N.D. Ill. 2012) ................................................... 17, 19

*Hartman v. Great Seneca Financial Corp.,*
    569 F.3d 606 (6th Cir. 2009) ................................................................... 18

*Heintz v. Jenkins,*
    514 U.S. 291 (1995) ............................................................................. 14

*Hill v. R+L Carriers, Inc.,*
    690 F. Supp. 2d 1001 (N.D. Cal. 2010) ..................................................... 12

*Hoffman v. Transworld Sys.,*
    806 F. App'x 549 (9th Cir. 2020) ............................................................. 17

*Hoffman v. Transworld Sys.,*
    No. C18-1132 TSZ, 2021 WL 22590 (W.D. Wash. Jan. 4, 2021) ....................... 18

*Kaiser v. Cascade Cap., LLC,*
    989 F.3d 1127 (9th Cir. 2021) .......................................................... 2, 16, 18

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*Lyons v. Michael & Assocs.*,
   824 F.3d 1169 (9th Cir. 2016) ........................................................................ 13

*McCollough v. Johnson, Rodenburg & Lauinger, LLC*,
   637 F.3d 939 (9th Cir. 2011) ......................................................................... 14

*Merrill v. Transworld Sys., Inc.*,
   No. 1:20-CV-183, 2020 WL 8474736 (W.D. Mich. Dec. 1, 2020) ........................... 14, 17, 18

*Micks v. Gurstel Law Firm, P.C.*,
   365 F. Supp. 3d 961 (D. Minn. 2019) ............................................................... 13

*Myrette-Crosley v. Ditech Home Loans*,
   No. 3:17-CV-05528-JD, 2018 WL 3159727 (N.D. Cal. June 28, 2018) ..................... 14

*Perry v. Stewart Title Co.*,
   756 F.2d 1197 (5th Cir. 1985) ........................................................................ 14

*Phillips v. Asset Acceptance, LLC*,
   736 F.3d 1076 (7th Cir. 2013) ........................................................................ 16

*Skerry v. Massachusetts Higher Educ. Assistance Corp.*,
   73 F. Supp. 2d 47 (D. Mass. 1999) ................................................................. 13

*Smith v. Progressive Fin. Servs., Inc.*,
   No. 6:12-CV-1704-MC, 2013 WL 3995004 (D. Or. Aug. 1, 2013) .......................... 13

*State Farm Fire & Cas. Co. v. Geary*,
   699 F. Supp. 756 (N.D. Cal. 1987) .................................................................. 12

*Tourgeman v. Collins Fin. Servs.*,
   755 F.3d 1109 (9th Cir. 2014) .............................................................. 12, 13, 17

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) ......................................................................... 12

*Wadlington v. Credit Acceptance Corp.*,
   76 F.3d 103 (6th Cir. 1996) ........................................................................... 14

*Weber v. Great Lakes Educ. Loan Servs.*,
   2014 U.S. Dist. LEXIS 59064 (W.D. Wis. Apr. 29, 2014) .................................... 14

*Young v. Unifund CCR Partners*,
   No. 09 C 04206, 2014 WL 4698646 (N.D. Ill. Sept. 22, 2014) ......................... 16, 17


**Statutes & Regulations**

15 U.S.C. § 1692(a) ..................................................................................... 12

15 U.S.C. § 1692(e) ..................................................................................... 12

15 U.S.C. § 1692a(6) ............................................................................ 14, 15

15 U.S.C. § 1692e ........................................................................................... 17

15 U.S.C. § 1692e(2)(A) ................................................................................. 18

15 U.S.C. § 1692e(5) ....................................................................................... 18

15 U.S.C. § 1692e(10) ..................................................................................... 18

15 U.S.C. § 1692f ............................................................................................ 16

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 5, 2022 at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 3 of the United States District Court for the Northern District of California, located at 280 South 1st Street, San Jose, California, 95113, before the Honorable Beth Labson Freeman, Plaintiff Oskar Lizarraga-Davis ("Plaintiff") will respectfully move this Court for partial summary judgment in his favor.

This motion is based on the accompanying Memorandum of Points and Authorities, the Declaration of Oskar Lizarraga-Davis and accompanying exhibits, the Declaration of Erika A. Heath and accompanying exhibits, the Request for Judicial Notice and accompanying exhibits, the parties' Joint Stipulation  re: Discovery Documents and Facts, such other documents as may be submitted in support of this Motion, such oral argument as may be heard by the Court, and all other papers on file in this action.

Dated: <u>March 31, 2022</u>    ERIKA HEATH, ATTORNEY AT LAW

              */s/ Erika Heath*
              Erika Heath
              Attorney for Plaintiff
              OSKAR LIZARRAGA-DAVIS

## I.   INTRODUCTION

This Court should grant partial summary judgment in favor of Mr. Lizarraga-Davis on his claims under the Fair Debt Collection Practices Act (FDCPA) against Defendant Transworld Systems, Inc. ("TSI").

TSI is the post-default servicer for student loans purportedly held by a number of National Collegiate Student Loan Trusts ("NCSLTs").  In this role, it engages collection law firms to file approximately 2,000 lawsuits against consumers every month.  It cannot prove many of these lawsuits.  TSI nevertheless moves forward with the litigation process, extracting settlements from consumers and amassing a large amounts of default judgments along the way.

Mr. Lizarraga-Davis is one of those consumers.  TSI engaged a collection law firm to pursue him with pre-litigation correspondence, a state court lawsuit, and subsequent settlement offers.  Each time Mr. Lizarraga-Davis asked for proof that the NCSLT owned his account, he received scant information.  But after hiring counsel, the lawsuit was dismissed voluntarily on the eve of trial.

This is hardly a trivial or technical issue, but one that is of great importance to consumers who face TSI's litigation mill.  As the Ninth Circuit has recognized, "[s]uing to collect on an unenforceable debt is patently unfair to the consumer."  *Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1133 (9th Cir. 2021).  Moreover, TSI's conduct specifically has been at issue with a number of regulatory agencies, including the Consumer Financial Protection Bureau and the New York Attorney General.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   Plaintiff Oskar Lizarraga-Davis

For years, Mr. Lizarraga-Davis was a stay-at-home father in Hollister, California. (Declaration of Oskar Lizarraga-Davis ("Lizarraga-Davis Decl."), at ¶ 25.)  In early 2017, he received correspondence from the Law Office of Patenaude & Felix ("P&F"), informing him that he had an outstanding balance of more than $30,000 for a student loan debt owed to the National

Collegiate Student Loan Trust 2006-4 ("NCSLT 2006-4").  (*Id*., at ¶ 2.)  He did not recognize the name of the creditor, so he requested that P&F provide him with verification of the debt.  (*Id*., at ¶ 3.)

The identity of NCSLT 2006-4 was important to Mr. Lizarraga-Davis.  He did not want to skirt any obligations he may owe, but after hearing about so many data leaks and scams, he wanted to ensure that he was dealing with a legitimate company with a legitimate right to collect money from him.  (*Id*., at ¶ 4.)  He did not want (and could not afford) to pay them money that he was not legally obligated to pay someone.  (*Id*.)

P&F provided a response dated April 21, 2017, purporting to attach documents supporting the obligation, but those documents did little to identify any ownership rights to his loan by NCSLT 2006-4.  (*Id*., at ¶ 5-6, Ex. 1.)  Mr. Lizarraga-Davis requested further documentation on May 15, 2017, but received largely the same boilerplate response from P&F. (*Id*., at ¶ 7-8, Ex. 2-3.)  Around May 31, 2017, Mr. Lizarraga-Davis sent another request (his third) to P&F, who never responded.  (*Id*., at ¶ 9-10, Ex. 4.)

The next time Mr. Lizarraga-Davis heard from NCSLT 2006-4 was Sunday, July 16, 2017, when he was served with a summons to a lawsuit filed by it.  (*Id*., at ¶ 11, Ex. 5.)  Attached to the complaint were some of the same documents P&F initially sent Mr. Lizarraga-Davis.  (*Id*.) Days later, P&F sent him a letter, pressuring him to settle the case, so that it could "discontinue" the pending litigation.  (*Id*., at ¶ 12, Ex. 6.)  After conducting some research, Mr. Lizarraga-Davis filed an answer, paying the filing fee of over $400, to raise the issue he had repeatedly notified P&F about – that NCSLT 2006-4 lacked standing to sue him.  (*Id*., at ¶ 13, Ex. 7.)

Mr. Lizarraga-Davis had recently rejoined the workforce prior to being served with the lawsuit.  (*Id*., at ¶ 25.)  He thus had to take time off from his busy work to attend case management conferences, such as the one taking place on October 4, 2017.  (*Id*., at ¶¶ 15, 22.) At that conference, in the presence of P&F, he again raised his concerns that NCSLT 2006-4 has not been able to prove ownership.  The judge explained to him that a company should not be suing him unless they had proof.  Mr. Lizarraga-Davis referenced a case brought against NCSLT

2006-4 by the Consumer Financial Protection Bureau ("CFPB"), which he had come across in his research, and he was requested to bring a copy with him to court for the next conference. (*Id.*, at ¶ 15.)

Mr. Lizarraga-Davis attended the second case management conference, approximately six weeks later, bringing along a copy of the CFPB filings against NCSLT 2006-4.  Mr. Lizarraga-Davis compared his lawsuit to that case, and was eventually urged by the judge to hire an attorney because he could not defend the case on his own.  (*Id.*, at ¶ 16.)  A trial was scheduled soon afterwards for May 18, 2018.  (*Id.*, at ¶ 17, Ex. 8.)  Not wanting to face the trial on his own, especially after hearing the judge's advice, Mr. Lizarraga-Davis began saving money for an attorney, and eventually hired the undersigned counsel to represent him in the case.  (*Id.*, at ¶ 18.)

After Mr. Lizarraga-Davis hired an attorney, and shortly before trial, however, NCSLT 2006-4 suddenly dismissed its case against him. (*Id.*, at ¶ 20, Ex. 9.)

Although the case had been dismissed, it was hardly a satisfying result for Mr. Lizarraga-Davis.  By the time NCSLT 2006-4 walked away from its case, much of the harm to him had already been done.  He spent money on filing fees, attorney fees, and took time off work to deal with the case.  The lawsuit also instilled a great deal of fear in him.  He tries to do the right thing, but after being sued, he became worried about garnishment, or even losing his job or professional license because of the public record.  (*Id.*, at ¶¶ 21-24.)  He was concerned that his entire career would be derailed, and that he would no longer be able to provide for his family. He lost sleep, and at times felt nauseous from worry about the lawsuit.  (*Id.*, at ¶ 24.)  He was embarrassed to be seen in the local courthouse, which is in a small town where people gossip. (*Id.*, at ¶ 26.)  And he came away from this process feeling that it was all done to strong arm him into either settling with them, or paying money to fight them off – all for a dispute that he had been raising for months.  (*Id.*, at ¶¶ 21, 27.)

### B.   Enforcement Actions

As discussed in more detail below, TSI was the real entity controlling the litigation against Mr. Lizarraga-Davis, and he is far from the only consumer affected by TSI's practices.

As Mr. Lizarraga-Davis discovered, the CFPB has taken enforcement action against Defendant TSI, as well as the individual NCSLT entities, for their conduct in initiating debt collection lawsuits against consumers like him. (*See generally*, Request for Judicial Notice ("RJN"), Ex. 12 ("CFPB Consent Order."); *see also Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Tr*., No. CV 17-1323 (MN), 2018 WL 5095666 (D. Del. Oct. 19, 2018). The CFPB specifically found, for example, that TSI regularly initiated these lawsuits, even though it lacks the intent or the ability to prove their claims if contested. (*Id*., at ¶¶ 25-27, 37-44.) Further, in these cases, Defendant representatives routinely make false attestations about their knowledge of consumer's records and debts. (*Id*., at ¶¶ 15-24.) The CFPB found these acts constituted unfair and deceptive conduct. (*Id*., at ¶¶ 37-44.) As described below, the New York Attorney General has also taken enforcement action for some of the undisputed conduct that is at issue here.

At a minimum, these enforcement actions illustrate that Defendant is well aware of the unfair practices in which it engages.

## C. Defendant Transworld and the NCSLT Accounts

### 1. Defendant TSI's Business Generally

TSI is in the accounts receivable business, and "act[s] as a collector or a collection agency for various clients." (Heath Decl., ¶ 3, Ex. 10 [Rule 30(b)(6) Dep.] ("Luke Dep."), at 25:24-26:9].) TSI does not originate its own loans, and it does not own any of the accounts for which it collects. (Luke Dep., at 32:12-19.)

One of its roles is to act as the "special subservicer and custodian of records for [the] 15 [NCSLTs]," including NCSLT 2006-4. (*Id*., at 25:24-26:9, 27:7-11.) In this role, TSI handles the "recoveries portion of defaulted student loans that are owned by the" NCSLTs. (*Id*., at 26:23-24.) TSI is the exclusive entity who does such work for the NCSLTS. (*Id*., at 29:16-22.) TSI's duties for the NCSLTs are governed by an agreement called the "Default Prevention and Collection Services Agreement." (*Id*., at 29:6-11.) A "defaulted student loan account owned by one of [the NCSLTs] would come to TSI for their servicing role, who would facilitate in most

cases, collections." (*Id.*, at 29:23-30:5.)  But instead of TSI "doing the collections" directly, they "act[] as kind of an intermediary between the client and the ultimate [collection] agency or [collection law] firm." (*Id.*, at 15:7-15.)

TSI has been in this role of "special subservicer" of the NCSLT accounts since November 2014. (*Id.*, at 30:19-24.)  According to TSI, it was provided with some global account information regarding the NCSLT accounts when it took over this role, including, for example, pool supplements and various terms and conditions pages for NCSLT loans.  (*Id.*, at 45:3-9, 75:10-15.)

### 2.    Defendant TSI Is Assigned Defaulted Accounts from AES and Begins Collection Activity.

An entirely different entity – American Education Services ("AES") – is the pre-default servicer of the NCSLT loans.  (Luke Dep., at 23:12-15.)  AES "service[s] these loans all the way through the time they default and are accelerated." (*Id.*, at 23:17-19.)

On a monthly basis, AES sends its defaulted accounts to TSI for servicing "generally when they are about 180 days past due."  These defaulted accounts come from AES in a single, electronic file, containing the entire batch of defaulted accounts for the month, and including basic information about each of those accounts.  (*Id.*, at 32:20-34:10.)  In the month leading up to that transfer, AES also sends to TSI some account documentation, such as the credit agreement, the signature page, and the note disclosure statement, which are stored in TSI's media repository and indexed by account number.  (*Id.*, at 33:16-23.)

After TSI sets the account up in its system and indexes the documents, "the next step is for TSI to forward it to a [collection] agency to collect on that balance that was defaulted." (*Id.*, at 46:25-47:9.)  The collection agency is chosen through a TSI network, known as the "agency network." (*Id.*, at 15:9-13, 47:11-25.)  TSI vets, selects, and onboards the collections agencies that form its agency network.  (*Id.*, at 47:11-25.)  Notably, TSI is itself in the agency network, so it sometimes attempts to collect directly from consumers on NCSLT loans.  (*Id.*, at 48:15-23.) TSI typically keeps the account with its third-party collection agency for six months.  (*Id.*, at

1  48:1-6.)  After the six-month mark, the account is assigned to a second collection agency for

2  another six months, and so on, typically until the account has gone through four different

3  collection agencies.  (*Id.*, at 48:24-49:24.)

### 3.    Defendant TSI Sends Out Accounts to Law Firms for Litigation.

5          After the account has exhausted its rounds in TSI's agency network, "the account goes

6  into an internal queue to be reviewed for potential placement to the attorney network."  (Luke

7  Dep., at 49:20-24.)  As with the agency network, an internal group at TSI decides whether a law

8  firm will become part of its attorney network.  (*Id.*, at 52:12-25.)  TSI has a single retainer

9  agreement with each law firm that governs the relationship and placement of various accounts.

10  (*Id.*, at 55:15-20.)

11          Once the account is placed with a law firm within the network, TSI requires the law firm

12  to scrub the account (such as for bankruptcy cases and military status) and review the account – a

13  process that generally takes two to three days.  (*Id.*, at 54:19-55:2.)  Afterwards, the law firm is

14  required to contact the borrower through collection letters and phone calls.  (*Id.*, at 53:24-54:9;

15  55:2-4.)  Those collection attempts typically occur in the first 30 to 60 days of account placement

16  with the law firm.  (*Id.*, at 54:10-15.)  At that point, the law firm is broadly authorized to file suit

17  on any account it receives from TSI if the law firm "determine[s] that account to be suit worthy."

18  (*Id.*, at 53:17-22.)

19          Any settlement offer received by a law firm is brought to TSI, who retains sole authority

20  on account settlements.  (*Id.*, at 57:23-58:1.) If a law firm is successful in recovering money, that

21  money is remitted back to TSI.  (*Id.*, at 55:21-24.)  TSI will then net out the attorneys' fees, and

22  remit the fees back to the law firm.  (*Id.*, at 55:25-56:6.)  Of the remaining funds, TSI retains a

23  certain percentage, and then remits the rest back to the appropriate NCSLT.  (*Id.*, at 56:7-11.)

24          The NCSLT entities do not have any employees.  (*Id.*, at 27:20-22; *see also* ECF 62-1, ¶

25  10.)  As a result, TSI is the entity who responds to all discovery requests in the NCSLT cases.

26  (*Id.*, at 58:10-15, 57:17-19.)  TSI provides testimony in NCSLT cases, both at depositions and at

27  trial, where they speak on behalf of the trust. (*Id.*, at 58:16-59:4.)  TSI makes the decision as to

28

1    whether it is even going to provide a witness to appear at the trial.  (*Id*., at 59:6-9.)  TSI makes

2    these decisions based on a number of factors, such as the costs of sending its witness from

3    Georgia, as well as the availability of its witnesses.  (*Id*., at 59:11-60:6.)

4         The amount of litigation TSI oversees is tremendous.  According to the CFPB Consent

5    Order, law firms hired by TSI filed 37,689 collection lawsuits between November 1, 2014 and

6    April 25, 2016 (on average, over 2,000 per month).[1]  Despite those large figures, however, TSI

7    rarely takes a case to trial.  In 2017, TSI had only between two and six employees who would

8    make appearances at trial.  (*Id*., 124:9-23.) The specific employee who was handling Mr.

9    Lizarraga-Davis' case, James Cummins, generally made appearances in only 1 to 4 cases per

10   month.  (*Id*., at 123:22-124:4.)

11        Court filings local to Mr. Lizarraga-Davis confirm these general numbers.  There is not a

12   single, known instance of an NCSLT entity filing a case in San Benito County that did not end by

13   settlement, default judgment, or voluntarily dismissal.  (*See* RJN, Ex. 14.)[2]  Granted, the

14   sampling in San Benito County is quite small, but even if one examined the records of the two

15   closest courthouses to Hollister, the result would be the same: every single case in the

16   neighboring counties of Monterey and Santa Cruz ended by settlement, default judgment, or

17   voluntarily dismissal.  (*See* RJN, Exs. 14, 15.)  Only two other cases were set for trial, like Mr.

18   Lizarraga-Davis' matter, and those cases were also voluntarily dismissed by NCSLT before trial

19   or at the call of trial.  (*See* RJN, Ex. 15, at LIZARRAGA-000282 (NCSLT voluntarily dismissed

20   at the call of trial); Ex. 16, at LIZARRAGA-000381, -000383 (case voluntarily dismissed five

21   months before the July 29, 2016, trial).)  There is not a single instance where TSI sent a witness

22   to Hollister, or two of the other closest courthouses, to actually prove its case at trial.

23

24   _____

     [1] TSI has stipulated not to contest this figure.  (*See* Joint Stipulation re: Discovery Documents
25   and Facts, ¶ 2.)

26   [2] TSI is the only servicer who engages attorneys to litigation NCSLT accounts.  (Luke Dep., at
     56:12-16.)  It can therefore be assumed that, if a case was filed on or after November 1, 2014,
27   TSI was the special subservicer for that loan.  (*Id*., at 56:18-57:2.)  Some of the court documents
     attached as Exhibit 13 may relate to cases filed before that date, but the point remains that not a
28   single one of the cases resulted in NCSLT

### 4.      Defendant TSI's Collection of Mr. Lizarraga-Davis' Account

Consistent with the above general process, "AES serviced [Mr. Lizarraga-Davis'] account from when it was originated by GMAC all the way through it ultimately was accelerated and defaulted." (Luke Dep., at 30:25-31:6.)  Mr. Lizarraga-Davis' account defaulted on March 2, 2015.  (*Id*., at 66:10-14.)  "[R]ight up on the default of that account," TSI became the special subservicer of Mr. Lizarraga-Davis' account.  (*Id*., at 64:15-65:5; *see also* 31:8-12; 64:8-13.)  TSI actually received the electronic file from AES, which contained Mr. Lizarraga-Davis' account, on March 5, 2015.  (*Id*., at 66:15-19.)

On March 7, 2017, TSI assigned Mr. Lizarraga-Davis' account to Patenaude & Felix, a collection law firm within TSI's attorney network.  (*Id*., at 106:19-107:3.)  After the account had been assigned to P&F for litigation, the media team at TSI created the spreadsheet that it TSI attaches to the last page of its pool supplement.  (*Id*., at 87:15-17, 90:16-18, Ex. 6.)  To do this, the TSI employee starts with a blank Excel file, and then they would copy account information over to the Excel file, format it, create a PDF of it, and then redact it, and save it to the repository.  (*Id*., at 91:1-21.)  For Mr. Lizarraga-Davis' loan, this sheet was created on March 16, 2017.  (*Id*., at 88:2-7, 93:5-12.)

As with other cases, TSI remained involved in Mr. Lizarraga-Davis' collection lawsuit, by for example responding to discovery requests on behalf of NCSLT 2006-4.  (*Id*., at 122:1-5.)

### 5.      TSI's Lack of Documentation to Prove Mr. Lizarraga-Davis' debt.

Discovery confirmed that TSI's general practices, outlined by the CFPB, affect Mr. Lizarraga-Davis' loan specifically.

***The "Credit Agreement."***  In its cross-motion, TSI presents a document it identifies as "the Credit Agreement signed by Plaintiff," (ECF 62-1, at ¶ 12, Ex. 2,) but it does not disclose that this "Credit Agreement" is actually re-created years later.  In the month leading up to the account transfer to TSI, AES would have sent a signature page of a note to TSI.  (Luke Dep., at 71:7-12, Ex. 4.)  Although the signature page indicates that it is "page 2 of 2," TSI does not have the first page, and would not have been given it by AES.  (*Id*., at 70:20-71:6, Ex. 4.)  Nor are

1   there terms & conditions attached to the note.  Instead, after receiving the signature page, TSI

2   goes through its library of documents to pair what it believes are the appropriate terms and

3   conditions pages with the signature page.  (*Id*., at 71:20-72:6, 72:13-15.)[3]  TSI also adds a federal

4   cosignor notice from its database to the terms & conditions pages.  (*Id*., at 73:7-17.)  But the

5   signature page continues to be stored as a separate document from the terms and conditions

6   pages.  (*Id*., at 75:1-8.)  Eventually, these pages are all consolidated into a single file that TSI

7   presents to consumers and courts, as done in declarations in this case, "as a true and correct copy

8   of the Credit Agreement signed by Plaintiff."  (ECF 45, at ¶ 13.)  In these declarations, TSI does

9   not disclose that it is missing the first page of the agreement from AES, and then re-created the

10  remainder of the credit agreement from multiple files.  (*See id*; see also ECF 62-1, at ¶ 2.)

11      ***The Note Disclosure Statement.***  To purportedly illustrate the loan distribution, TSI also

12  presents a document entitled "Note Disclosure Statement."  (ECF 62-1, at ¶ 14, Ex. 3.)  This

13  document purportedly shows the proceeds and any returns or refunds.  (*Id*.)  But this document is

14  also labeled at the top left as "(Page 3 of 18)" and – whatever the remaining pages of this

15  important document are – TSI does not have them.  (Luke Dep., 81:20-82:6.)

16      ***Part 1 of the Assignment.***  In its cross-motion, TSI also produces the purported Pool

17  Supplement that it refers to as "Part 1" of the assignment.  (ECF 62-1, at ¶ 18, Ex. 5.)  But there

18  are at least a couple of reasons this document does not establish a chain of assignment for Mr.

19  Lizarraga-Davis' loan:

20          • *Missing Schedule 1*.  Most notably, this agreement only includes those loans

21              "described in the attached Schedule 1."  (ECF 62-1, at (Luke Dep., 85:7-9, Ex. 4

22              (emphasis in original).)  Of course, there is no attached Schedule 1 attached to

23              that document.  (*See id*.)  Instead, the last page is what TSI calls an "excerpt" of

24              Schedule 1.  (*Id*., at 85:16-86:1.)  This "excerpt" is created by the media team at

25              TSI.  (*Id*., at 87:15-17, 90:16-18.)  To do this, the TSI employee starts with a

26  _____

[3] The precise point in the process that this match-up occurs has changed.  Under the previous practice, this match-up
27  would only occur upon request from one of TSI's collection agencies or law firms.  But currently, TSI does this
    match-up proactively on its own.  (Luke Dep., 72:16-73:3.)  TSI was unable to explain which process was in effect
28  during Mr. Lizarraga-Davis' account placement.  (*Id*., at 73:4-6.)

blank Excel file, (*id.*, at 91:18-21,) purportedly copies account information over to that new Excel file, formats it, creates a PDF of it, redacts it, and then saves it to the repository, (*id.*, at 91:1-7.)  As described above, for Mr. Lizarraga-Davis' loan, this sheet was created on March 16, 2017 – after the account had been sent to P&F for litigation.  (*Id.*, at 88:2-7, 93:5-12.)  Eventually, this page is affixed to the pool supplement pages, which TSI presents to courts, such as this one, as a single document.  (ECF 45, at ¶ 16.)  TSI does not typically disclose in such statements that the "excerpt" was created from a separate file in preparation of litigation. (*See id.*)  Perhaps aware of the problem that presents, TSI has finally added a new page to this document, which it indicates is a "raw printout of the Schedule where the subject Loan is listed."  (ECF 62-1, at n. 3; *compare id.*, at Ex. 5, with ECF 45, at ¶ 16, Ex. 3.)  But this document is not labeled as the missing Schedule 1, (*id.*,) has never produced in discovery, (Heath Decl., at ¶ 5,) and has certainly never been sent to Mr. Lizarraga-Davis, (*see* Lizarraga-Davis Decl., ¶¶ 5, 8, 11, at Ex. 1, 3, 5.)

- *Inability to Authenticate signatures*.  In his deposition, TSI's person-most-knowledgeable could not verify the signatures on the document.  (Luke Dep., 83:13-85:3.)

**Part 2 of the Assignment.**  The second assignment only applies to loans that are part of GMAC Bank's Alternative Loan Program.  (ECF 62-1, at ¶ 24.)  But none of the documents produced connect Mr. Lizarraga-Davis' specific loan to the GMAC Bank's Alternative Loan Program.  If such documentation does exist, it was never provided to Mr. Lizarraga-Davis when TSI was attempting to collect the loan, and he was trying to decide how to proceed.  (*See* Lizarraga-Davis Decl., ¶¶ 5, 8, 11, at Ex. 1, 3, 5.)

## III.   LEGAL STANDARD

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca*, 747 F.3d 1162,

1168 (9th Cir. 2014) (en banc) (quoting Fed. R. Civ. P. 56(a)).  "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987).

"The moving party bears the burden of showing that there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying the portions of the materials on file that it believes show an absence of a genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987).  "When judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513–14 (N.D. Cal. 1995).

Partial summary judgment should be granted here because the undisputed evidence establishes, as a matter of law, that TSI violated the Fair Debt Collection Practices Act.  *See Camacho v. Jefferson Cap. Sys., LLC*, No. 14-CV-02728-BLF, 2015 WL 5569082, at *2–3 (N.D. Cal. Sept. 21, 2015) (Plaintiff granted partial summary judgment on FDCPA claims that the debt collector falsely represented the amount of debt); *Garcia v. Creditors Specialty Serv., Inc.*, No. 14-CV-01806-BLF, 2016 WL 6778681, at *6 (N.D. Cal. Nov. 16, 2016) (Plaintiff granted partial summary judgment on FDCPA claims related to the mailing of collection letters).

## IV.   ARGUMENT

Partial summary judgment should be granted on liability because the undisputed evidence shows Defendant violated the FDCPA.

"The FDCPA comprehensively regulates the conduct of debt collectors, and is a strict liability statute." *Tourgeman v. Collins Fin. Servs.*, 755 F.3d 1109, 1119 (9th Cir. 2014), superseded on other grounds in *Tourgeman v. Nelson & Kennard*, 735 F. App'x 340 (9th Cir. 2018).  In enacting the FDCPA, Congress expressly aimed "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). These practices were of great concern to Congress because they "contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. § 1692(a).

To accomplish its goal, Congress equipped consumers with broad protections, including full bans on "false, deceptive, or misleading representation[s] or mean[s] in connection with the collection of any debt," as well as the "use [of] unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. §§ 1692e, 1692f. The statute even includes a list of non-exhaustive sampling of acts that constitute such violations. *See id*; *see also Tourgeman*, 755 F.3d at 1119 (9th Cir. 2014) (noting the non-exhaustive nature of the subsections). Not surprisingly, these provisions are to be construed liberally in favor of the consumer. *Lyons v. Michael & Assocs.*, 824 F.3d 1169, 1172 (9th Cir. 2016).

"To establish a claim under the FDCPA, a plaintiff must prove the following elements: (1) plaintiff has been the object of collection activity arising from a consumer debt; (2) the defendant qualifies as a 'debt collector' under the FDCPA; and (3) the defendant has engaged in a prohibited act or has failed to perform a requirement imposed by the FDCPA." *Ellis v. Phillips & Cohen Assocs., Ltd.*, No. 5:14-CV-05539-EJD, 2016 WL 3566981, at *3 (N.D. Cal. June 30, 2016) (internal quotations omitted).

The undisputed evidence shows that each of these FDCPA elements has been satisfied in this case.

## A. Plaintiff Has Been the Object of Collection Activity Arising from a Consumer Debt.

As this Court has already noted, "Plaintiff clearly has been the subject of collection activity." (ECF 56, at 7.) That previous finding remains just as valid today.

It is well-established that a student loan is a "consumer debt" within the meaning of the FDCPA. *Micks v. Gurstel Law Firm, P.C.*, 365 F. Supp. 3d 961 (D. Minn. 2019) (educational loans are for personal use); *Smith v. Progressive Fin. Servs., Inc.*, No. 6:12-CV-1704-MC, 2013 WL 3995004, at *3 (D. Or. Aug. 1, 2013) ("plaintiff's student loan is 'debt' subject to the FDCPA"); *Skerry v. Massachusetts Higher Educ. Assistance Corp.*, 73 F. Supp. 2d 47, 51 (D. Mass. 1999) ("Student loans such as the loan at issue here fall under the FDCPA's definition of debt."). Moreover, the filing of a debt collection lawsuit to collect on a consumer debt is

"collection activity" within the meaning of the statute.  *See Heintz v. Jenkins*, 514 U.S. 291, 294

(1995) (the FDCPA "applies to the litigating activities of lawyers"); *McCollough v. Johnson,*

*Rodenburg & Lauinger, LLC*, 637 F.3d 939, 950-51 (9th Cir. 2011) ("the FDCPA covers both

the filing of complaints . . . and the service of settlement letters during the course of litigation.");

*Donohue v. Quick Collect, Inc*., 592 F.3d 1027 (9th Cir. 2010) (state court debt collection

complaint is communication subject to FDCPA).

There is no dispute that the debt at issue here arises from a student loan.  (Lizarraga-

Davis Decl., at ¶ 2; ECF 62-1, at ¶ 1.)  Moreover, he was the subject of collection activity,

including a collection lawsuit, at the hands of a law firm hired by TSI.  (*See* Luke Dep. 106:19-

107:3.)  As a result, this first element is easily met.

**B.     TSI Qualifies As a "Debt Collector" Under the FDCPA.**

Although TSI has previously raised the argument that it is not a "debt collector," the

Court soundly rejected TSI's legal rationale for that stance.  Since that decision, the undisputed

facts make clear that TSI is unquestionably a "debt collector."

The FDCPA broadly defines a "debt collector" as an entity "who regularly collects or

attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due

another." 15 U.S.C. § 1692a(6).  As this Court previously found, "a servicer may qualify as a

debt collector if it began servicing the loan after default."  (ECF 56, at 7;) *see also Myrette-*

*Crosley v. Ditech Home Loans*, No. 3:17-CV-05528-JD, 2018 WL 3159727, at *2 (N.D. Cal.

June 28, 2018); *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012) (citing

*Wadlington v. Credit Acceptance Corp*., 76 F.3d 103, 106-8 (6th Cir. 1996) and *Perry v. Stewart*

*Title Co*., 756 F.2d 1197, 1208 (5th Cir. 1985)); *Weber v. Great Lakes Educ. Loan Servs*., 2014

WL 1683299, at *5 (W.D. Wis. Apr. 29, 2014) ("to determine whether Great Lakes is a debt

collector, the court must determine: (1) the date it "obtained" Weber's loan; and (2) the date

Weber defaulted").  Moreover, a debt collector can be liable for the actions of the collection

attorneys it hires.  *See Merrill v. Transworld Sys., Inc*., No. 1:20-CV-183, 2020 WL 8474736, at

*6 (W.D. Mich. Dec. 1, 2020), report and recommendation adopted, No. 1:20-CV-183, 2021 WL

210715 (W.D. Mich. Jan. 21, 2021) (TSI "can be liable for its attorneys' debt collection activity.").

Here, the undisputed facts show that TSI is a "debt collector." Mr. Lizarraga-Davis' student loan account went into default on March 2, 2015. (Luke Dep., 66:10-14.) Immediately upon default, TSI became the special subservicer of Mr. Lizarraga-Davis' account. (*Id.*, at 31:8-12, 64:8-65:5.) Approximately two years later, TSI engaged a collection law firm to commence litigation against Mr. Lizarraga-Davis. (*See id.*, at 106:19-107:3.)

Moreover, TSI's post-default collection activities of Mr. Lizarraga-Davis' account are consistent with its role collecting on NCSLT debts more generally. TSI regularly "act[s] as a collector or a collection agency for various clients." (Luke Dep., 25:24-26:9.) Upon default of a NCSLT student loan account, TSI takes over servicing responsibilities from AES, and indirectly collect on the account through its network of collection agencies or collection law firms. (*Id.*, at 15:7-15, 23:17-19, 29:23-30:5.) TSI vets, selects, and onboards the collection agencies and law firms in its network. (*Id.*, at 47:11-25, 52:12-25.) TSI requires the law firms to perform several pre-litigation actions on the account, including "scrub[ing]" the account and contacting the borrower. (*Id.*, at 53:24-54:9, 54:19-55:4.) TSI authorizes the law firm to file suit and retains sole authority on any settlement offers. (*Id.*, at 53:17-22, 57:23-58:1.) If one of TSI's collection law firms recovers money, that money is remitted directly back to TSI, who nets out attorneys' fees, pays the law firm, and retains a certain percentage before remitting the rest back to the appropriate NCSLT. (*Id.*, at 55:21-56:11.) TSI also remains heavily involved in the litigation itself, from responding to discovery requests and providing testimony. (*Id.*, at 57:17-19, 58:10-59:4.) TSI even decides whether it is going to produce a witness at all. (*Id.*, at 59:6-9.)

In summary, not only did TSI act as a debt collector as to Mr. Lizarraga-Davis' account specifically, but as the default servicer, it "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due" to the NCSLTs. *See* 15 U.S.C. § 1692a(6).

### C.       TSI Engaged in Activity Violating the FDCPA.

As with countless other debtors, TSI pressed forward with a collection lawsuit against Mr. Lizarraga-Davis even though it did not have adequate documentation that it owned his debt, or could otherwise prove its case against him if pressed to do so.  In fact, some of TSI's key documents were specifically prepared for the purpose of litigation.  This practice violates a number of FDCPA provisions.

### 1.       Section 1692f

Section 1692f generally prohibits any "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

As the Ninth Circuit has recognized, "[s]uing to collect on an unenforceable debt is patently unfair to the consumer." *Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1133 (9th Cir. 2021).  Although *Kaiser* dealt with a different litigation abuse (suing on time-barred debt), that abuse has been found "analogous" to the practice of filing collection lawsuits without the ability to prove proper assignment.  *See Young v. Unifund CCR Partners*, No. 09 C 04206, 2014 WL 4698646, at *5 (N.D. Ill. Sept. 22, 2014).  That analogy makes sense because, whether the debt is unenforceable due to a statute of limitations, or whether the debt is unenforceable because the collector cannot prove ownership, the practical effect is the same: the vast majority of the suits lead to default judgments, and "[e]ven the rare consumer who understands… [the defense] is likely to give in rather than fight the lawsuit because she must still expend energy and resources and subject herself to the embarrassment of going to court." *Kaiser*, 989 F.3d at 1133-34 (quoting *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1079 (7th Cir. 2013)).

It is thus hardly a surprise that there is a plethora of authority supporting that TSI's collection efforts on NCSLT accounts is unfair. *Eul v. Transworld Sys.*, No. 15 C 7755, 2017 WL 1178537, at *14–15 (N.D. Ill. Mar. 30, 2017) (plaintiffs stated claim under 1692f that TSI filed debt collection lawsuits without authorization).  In fact, the Ninth Circuit itself has already found that TSI's "attempts to collect debts with false affidavits and without the necessary documentation to prove their claims plausibly alleged the use of 'unfair or unconscionable means

1  to collect or attempt to collect any debt.'"  *Hoffman v. Transworld Sys., Inc.*, 806 F. App'x 549,

2  552 (9th Cir. 2020).  Similarly, the Western District of Michigan has found these alleged

3  practices by TSI to violate section 1692e, which is discussed in more detail below.  *Merrill*, ,

4  2020 WL 8474736, at *9; *see also Young*, 2014 WL 4698646, at *5 (different collector's practice

5  of suing without ability to prove assignment states a claim under section 1692f).

6       State and federal regulators have also found the conduct at issue here by TSI to be both

7  "unfair" and "deceptive."  The CFPB found that two key components of TSI's litigation practies

8  were unfair and deceptive: its practice of using false and misleading affidavits and testimony in

9  litigation, (Consent Order, at ¶¶ 33-36,) and its practice of filing lawsuits without the intent or

10  ability to prove the claims if contested, (*id.*, at ¶¶ 37-44.)  Similarly, the New York Attorney

11  General found it deceptive that TSI (a) created its "redacted excerpts" in anticipation of

12  litigation, and failed to disclose that fact (Request for Judicial Notice, Ex. 13, at ¶¶ 19-23;) and

13  (b) attached purported assignment documents referencing "loan programs… [that] were not an

14  exact match, and a third-party reviewing the documents – such as a court – would have no non-

15  speculative way to confirm the loan at issue is actually owned by the plaintiff Trust," (*id.*, at ¶

16  33.)

17       **2.     Section 1692e (including 1692e(2)(A), 1692e(5), and 1692e(10))**

18       Section 1692e broadly prohibits "false, deceptive, or misleading representation[s] or

19  means in connection with the collection of any debt."  15 U.S.C. § 1692e.  "In this circuit, a debt

20  collector's liability under § 1692e of the FDCPA is an issue of law." *Tourgeman*, 755 F.3d at

21  1119 (internal quotation marks and citation omitted). "The analysis is objective and takes into

22  account whether the least sophisticated debtor would likely be misled by a communication." *Id.*

23  (internal quotation marks and citation omitted).

24       "The filing of a legally defective debt collection suit can violate § 1692e where the filing

25  falsely implies that the debt collector has legal recourse to collect the debt." *Grant-Hall v.*

26  *Cavalry Portfolio Servs., LLC*, 856 F. Supp. 2d 929, 944 (N.D. Ill. 2012); *see also Eul*, 2017 WL

27  1178537, at *13–14 (plaintiffs stated claim under 1692e that TSI filed debt collection lawsuits

28

1  without authorization); *see also Kaiser*, 989 F.3d at 1133 (lawsuits to collect unenforceable debts

2  "are both unfair and misleading").  That is especially true when deceptive court filings could

3  have an impact on the consumer's decision-making.  *Hartman v. Great Seneca Financial Corp*.,

4  569 F.3d 606, 613 (6th Cir. 2009) (applying "least sophisticated consumer" standard).

5       In addition to the broad prohibition on "false, deceptive, or misleading" conduct, section

6  1692e includes a nonexclusive list of practices that are deemed to violate that provision.  Those

7  practices include the "false representation of… the character, amount, or legal status of any

8  debt," 15 U.S.C. § 1692e(2)(A), "threat to take any action that cannot legally be taken or that is

9  not intended to be taken," 15 U.S.C. § 1692e(5), and a catch-all prohibition against the "use of

10 any false representation or deceptive means to collect or attempt to collect any debt…," 15

11 U.S.C. § 1692e(10).

12      As with section 1692f, numerous courts have found the practices at issue here to state

13 claims under various sections of section 1692e.  *Merrill*, 2020 WL 8474736, at *9 ("Plaintiff

14 Merrill has stated a valid FDCPA [1692e] claim against TSI based on the alleged false

15 misrepresentation that the Trusts owned the loans in question and the filing of a false or

16 misleading affidavit in the Merrill Grand Traverse County Circuit Court case."); *Hoffman v.*

17 *Transworld Sys. Inc*., No. C18-1132 TSZ, 2021 WL 22590, at *5 (W.D. Wash. Jan. 4, 2021)

18 (TSI's alleged practices stated claims under 1692e(2)(A) and 1692e(10)).  Moreover, as

19 described above, regulatory bodies have found TSI's conduct to be both "unfair" and

20 "deceptive."

21            **3.    TSI's Conduct With Respect to Mr. Lizarraga-Davis**

22      The undisputed evidence in this case shows that TSI has violated the above FDCPA

23 provisions by engaging a collection law firm to send pre-litigation correspondence, file a state

24 court collection action, and send settlement letters.

25      First and foremost, TSI does not have the documentation to show proper ownership of

26 Mr. Lizarraga-Davis's debt.  As laid out in II.C.5. above, and as also laid out in Plaintiff's

27 Opposition to Defendant's Motion for Summary Judgment, there are many deficiencies in TSI's

28

paperwork.  Most notably, the last page of Exhibit 5 was created for purposes of litigation – the very same practice that the New York Attorney General found to be deceptive.  As the Attorney General concisely described:

> TSI's description of a newly-created document as a 'redacted' version of the original document may confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).

(RJN, Ex. 13, at ¶ 22.)  Moreover, the purported "Part 2" of the assignment only applies to loans under the "GMAC Alternative Loan Program," which is far from an "exact match" to Mr. Lizarraga-Davis' loan documents – another deceptive practice identified by the New York Attorney General.  (*See id.*, at ¶ 33 (New York Attorney General findings), *see also* ECF 62-1, at ¶ 24 (referencing Part 2 of the assignment here).)  These issues are in addition to the many other deficiencies in TSI's chain of assignments, which also include TSI's inability to authenticate key documents, missing pages in some of its exhibits, its re-creation of the loan notes, and its failure to produce one page in discovery (despite years of discovery in two different court cases).

TSI's deceptive conduct here had serious implications on Mr. Lizarraga-Davis' own decision-making.  Mr. Lizrraga-Davis had real concerns "about who NCSLT 2006-4 was," "did not know whether this was a legitimate company, and whether it had a legitimate right to collect money from him."  Although he "did not want to skirt [his] obligation," he "did not want (and could not afford) to pay them money if [he] did not legally owe them anything."  (Lizarraga-Davis Decl., ¶ 4.)  The issue was important enough for him that he sent multiple requests to obtain further information from the collection law firm.  (*Id.*, at ¶¶ 3, 6, 7, 9, Exs. 2, 4.)  In response, he received only incomplete documentation.  (*See id.*, Exs. 1, 3.)

As the specific examples cited by the New York Attorney General illustrate, which are unquestionably the facts at issue here, TSI's efforts to collect on Mr. Lizarraga-Davis' debts were deceptive as a matter of law.  *See also Grant-Hall*, 856 F. Supp. 2d at 944.  And these deceptive acts continue from the pre-litigation correspondence to Mr. Lizarraga-Davis,

(Lizarraga-Davis Decl., Exs. 1, 3,) its state court lawsuit, (*id*., at Ex. 5 (including attached Exhibit A),) and its settlement offer that did not disclose any of the deceptive practices while trying to coerce him into making payments, (*id*., at Ex. 6.)

These same collection efforts, especially TSI's use of the state court litigation process, to collect on an unenforceable debt are also "patently unfair."  *See Kaiser*, 989 F.3d at 1133.  In reaching that conclusion, the *Kaiser* Court noted that "90% or more of consumers sued in these actions do not appear in court."  *Id*.  Moreover, even for the rare consumer who knows how to assert the proper defenses, she may "give in rather than fight the lawsuit because she must still expend energy and resources and subject herself to the embarrassment of going into court."  *Id*., at 1134.

TSI's litigation efforts more generally mirror those concerns raised by the *Kaiser* Court.  Despite the fact TSI files approximately 2,000 lawsuits on behalf of the NCSLTs per month, it only has between two and six employees to make appearances at trial, who may only appear at one to four trials per month.  (Luke Dep., 123:22-124:4, 124:9-23.)  As explained *supra*, In Mr. Lizarraga-Davis' own county, and the two next closest courthouses (in Santa Cruz County and Monterrey County), there is no record of TSI ever sending a single witness to court.  Instead, TSI relies heavily on default judgments and settlements.  When a case is scheduled for trial, TSI simply dismisses rather than attempt to prove its case.  (*See* RJN, Exs. 14, 15, 16.)  This conduct is also shown in Mr. Lizarraga-Davis's case.  He requested proof of assignment, only to be given scant documentation and settlement offers, only to see his case dismissed after experiencing the pain of litigation.  TSI's extensive use of these lawsuits to extract settlements and default judgments, only to dismiss (as with Mr. Lizarraga-Davis) when it is tasked to prove its case (which it cannot do) is just as "patently unfair" as the lawsuits at issue in *Kaiser*.

TSI's conduct is both unfair and deceptive, Mr. Lizarraga-Davis is entitled to judgment as to liability on his FDCPA claim.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## V.   CONCLUSION

The undisputed evidence in this case supports the legal theories upheld by many courts and regulators: TSI's litigation conduct violates the FDCPA, and it certainly does so in Mr. Lizarraga-Davis' case.  This Court should grant him partial summary judgment as a result.

Dated: <u>March 31, 2022</u>                    ERIKA HEATH, ATTORNEY AT LAW

                              <u>*/s/ Erika Heath*</u>
                              Erika Heath
                              Attorney for Plaintiff
                              OSKAR LIZARRAGA-DAVIS