Erika Heath (SBN 304683)
ERIKA HEATH, ATTORNEY AT LAW
369 Pine St., Ste. 410
San Francisco, CA 94104
Tel.:    (415) 426-7850
erika@heathlegal.com

Attorney for Plaintiff
OSKAR LIZARRAGA-DAVIS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OSKAR LIZARRAGA-DAVIS,<br>        Plaintiff,<br><br>v.<br><br>TRANSWORLD SYSTEMS, INC.;<br>        Defendant. | Civil Action No. 5:18-cv-4081-BLF<br><br>**DECLARATION OF ERIKA HEATH IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        May 5, 2022<br>Time:        9:00 a.m.<br>Courtroom:   virtual<br>Judge:       Hon. Beth L. Freeman |

I, Erika Heath, being first duly sworn, depose and state under oath as follows:

1.      I am a member of the State Bar of California and admitted to practice law in all the courts of the State of California. I am in good standing with the Bar of this Court. I am over the age of 18 years, and am competent to testify. The facts contained in this declaration are within my personal knowledge, and I could and would testify truthfully to those facts if called under oath to do so.

2.      I am counsel for Plaintiff in the above-styled action, and I make this declaration in support of Plaintiff's Motion for Partial Summary Judgment.

3.      Attached as **Exhibit 10** is a true and correct copy of deposition transcript excerpts of the Deposition of Bradley Luke, dated March 30, 2021.  Bradley Luke was designated by Transworld Systems, Inc. ("TSI") as TSI's Person Most Knowledgeable.

4.      Attached as **Exhibit 11** is a true and correct copy of a meet-and-confer email I sent to defense counsel on September 6, 2019, reiterating my request for TSI to produce all documents it had regarding its assignment records, in line with Plaintiff's Request for Production Nos. 8 and 9.

5.      Although documents were produced pursuant to the parties' September 2019 meet-and-confer, the redacted spreadsheet attached to Exhibit 5 of the Bradley Luke declaration, ECF (the next-to-last page of that exhibit) was not part of that production, and in fact, was never produced in discovery.  (*See* ECF 62.) The first time I saw this particular document was in Defendant's March 2022 motion for summary judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of March, 2022, in The Sea Ranch, California.


   */s/ Erika Heath*
Erika Heath

DECLRATION OF ERIKA HEATH IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT 10

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3
     OSKAR LIZARRAGA-DAVIS,          )
4                                    )
                  Plaintiff,         )
5                                    )
          vs.                        )   No. 5:18-cv-4081-BLF
6                                    )
     TRANSWORLD SYSTEMS, INC.,       )
7                                    )
                  Defendant.         )
8    _____)

9

10

                     REMOTE DEPOSITION OF
11
       BRADLEY LUKE, 30(b)(6) FOR TRANSWORLD SYSTEMS, INC.
12
                       PAGES 1 - 143
13

14

15

16           DATE:  Tuesday, March 30, 2021

17           TIME:  8:59 a.m. - 1:59 p.m.

18   WITNESS LOCATION:  Peachtree Corners, Georgia

19      REPORTED BY:  Sarah Jean MacDevitt, CSR, RPR
                      California CSR 14175
20

21

22

23

24

25



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1                    VIRTUAL APPEARANCES

 2    FOR THE PLAINTIFF:

 3         ERIKA HEATH, ATTORNEY AT LAW
           BY:   ERIKA HEATH, Attorney at Law
 4         369 Pine Street, Suite 410
           San Francisco, California 94104
 5         (415) 426-7850
           erika@heathlegal.com
 6
      FOR THE DEFENDANT AND THE WITNESS:
 7
           SESSIONS ISRAEL & SHARTLE
 8         BY:   JAMES K. SCHULTZ, Attorney at Law
           1545 Hotel Circle South, Suite 150
 9         San Diego, California 92108
           (619) 296-2018
10         jschultz@sessions.legal

11    ALSO PRESENT:

12         CYDNEY AGNO - Court Reporting Intern

13                     ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS · LEGAL VIDEO

```
1                    INDEX OF EXAMINATIONS

2    EXAMINATION BY:                              PAGE

3    MS. HEATH......................................   6

4

5

6                        ---oOo---

7

8                    INDEX OF EXHIBITS

9    NUMBER       DESCRIPTION                     PAGE

10   Exhibit 1    Plaintiff's Notice of             20

11                Deposition of Defendant

12                Transworld Systems, Inc.

13                Pursuant to Fed. R. Civ. P.

14                30(b)(6); 4 pages

15

16   Exhibit 2    November 3, 2014, letter from     24

17                U.S. Bank National Association

18                to Whom it May Concern; TSI0026

19

20   Exhibit 3    March 10, 2017, Loan Payment      65

21                History Report; 2 pages

22

23

24

25
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1              INDEX OF EXHIBITS (CONTINUED)

 2   NUMBER        DESCRIPTION                        PAGE

 3   Exhibit 4     June 2006 Cosigned Loan              68

 4                 Request/Credit Agreement -

 5                 Signature Page; 5 pages

 6

 7   Exhibit 5     Note Disclosure Statement;           81

 8                 1 page

 9

10   Exhibit 6     2006-4 Pool Supplement GMAC          82

11                 Bank; 6 page

12

13   Exhibit 7     Deposit and Sale Agreement The       94

14                 National Collegiate Student

15                 Loan Trust 2006-4; 11 pages

16

17   Exhibit 8     September 14, 2016, Loan            100

18                 Financial Activity; 12 pages

19

20   Exhibit 9     Excerpt of TSI's Internal           107

21                 Account Notes; 17 pages

22                 CONFIDENTIAL

23

24

25
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

1              INDEX OF EXHIBITS (CONTINUED)

2    NUMBER        DESCRIPTION                        PAGE

3    Exhibit 10   Consent Order In the Matter of       125

4                 Transworld Systems, Inc.;

5                 32 pages

6

7    Exhibit 11   Defendant Transworld Systems,        133

8                 Inc.'s Declaration in Support

9                 of Motion for Summary Judgment;

10                6 pages

11

12

13

14

15

16

17

18                          ---oOo--

19

20

21

22

23

24

25



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS · LEGAL VIDEO

1     is a subset of clients as opposed to my corporate role,

2     which I worked on everything that TSI had.

3            Q.   Okay.  I think I understand.

4                 So let me ask you what this claims processing

5     piece means, just so I can understand what you mean when

6     you say that.  Yeah.

7                 When you say "claims processing," what exactly

8     does that mean?

9            A.   So that's just the name of my side of the

10    business, and basically you can think of it as instead

11    of TSI doing the collections, we are forwarding out

12    clients' accounts to either our agency network or our

13    legal network for them to facilitate the collections.

14    So we are acting as kind of an intermediary between the

15    client and the ultimate agency or firm.

16           Q.   Okay.  I think I understand.

17                And in your position as senior litigation

18    paralegal, you said that would include all kinds of

19    matters, does that mean matters where TSI collected

20    directly from the consumer without bringing in an

21    intermediary?

22           A.   Yes, ma'am.  That would include those types of

23    matters.

24           Q.   Okay.  How much of your current workload at TSI

25    relates to National Collegiate Student Loan Trust



 1    education loan programs for which the banks lent them
 2    money.  First Marblehead Corporation had a right to
 3    purchase the loans that were originated under these
 4    programs, or they had the option to set up a special
 5    purpose entity to purchase those loans, in which case --
 6    in this case, that's what they did.
 7         Q.  That entity being the 2006-4 trust?
 8         A.  Yes, ma'am.  That's correct.
 9         Q.  And who is the Pennsylvania Higher Education
10    Assistance Agency?
11         A.  So they are the -- I'm not sure their corporate
12    structure, but they do business as American Education
13    Services.  We refer to them usually as AES.  So they act
14    as the pre-default servicer of loans owned by the trust
15    and loans that were originated through these programs.
16    So when GMAC originated the loan, PHEAA, P-H-E-A-A, or
17    AES begin servicing that loan upon origination, and they
18    would service these loans all the way through the time
19    they default and are accelerated.
20         Q.  Was AES the -- or PHEAA the exclusive
21    pre-default servicer on these loans?
22             MR. SCHLUTZ:  Objection.
23             THE WITNESS:  No, ma'am.
24             (Reporter clarification.)
25    ///



```
 1    it less confusing, but I labeled the PDFs that I sent

 2    out as letters.  We are going to number the actual

 3    exhibits as they are entered as numbers.

 4              MR. SCHLUTZ:  Okay.  No problem.  I just want

 5    to make sure I stay consistent.

 6              MS. HEATH:  Sure.

 7    BY MS. HEATH:

 8         Q.  So this PDF B will be marked as Exhibit 2.

 9    And, for the record, this is Bates stamped TSI 26.

10              So, Mr. Luke, have you seen this document

11    before?

12         A.  Yes, ma'am.  I have.

13         Q.  Okay.  What is this?

14         A.  This is a -- basically a confirmation or

15    acknowledgement by U.S. Bank and GSS Data Services

16    basically acknowledging and confirming that Transworld

17    Systems is a special subservicer and able to file proofs

18    of claim, answer discovery, provide testimony, including

19    executing affidavits on behalf of the trusts that are

20    listed.

21         Q.  So who is GSS Data Services?

22         A.  So they are the administrator of the 15 trusts

23    that are listed at the top of this page.

24         Q.  How would you describe TSI's business?

25              MR. SCHLUTZ:  Object to the form.
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1              THE WITNESS:  Predominately accounts
 2    receivable.  They act as a collector or a collection
 3    agency for various clients.  I describe their other line
 4    of business being the agency and law firm network,
 5    attorney network, and then that goes along with that,
 6    and the document -- in the deposition Exhibit 2, they
 7    also act as a special subservicer and custodian of
 8    records for these 15 trusts that are listed on the
 9    document.
10    BY MS. HEATH:
11        Q.  I want to hone in on one of those phrases that
12    you just used that I think I saw referenced in this
13    document, "special subservicer."
14             What does that mean?
15        A.  So we discussed a little earlier U.S. Bank
16    being the special servicer.  TSI has been enacted by U.S
17    Bank as a special subservicer.  So we have taken over
18    through contracts various obligations and duties that
19    U.S. Bank would have otherwise been obligated to carry
20    out for these 15 trusts.
21        Q.  And what obligations has TSI agreed to take
22    over?
23        A.  Basically it is the recoveries portion of
24    defaulted student loans that are owned by the trusts as
25    well as being the custodian of records pertaining to
```



```
1    those loans for the trust.

2         Q.  Do you know what obligations U.S. Bank did not

3    assign to TSI?

4              MR. SCHLUTZ:  Object to the form.

5              THE WITNESS:  I'm not sure.

6    BY MS. HEATH:

7         Q.  So I see on this Exhibit 2 National Collegiate

8    Student Loan Trust 2006-4.  Does that mean that TSI is

9    also special subservicer for NCSLT-2006-4 specifically?

10        A.  Specifically, yes.  And the other trusts that

11   are also listed there.

12        Q.  And is it okay if I abbreviate National

13   Collegiate Student Loan Trust to NCSLT today?

14        A.  Yes, ma'am.  That's fine.

15        Q.  Have you ever been employed by NCSLT-2006-4?

16        A.  No, ma'am.  I have not.

17        Q.  Have you ever met anyone who worked for

18   NCSLT-2006-4?

19        A.  No, ma'am.

20        Q.  Are you aware of whether NCSLT-2006-4 has any

21   employees?

22        A.  They do not.

23        Q.  While we are looking at a list of all of these

24   different trusts, let me ask you, what does the -- what

25   do these numbers mean at the end?
```



1    is the fourth trust that was set up and purchased loans

2    in 2006.  So there were three other purchases for

3    different trusts in 2006 prior to the 2006-4 purchase.

4    BY MS. HEATH:

5        Q.  Okay.  Thank you.

6            And is there some kind of agreement that

7    governs TSI's relationship with NCSLT-2006-4?

8        A.  Yes, ma'am.

9        Q.  And what is that agreement?

10       A.  So the agreement for TSI is called the "Default

11   Prevention and Collection Services Agreement."

12       Q.  Is that agreement specific to the 2006-4 trust,

13   or does it cover multiple trusts?

14       A.  It covers all the trusts that are listed on

15   this Exhibit 2.

16       Q.  You mentioned that TSI is the special

17   subservicer.  Are they the exclusive special

18   subservicer?

19       A.  There is another special subservicer, but TSI

20   is exclusive in what they do.  So there's not another

21   subservicer that also does what TSI does.  The other

22   special subservicer does other things.

23       Q.  So if there was a defaulted NCSLT account, it

24   goes to TSI, not -- it goes to TSI for collection; is

25   that correct?



1            MR. SCHLUTZ:  Object to the form.

2            THE WITNESS:  Today a defaulted student loan

3    account owned by one of these 15 trusts would come to

4    TSI for their servicing role, who would facilitate, in

5    most cases, collections.

6    BY MS. HEATH:

7        Q.  Now, in the documents produced, I don't think I

8    saw any servicing procedures that were unique to the

9    2006-4 trust.  So let me ask you this:  Does TSI

10   generally employ the same practice -- the same practices

11   across these different trusts?

12           MR. SCHLUTZ:  Object to the form.

13           THE WITNESS:  Yes.  They do.

14   BY MS. HEATH:

15       Q.  Okay.  But if there's any point where we are

16   discussing these generally today and there's a nuance

17   for 2006-4, please let me know.  Okay?

18       A.  Yes, ma'am.  I understand.

19       Q.  How long has TSI been the special subservicer

20   of these accounts?

21       A.  So this goes back to when I was talking about

22   my employment.  So technically TSI since November 1st of

23   2014.  Prior to that, it was NCO.  So the subservicing

24   role went over with the acquisition under the TSI name.

25       Q.  So earlier we briefly discussed American



1   Education Services, or AES.   What was their role with

2   Mr. Lizarraga-Davis's account?

3           MR. SCHLUTZ:   Object to the form.

4           THE WITNESS:   So AES serviced the account from

5   when it was originated by GMAC all the way until it

6   ultimately was accelerated and defaulted.

7   BY MS. HEATH:

8       Q.   And then who did the account go to immediately

9   after default?

10      A.   Depends on the date.   And if I remember this

11  one correctly, it defaulted in 2015.   So it would have

12  went directly to TSI.   Had it defaulted prior to

13  November 1, 2014, it would have went to NCO.

14      Q.   So in case it is not clear already, does TSI

15  service any accounts for the National Collegiate Student

16  Loan Trusts that are not in default?

17      A.   TSI has a limited role for delinquent accounts.

18  So when an account goes 31 days past due, AES will send

19  the account over to TSI to facilitate default aversion,

20  basically getting that consumer back current on the

21  account to prevent default.

22          TSI doesn't partake in those attempts directly.

23  Just like TSI will forward out accounts to agencies

24  similar to that, we do that on the default aversion.   So

25  it is not TSI calling the consumer trying to get them



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

1    back current.  We facilitate and place the account to an

2    agency to help facilitate that.

3          Q.   Does TSI ever lend money out to consumers

4    itself?

5          A.   Can you restate your question, please?

6          Q.   Sure.

7               So earlier you mentioned that TSI's business is

8    accounts receivable; right?

9          A.   Yes, ma'am.

10         Q.   Okay.  Is that business primarily to collect

11   debts -- strike that.

12              Does TSI own any of the accounts that it is

13   collecting for?

14              MR. SCHLUTZ:  Object to the form.

15              THE WITNESS:  Currently, I'm not sure,

16   actually.

17   BY MS. HEATH:

18         Q.   And TSI doesn't originate any loans; right?

19         A.   Not to my knowledge.

20         Q.   So when TSI first gets a National Collegiate

21   student loan account, such as plaintiff's, for

22   servicing, how does TSI get presented with that account?

23              MR. SCHLUTZ:  Object to the form.

24              THE WITNESS:  The account comes over -- it is

25   usually a group of accounts.  So accounts at AES will



1   default on a monthly basis, generally when they are

2   about 180 days past due.   AES will send over a file

3   through a secure file transfer to TSI.   That electronic

4   file contains crucial information regarding the account,

5   account number, consumer's name, address, balance

6   information, stuff like that.

7          TSI will then take that file and we will create

8   an account within our system of record using that data

9   along with data from the default aversion account.

10  Because if you recall, we get the accounts for default

11  aversion, so we already will have an account in our

12  system.   So we use information from that account

13  placement and append that to the new information we

14  receive in the default file.   And that creates our

15  default account.

16          And then AES also, throughout the month leading

17  up to the default, will send us through a secure site,

18  account documentation.   Documentation such as the credit

19  agreement, the signature page, the note disclosure

20  statement, and then they can send additional documents

21  through that site.   And we take those documents and put

22  them into our media repository and index them under the

23  account number.

24  BY MS. HEATH:

25          Q.   So when they first send this file that has the



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

1    account details in it, the account number, the consumer

2    name, et cetera, is that one single file that has all of

3    the transferred accounts in it?

4         A.   Yes, yes.   So it is one single file, so

5    everything that defaulted that month.   So let's say they

6    defaulted on the 1st of the month, we will get that file

7    on the 2nd or the 3rd, depending on weekends and

8    whatnot.   And that file contains everything that

9    defaulted on the 1st of that month, so in that batch of

10   defaults.

11        Q.   Is that an Excel file or what kind of format?

12        A.   I believe it is a text file in tab delimited

13   format.

14        Q.   And you said that was an electronic transfer.

15   What platform does that transfer take place on?

16        A.   AES has its own online portal that they put the

17   file out on and we grab.

18        Q.   So you have that file, and then you had

19   indicated that you create an account in your system of

20   record; right?

21        A.   Yes, ma'am.

22        Q.   Does your system of record have a name?

23        A.   CRS.

24        Q.   And then I want to make sure I understood this

25   next part, because you had mentioned some data from



```
 1    the assignment pop up in the repository?

 2         A.  Yes, ma'am.

 3         Q.  When does TSI get copies of these pool

 4    supplements?

 5         A.  So since these relate to pools of loans and not

 6    individualized for each loan, TSI actually got these

 7    from NCO when the subservicing business was

 8    transitioned, so TSI has always had them since they

 9    became the special subservicer.

10         Q.  Okay.  Now, for AES's online portal where you

11    go and retrieve these account documents, what is the

12    name of that portal?

13         A.  PageCenter, I believe, for their documents.  I

14    could be mistaken on the name, though.

15         Q.  Do you know of a system called Compass?

16         A.  Yes, ma'am.

17         Q.  What is Compass?

18         A.  So Compass is basically the -- AES's equivalent

19    to CRS.  So it is AES's internal electronic system of

20    accounts.  So there's no documents within that, but

21    there's the electronic account data.

22         Q.  And have you heard of a system called OCWEBB?

23    I think that is spelled O-C-W-E-B-B.

24         A.  Yes, ma'am.

25         Q.  And what is that?
```



```
 1        A.   That is sometimes used in place of Compass.
 2   But my understand is that's the launch application to
 3   launch the Compass system.
 4        Q.   And do you ever access Compass?
 5        A.   Yes, ma'am.  I do.
 6        Q.   And why do you access Compass?
 7        A.   For various reasons, account research, to look
 8   through their records, notes, verify payment
 9   information, for any number of reasons.
10             MS. HEATH:  I think I'm going to go ahead and
11   take a break before we start getting into some of the
12   next topics.
13             MR. SCHLUTZ:  Okay.
14             MS. HEATH:  So I need to -- yeah.  Let's take
15   ten minutes.
16             MR. SCHLUTZ:  Okay.
17             (Off the record:  10:13 a.m. to 10:25 a.m.)
18   BY MS. HEATH:
19        Q.   So, Mr. Luke, do you understand that you are
20   still under oath?
21        A.   Yes, ma'am.  I understand.
22        Q.   And did you speak to anyone about this
23   deposition during the break?
24        A.   No, ma'am.  I did not.
25        Q.   All right.  So when TSI is first taking over a
```



1    defaulted NCSLT account for servicing, what is the

2    general next step in the process, in the accounts

3    receivable process?

4            MR. SCHLUTZ:  Object to the form.

5            THE WITNESS:  So after TSI sets up the account

6    in our system, we index the documents that came over

7    from AES.  Generally speaking, the next step is for TSI

8    to forward it to an agency to collect on the balance

9    that was defaulted.

10   BY MS. HEATH:

11       Q.  And you referenced earlier an agency network;

12   is that right?

13       A.  Yes, ma'am.

14       Q.  Can you describe this agency network?

15       A.  We just refer to it as a network.  It is just a

16   collective of various agencies who we have contracts

17   with who attempt to collect various accounts that are

18   placed to them.

19       Q.  And who selects the agencies that are in this

20   network?

21       A.  It is a collective, TSI internally.  We go

22   through a vetting process of agencies who want to be

23   onboarded, send them a questionnaire.  We thoroughly vet

24   them and then ultimately make a decision whether to add

25   them to our network or not.



1    Q.  Once the account has been placed with an

2    agency, is there any typical amount of time it stays

3    there?

4    A.  For the agency side, yes.  There is.

5    Q.  And what is that?

6    A.  Typically it would be six months, unless

7    there's some type of an arrangement reached with the

8    consumer before that expires.  So if the account is

9    paying, it will stay with that agency so long as

10   payments are made.  It won't be recalled at that

11   six-month mark.

12   Q.  Does TSI send any communications directly to

13   the consumers during that time?

14   A.  TSI, in its capacity as a special subservicer,

15   no.  However, TSI's -- their collection side does act as

16   an agency within the network.  So TSI, the subservicer,

17   can get the account at default and place the account to

18   TSI's collection side as an agency.  And in that case,

19   TSI, the collection agency, would send a letter to the

20   consumer.

21   Q.  And does TSI -- so I assume TSI, the collection

22   agency side, handles NCSLT accounts?

23   A.  Yes.  They do.

24   Q.  So what happens after six months with an

25   agency?



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

```
 1        A.   So after the first six months with an agency,
 2   if no arrangement or payments are set up, the account
 3   gets recalled and gets placed to a second agency.
 4        Q.   And how long does that account stay with that
 5   second agency?
 6        A.   Six months, unless some type of arrangement is
 7   made.
 8        Q.   And what happens at the end of that six months?
 9        A.   Basically the process starts over with a third
10   agency.
11        Q.   And how long does it stay with a third agency?
12        A.   Six more months.
13        Q.   Now, at the end of that six-month period, what
14   happens?
15        A.   Fourth agency.
16        Q.   I'm noticing a pattern, but I'll go ahead and
17   ask the questions for a clear record.  How long does it
18   stay with that fourth agency?
19        A.   Typically six months also.
20        Q.   Okay.  And what happens at the end of that six
21   months?
22        A.   At the end of that six months, the account goes
23   into an internal queue to be reviewed for potential
24   placement to the attorney network.
25        Q.   You said "to be reviewed."  Can you describe
```



EXCEEDING YOUR EXPECTATIONS

COMBS REPORTING, INC.

DEPOSITION REPORTERS • LEGAL VIDEO

1   split of the placements or one firm gets 20 percent, the

2   other firm gets 80 percent of the placement.  So in a

3   given month, for example, if we have ten accounts that

4   are going to a law firm in California, if it's a 50-50

5   split, we will try to split those accounts five to Firm

6   1, five to Firm 2.  The exception of that is we keep

7   accounts together by consumer.

8          So if one consumer has six accounts and then

9   there's four individual accounts for other consumers,

10  one firm is going to get those six accounts and the

11  other firm is going to get the four accounts.

12      Q.  And who decides which law firms are in this

13  attorney network?

14      A.  It is similar to what we described or what we

15  discussed with the agency network.  It is an internal

16  group of people where if a firm wants to be onboarded to

17  our network, we send them out a questionnaire, we go

18  through the types of business that they would be doing

19  and ensure that basically they can comply with all of

20  our procedures and insurance requirements, data security

21  requirements, and then we'll meet internally and decide

22  whether a firm would be onboarded or not.

23      Q.  And you say "internally," does that mean

24  internally within TSI?

25      A.  Yes, ma'am.  TSI.



```
1          Q.  So TSI sends an account to the law firm at that

2     point.  Who makes the decision to file suit?

3               MR. SCHLUTZ:  Object to the form and to the

4     extent that this could potentially include any

5     attorney-client communications.  I don't think we are

6     there yet, but just heads-up for you on that issue,

7     Bradley.

8               MS. HEATH:  And then I want to be clear too.  I

9     don't want to know about communications and what is said

10    between you and the attorneys.  But, yeah, to the extent

11    you can answer that question without discussing those

12    communications, then yes.

13              THE WITNESS:  Okay.  The firm would be

14    responsible in determining whether a suit would be filed

15    on that account or not.

16    BY MS. HEATH:

17         Q.  Does TSI authorize the law firm to file a suit?

18              MR. SCHLUTZ:  Object to the form.

19              THE WITNESS:  Specifically for individual

20    suits, no.  However, every account that is placed to the

21    law firm, they are able to file a suit if they determine

22    that account to be suit worthy.

23    BY MS. HEATH:

24         Q.  So I realize I may be jumping ahead a little

25    bit here in terms of filing a lawsuit.  Is there
```



**typically any work done by the law firm before filing the lawsuit?**

A. Yes, ma'am.

**Q. And what is that process?**

A. So any account that we place to a law firm, the law firm is required to send a collection letter to the consumer, and co-borrower if applicable, and attempt to make calls to contact those consumers that the account is placed with.

**Q. Is there a period of time that that is supposed to go on before litigation?**

A. I don't recall if our procedures have a set time period in them or not, but generally it is the first 30 to 60 days of the account placement those collection attempts would occur.

**Q. And you mean 30 to 60 days when those collection attempts would start?**

A. So the collection attempts would start upon or shortly after the placement of the account. So when the account gets placed, the firms are required to do mandatory scrubs, just like we scrub before we place to them, they are going to do scrubs for bankruptcy, active duty, a deceased scrub. So they are required to do certain scrubs and review of the account prior to initiating collection attempts. Generally those take

1   anywhere between two to five business days for those

2   reviews to take place, and then a collection letter

3   would be sent, generally speaking, about five business

4   days following the placement of the account.

5        Q.  But there's no -- so for the agencies, they had

6   this six-month window, there's no similar six-month

7   window for the law firms?

8        A.  No, ma'am.  No.  There's no proactive recall

9   strategy for a law firm outside of statute of

10  limitations.  If the law firm has the account and TSI

11  determines the statute of limitations may have expired,

12  TSI will proactively recall that account.  Also such

13  things as, like, bankruptcy, we will recall the account,

14  but nothing is on like a set time period for recall.

15       Q.  Does TSI enter separate retainer agreements for

16  each of these accounts?

17       A.  Not each account individually.  TSI has an

18  agreement with the firm, each individual firm that kind

19  of governs our relationship and placement of various

20  accounts for various clients.

21       Q.  Okay.  So let's say that a law firm is

22  successful in recovering some money in its efforts, I

23  assume that money is sent back to TSI?

24       A.  Yes, ma'am.  It is.

25       Q.  And when TSI receives that money, did the law



1    firm already take any attorneys' fees out of it?

2         A.   Not at that time.  No, ma'am.

3         Q.   And when does the law firm get paid?

4         A.   So once the law firm remits the funds to TSI,

5    TSI will take those gross funds, net out their -- the

6    attorney's portion of it, and pay that to the attorney.

7         Q.   And then after paying those fees to the

8    attorney, what does TSI do with the remaining funds?

9         A.   So the remaining funds for the most part are

10   sent on to ultimately the trust.  However, TSI keeps

11   their percentage of those funds.

12        Q.   Now, are you aware of any other servicers who

13   engage attorneys to litigate NCSLT accounts?

14             MR. SCHLUTZ:  Object to the form.

15             THE WITNESS:  Currently I'm not aware of any

16   others.

17   BY MS. HEATH:

18        Q.   So if there's a case filed by a National

19   Collegiate Student Loan Trust anywhere in the country,

20   does that mean TSI was a default servicer of that

21   account?

22             MR. SCHLUTZ:  Object to the form.

23             THE WITNESS:  Particular to the 15 trusts that

24   are cited on deposition Exhibit 2 and depending on the

25   date of that filing, if that filing was on or after



```
 1  November 1st of 2014, then presumably TSI was the

 2  special subservicer for that loan.

 3  BY MS. HEATH:

 4       Q.  You just referred to the trust listed on

 5  Exhibit 2.  Are there other NCSLT trusts that TSI

 6  handles that are not on that exhibit?

 7            MR. SCHLUTZ:  Object to the form.

 8            THE WITNESS:  Not that I'm aware of.

 9  BY MS. HEATH:

10       Q.  So after a case gets filed, does TSI have any

11  role in the litigation afterwards?

12       A.  That would depend on where the litigation goes

13  afterwards.  So as we spoke about towards the beginning,

14  like if a counterclaim was filed, the firm would work

15  with TSI to gather information in response to that

16  counterclaim, maybe partake in negotiations, settlement

17  conferences.  TSI would have a role in answering

18  discovery, verifying those responses, perhaps providing

19  an affidavit for the account.  But it really depends on

20  where that litigation goes to determine how, when, and

21  why TSI would be involved with the law firm for that

22  litigation.

23       Q.  So let's start with settlement.  Does TSI have

24  authority to settle these accounts in litigation?

25            MR. SCHLUTZ:  Object to the form.
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1              THE WITNESS:  Yes, ma'am.
 2   BY MS. HEATH:
 3         Q.  Do law firms bring settlement offers to TSA --
 4   I'm sorry, TSI?
 5         A.  Yes, ma'am.  They do.
 6         Q.  And then does TSI have sole authority to decide
 7   how to settle, or, for example, do you have to run that
 8   decision by anybody else?
 9         A.  Sole authority.
10         Q.  And TSI responds to discovery requests in those
11   cases; is that right?
12         A.  Yes, ma'am.
13         Q.  All kinds of discovery?
14         A.  Pertaining to National Collegiate litigation,
15   yes, ma'am.
16         Q.  Let's say a consumer is sued by a National
17   Collegiate Student Loan Trust entity and the deposition
18   is noticed.
19              Does TSI provide testimony in those
20   depositions?
21         A.  Yes, ma'am.
22         Q.  And do TSI employees appear at trial in these
23   cases?
24         A.  Yes, ma'am.  They do.
25         Q.  And to be clear, if a TSI employee appears at
```



1    trial, who are they speaking on behalf of?

2              MR. SCHLUTZ:  Object to the form.

3              THE WITNESS:  On behalf of the individual trust

4    that brought the suit.

5    BY MS. HEATH:

6         Q.  Does TSI ever decide that it is not going to

7    send a witness to trial?

8              MR. SCHLUTZ:  Object to the form.

9              THE WITNESS:  Yes, ma'am.

10   BY MS. HEATH:

11        Q.  How does it make that decision?

12             MR. SCHLUTZ:  Object to the form and also

13   reminder about potential privilege issues.

14             THE WITNESS:  So there could be discussions

15   about the law firm, but also TSI looks at the financial

16   aspect of it.  So how much is at issue in the case.  So

17   if, for example, we are located in Georgia.  If it is a

18   California case that is $2,000 and the consumer is on

19   protected income, TSI may make the decision not to send

20   a witness because of the cost to provide a witness

21   across the country coupled with the protected income in

22   the event a judgment were to be obtained.

23             So TSI looks at the financial aspects of the

24   case to make a business decision whether to provide a

25   witness or not.  Also, we look at potential conflicts



1   within our witness calendar.  If there's four cases
2   across the country scheduled at the same time on the
3   same day, of course, we wouldn't be able to provide
4   witnesses to every one.  So we try to make continuances
5   or settlement negotiations to the extent we can for
6   those types of instances.

7   BY MS. HEATH:

8       Q.  When is that determination typically made,
9   about whether to send a witness to trial?

10          MR. SCHLUTZ:  Object to the form.

11          THE WITNESS:  So prior to the pandemic, we
12  would meet every month, go over the witness calendar,
13  and look at the cases, make determinations; then with a
14  lot of courts closing down throughout the pandemic and
15  making virtual testimony a viable option in certain
16  states, we meet less frequently just because the need
17  for travel and making those determinations has become
18  less frequent, but we try to get the attorney a decision
19  as soon as possible for when they make the request for a
20  witness.

21  BY MS. HEATH:

22      Q.  And I assume that request for a witness is
23  usually once there's a trial scheduled.  Is that an
24  accurate assumption?

25      A.  It should be, yes.  Generally speaking, as soon



```
 1        A.   Slightly, but that filter is fairly easy, to
 2   narrow it down to a state.
 3        Q.   Okay.  So about how long would that take?
 4        A.   For which category?
 5        Q.   I'm sorry.  To filter down by a state.
 6        A.   That would be -- I would just pull that state
 7   data.  So another 15 minutes, maybe.
 8        Q.   So to be clear, what is TSI's relationship with
 9   Mr. Lizarraga-Davis?
10             MR. SCHLUTZ:  Object to the form.
11             THE WITNESS:  TSI is the special subservicer of
12   his defaulted student loan that is owned by the 2006-4
13   trust.
14   BY MS. HEATH:
15        Q.   And when did TSI become the special subservicer
16   for his account?
17        A.   I believe it was right upon the default of that
18   account.  I would have to double-check the default date,
19   but if I recall, it was in 2015.
20        Q.   If I wanted to locate the default date, where
21   is the best place to do that?
22        A.   From your exhibits that you sent over, if you
23   look at Exhibit D, D, as in "David," there's a
24   charge-off date on --
25        Q.   Okay.
```



1      A.  -- about halfway down on the first page that

2    says March 2, 2015.

3           So that's when the account was defaulted and

4    charged off by AES, and TSI became the special

5    subservicer at that point.

6           MS. HEATH:  Okay.  So let's take a quick look

7    at that PDF.  So this is the PDF I labeled D, and we

8    will mark this as Exhibit 3.

9           (DEPOSITION EXHIBIT 3 WAS MARKED.)

10          THE WITNESS:  Yes, ma'am.

11   BY MS. HEATH:

12      Q.  In fact, what I'm going to do, I'm going to go

13   ahead and share my screen on it, if I can figure that

14   out.

15          MR. SCHLUTZ:  I'm glad it is not just me that

16   has that problem here.

17          MS. HEATH:  I'm embarrassed because my

18   first-grade daughter knows more about Zoom than I do.

19          THE WITNESS:  It is common these days.

20          MR. SCHLUTZ:  Nothing to be embarrassed about.

21   BY MS. HEATH:

22      Q.  Can you see Exhibit 3 on the screen?

23      A.  Yes, ma'am.  I can.

24      Q.  The first thing I will notice is there's no

25   Bates stamp on this document, and the ECF heading is a



```
 1    little funky, but I will represent for the record that

 2    this is ECF Entry 45 so that we can find this document

 3    later if we need to.

 4              So, Mr. Luke, I'm going to scroll down on this

 5    document, and I want to make sure I understand this.  So

 6    right here on my screen, I'm going to highlight this

 7    phrase "Charge Off Date."

 8              Can you see the highlighting?

 9        A.   Yes, ma'am.

10        Q.   Okay.  And then I see March 2, 2015?

11        A.   That's correct.

12        Q.   Okay.  So is that what you were testifying to

13    as to the default date?

14        A.   Yes, ma'am.

15        Q.   Okay.  And then when did TSI get this account?

16        A.   So as we discussed earlier, it takes a day or

17    two, depending on weekends and whatnot, for the

18    electronic file to come over.  TSI got this account on

19    March 5th of 2015.

20        Q.   So while we are on this document, can you

21    describe what this document is?

22        A.   Yeah.  This is the loan payment history report.

23    And basically what this document is, the first part is

24    just general account information.  And then later on it

25    goes to a transaction history, and that is the financial
```



1    above you have a "Date Assigned," that date assigned

2    indicates that it was assigned, and I know from my

3    review of the account that was assigned to Patenaude &

4    Felix.  So it was assigned on the 7th of March.  And

5    this report gets automatically generated at that time.

6    And in this case, it took a couple days for that report

7    to be generated.

8         Q.   I see what you mean.  Okay.  Because it was

9    assigned on March 7th and it was generated on

10   March 10th.

11        A.   Yeah.  So once it gets assigned, we spoke about

12   the codes to request documentation.  Part of the

13   assignment is we put the code for this document on the

14   account right at assignment.  So it took a couple days

15   for our media team to go through, generate this report,

16   and index it.

17        Q.   Okay.  I'm going to stop sharing my screen, and

18   I'm going to ask that you now turn to the PDF labeled C,

19   the loan documents.

20        A.   Okay.

21             MS. HEATH:   And I'm going to ask that the court

22   reporter mark this as Exhibit 4.

23             (DEPOSITION EXHIBIT 4 WAS MARKED.)

24             THE WITNESS:   Okay.

25   ///



```
1   BY MS. HEATH:

2       Q.  So can you identify this document?

3       A.  Yes, ma'am.  This is the loan request credit

4   agreement.  And it has the terms and conditions and

5   cosigner notice attached to it.

6       Q.  Okay.  And I see that the lender is indicated

7   as GMAC Bank, as you indicated earlier.  My question is,

8   by looking at this document, can you tell who

9   Mr. Lizarraga-Davis was interacting with to get this

10  loan?  For example, was it the bank or was it the school

11  or . . .

12          MR. SCHLUTZ:  Object to the form.

13          THE WITNESS:  So these loan programs were

14  through the bank or a loan processor on the bank's

15  behalf.  So in certain instances they hire a third party

16  to help originate these loans on the bank's behalf.

17  BY MS. HEATH:

18      Q.  I'm going to do another screen share on this

19  one.

20      A.  Okay.

21      Q.  And I'm going to scroll down here to the

22  signature line.  And right above the signature line,

23  there's this fax number.

24          Do you see that?

25      A.  Yes, ma'am.  I do.
```



```
 1         Q.   Do you know whose fax number that is?

 2         A.   Not with certainty.

 3         Q.   And it looks like, actually, there is indeed a

 4    fax header at the top that says "Page 2 of 2."

 5              Do you see that?

 6              MR. SCHLUTZ:  Object to the form.

 7              THE WITNESS:  Yes, ma'am.  I see that.

 8    BY MS. HEATH:

 9         Q.   Actually, I -- to be clear, I think I referred

10    to it as a fax header.  Let me ask you, do you know what

11    that "Page 2 of 2" refers to?

12         A.   Yes, ma'am.  I do.

13         Q.   And what is that?

14         A.   That's actually part of AES's just -- they put

15    that on certain documents when they are indexing them.

16    So it is not actually a fax header.  It was something

17    that was put on after, afterwards, after it was signed.

18         Q.   After it was signed?

19         A.   Yes, ma'am.

20         Q.   Where is page 1 of 2?

21              MR. SCHLUTZ:  Object to the form.

22    BY MS. HEATH:

23         Q.   If you know?

24         A.   I don't -- well, it is with AES.  I don't know

25    specifically what it is.  I may have it.  This case has
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

1   been going on for a little while.  But basically it

2   is -- there's a packet of information called the loan

3   origination packet that includes this document, the note

4   disclosure statements, amongst other documents.  Page 1

5   of 2 would be within that packet that is generally held

6   by AES unless TSI needs to request it for any reason.

7        Q.  So we spoke about the process a little bit more

8   broadly earlier, but when would AES -- I'm sorry.  When

9   would TSI have gotten this particular document?

10       A.  On or about March of 2015.  So most likely it

11  was sometime in February of 2015 they would have

12  received a copy of this document.

13       Q.  Okay.  And this document would have been a PDF

14  sent through the file transfer?

15       A.  Yes, ma'am.  And to clarify a little bit, it

16  wouldn't be this document in totality, it would be the

17  first page of this document along with the note

18  disclosure statement, which was your PDF letter E.  They

19  would receive those two documents in PDF format.

20       Q.  And you said just this -- you said just this

21  first page is received?

22       A.  Yes, ma'am.  That's correct.

23       Q.  So where do the remaining pages come from?

24       A.  So those come from -- we have a library of

25  various terms and conditions that go along with each



1    program lender and loan program.  So those documents are

2    matched up to the signature page of the credit agreement

3    based on a unique alphanumeric code that specifically

4    relates to this credit agreement.

5        Q.  And who matches those up?

6        A.  TSI would at this time.

7        Q.  When you said "at this time," would that have

8    been different at some point in time?

9        A.  Yes, ma'am.

10       Q.  And when would that have been different?

11       A.  So, for example, when NCO was the special

12   subservicer, NCO would have been doing the matching.

13       Q.  But in 2017, when TSI was the subservicer, they

14   would have matched these documents up?

15       A.  Yes, ma'am.  That's correct.

16       Q.  When do these documents get matched up?

17       A.  So they will get matched up -- once again, it

18   depends on when the matching occurs.  So currently, when

19   we are pulling the chain of title documents proactively,

20   we are also pulling these terms and conditions and

21   indexing them into the repository.  Where historically,

22   going years back -- once again, I don't remember exactly

23   when it changed -- but at some point in the past, these

24   documents were another request by the agency or firm

25   where they would send us a code and say, "Hey, we need



1   the terms and conditions," and we would go and pull the

2   terms and conditions and index them to the account and

3   send them to that requesting party.

4       Q.  And do you know which one of those processes

5   was in place for Mr. Lizarraga-Davis's account?

6       A.  I do not off the top of my head.

7       Q.  So I think you were referring to the terms and

8   conditions here.  But then there's also this fifth page,

9   the "FEDERAL COSIGNER NOTICE."

10          Where does that come from?

11          MR. SCHLUTZ:  Object to the form.

12          THE WITNESS:  That's actually part -- sorry.

13          MR. SCHLUTZ:  Object to the form.

14          THE WITNESS:  That's actually part of the terms

15   and conditions.  It is part of the same PDF that the TSI

16   team member grabs and copies to match up to the

17   signature page of the credit agreement.

18   BY MS. HEATH:

19       Q.  So at the bottom of the first page, I see

20   there's this long -- what appears to be a long file page

21   followed by .pdf here.

22          Do you see this?

23       A.  Yes, ma'am.  I do.

24       Q.  So what file is that?

25       A.  So that's how the document was originally saved



1        Q.   And then once those terms and conditions have

2   been found, are they -- is this saved to the repository

3   as a single PDF?

4        A.   Generally, no.   They are saved under their

5   individual document type, which for the terms and

6   conditions it is term, t-e-r-m, is that document type.

7   So they are saved individually, where the signature page

8   is saved under loan, l-o-a-n, document type.

9        Q.   And when did -- excuse me.

10            When did TSI get the terms and conditions that

11   are saved in its library?

12        A.   So they receive those terms and conditions

13   similar to the pool supplements or other chain of title

14   documents, right when they began special subservicing as

15   of November 1st of 2014.

16        Q.   So I note that this particular page, it is

17   called a "Loan Request/Credit Agreement."   Do you know

18   what Mr. Lizarraga-Davis would have gotten as part of

19   this package when he got the loan?

20        A.   Yes, ma'am.

21        Q.   What was that?

22        A.   So included in the package would be this page,

23   which is called the "LENDER COPY."   If you go down to

24   the bottom, you will see in the bottom middle, it will

25   say "LENDER COPY."   So he would have received this exact



```
 1              And if the court reporter could label this PDF

 2    as Exhibit 5.

 3              (DEPOSITION EXHIBIT 5 WAS MARKED.)

 4    BY MS. HEATH:

 5        Q.  And, Mr. Luke, can you identify this document?

 6        A.  Yes, ma'am.  It is a note disclosure statement

 7    that was issued upon the approval and disbursement of

 8    Mr. Lizarraga-Davis's loan, particularly the loan that

 9    is evidenced by the credit agreement we just discussed

10    as deposition Exhibit 4.

11        Q.  And I know we may have discussed this document

12    earlier, but now that we have it in front of us, for a

13    clear record, where does TSI get this document?

14        A.  Similar to the credit agreement, the signature

15    page of the credit agreement, we got it at the same time

16    from AES.

17        Q.  And then this is saved on the repository; is

18    that right?

19        A.  Yes, ma'am.

20        Q.  Now, you will notice at the top there's sort of

21    a similar header as to what we saw earlier that says

22    "Page 3 of 18."

23              Do you see that?

24        A.  Yes, ma'am.  I do.

25        Q.  What is that?
```



1        A.   Similar to with the signature page of the

2   credit agreement, that just designates the pages for AES

3   in their loan origination file.   So the other 17 pages

4   would be other documents within that origination file.

5        Q.   And where are those 17 pages?

6        A.   With AES.

7        Q.   Why is this particular page singled out?   Do

8   you know?

9        A.   Well, it is -- so it forms a part of the credit

10  agreement, but it is generated and sent after the credit

11  agreement.   So the credit agreement would be sent in by

12  the consumer, and once that loan is approved and

13  disbursed, the note disclosure statement gets sent along

14  with the disbursement funds to the consumer.   So it is a

15  separate document but it does form and it is

16  incorporated into the credit agreement.

17            MS. HEATH:   Okay.   Let's turn to the PDF letter

18  F, and I will ask the court reporter to mark this as

19  Exhibit 6.

20            (DEPOSITION EXHIBIT 6 WAS MARKED.)

21  BY MS. HEATH:

22       Q.   Mr. Luke, can you identify this document?

23       A.   Yes.   This is the pool supplement particular to

24  GMAC Bank for the 2006-4 pool.

25       Q.   And I know we discussed pool supplements in



1    general, but to be clear, where is this particular pool

2    supplement stored?

3         A.   So this is stored in -- on TSI's server

4    generally with the rest of the pool supplements for the

5    trust that TSI is a subservicer for.

6         Q.   And do you know if this particular pool

7    supplement ever became or was ever saved in the

8    repository for Mr. Lizarraga-Davis's loan?

9         A.   I don't believe it was.

10        Q.   Okay.  I'm going to go over to page 4 of the

11   PDF.

12        A.   Okay.

13        Q.   And I see a couple signature lines.  First I

14   see the First Marblehead Corporation and then the name

15   John Hupalo.

16             Do you see that?

17        A.   Yes, ma'am.  I do.

18        Q.   Do you know who John Hupalo is?

19        A.   I don't know him personally.

20        Q.   Do you know his -- are you able to recognize

21   his signature?

22        A.   I mean, from review of these agreements, yes.

23   But independent from signatures on pool supplements, not

24   that I'm aware of.

25        Q.   Now, I see -- it appears he is signing for



1    First Marblehead Corporation and the National Collegiate

2    Funding, LLC?

3        A.   Yes, ma'am.

4        Q.   Do you know, does he -- does he work for both

5    of those entities?

6        A.   I'm not sure -- well, he doesn't work for

7    National Collegiate Funding.  He signed as Gate

8    Holdings, a member of National Collegiate Funding, but

9    I'm not sure of his employment status with Gate

10   Holdings.

11       Q.   Who is Gate Holdings?

12       A.   Specifically I'm unaware other than they are a

13   member of National Collegiate Funding.

14       Q.   A member of the LLC?

15       A.   Yes, ma'am.

16       Q.   On the next page, it looks like there's a

17   counter signature from GMAC Bank.  Do you see that?

18       A.   Yes, ma'am.  I do.

19       Q.   I can't recognize the name.  Do you have any

20   idea whose name that is?

21       A.   No, ma'am.  I can't make it out with certainty.

22       Q.   So I assume you don't know if that signature is

23   accurate?

24       A.   Can you rephrase your question?

25       Q.   Sure.



1              So do we know that whoever this person is, that
2      that is their real signature?
3          A.   I can't be certain.
4          Q.   Okay.  Let me go back to the first page.  In
5      fact, actually, it might be easier if I do a screen
6      share on this one too.
7              Okay.  Now, do you see under Article 1 there is
8      this underlined reference to Schedule 1?
9          A.   Yes, ma'am.
10         Q.   Now, there's no Schedule 1 attached to this
11     document, is there?
12         A.   Not in its full form.  That is correct.
13         Q.   Where is Schedule 1?
14         A.   Schedule 1 is in TSI servers, saved along with
15     the pool supplements.
16         Q.   And you said Schedule 1 is not here in its full
17     form.  What do you mean by "full form"?
18         A.   So what Schedule 1 is, it is a listing of all
19     of the loans that were included in the pool.  So it
20     contains hundreds if not thousands of loans along with
21     various pieces of sensitive data.  So instead of
22     attaching it in its full form, which could be hundreds
23     of pages potentially, what is attached as the final page
24     of deposition Exhibit 6 is an excerpt of the Schedule 1
25     that is just showing the line item of



1    Mr. Lizarraga-Davis's loan.

2         Q.  Okay.  So let's take a look at this page.  I'm

3    curious about this phrase, "Total Net Principal."

4         Do you see that?

5         A.  Yes, ma'am.

6         Q.  What does that mean?

7         A.  So that was the total amount of principal net

8    of any interest that had capitalized or -- interest that

9    had capitalized or payments to the principal that had

10   been made between the origination and the date the loan

11   was sold.  Because this loan was opted to be an

12   interest-only payment loan, so payments were to begin

13   while the consumer was still in school.

14        Q.  Okay.  So as of what date is this principal

15   balance referring to?

16        A.  It should be as of the date of the pool

17   supplement, which is December 7, 2006.  I would have to

18   look at the loan financial activity to verify that that

19   amount is there.

20        Q.  And what about "Total Outstanding Gross

21   Principal"?

22        A.  So the gross principal is the principal amount,

23   and it includes the origination fee and any capitalized

24   interest that may have occurred.

25        Q.  Up until presumably December 7, 2006?



1        A.   Yes, ma'am.

2        Q.   And then the last one for the moment, I'm

3   having a hard time highlighting it, but this "Total

4   Amount Due Bank."

5             What is that?

6        A.   So that's actually the full amount that was

7   paid for this loan, which includes the full balance that

8   was due and owing at the time of the sale along with

9   various other fees that were associated with it.  So if

10  you look just at the left boxes, you see various

11  marketing fees.  So it is basically everything that was

12  owed on the account plus all those fees for the total

13  amount that was due to be paid for the purchase of this

14  loan.

15        Q.   So you said this is an excerpt of the

16  information in Schedule 1.  Who creates this excerpt?

17        A.   TSI.

18        Q.   And at what point of the process is this

19  excerpt created?

20        A.   It depends.  Similar to a lot of the documents

21  we discussed today, it depends on the time.

22  Traditionally this was a document that was requested as

23  needed from either an agency or a firm; however, similar

24  to the other documents that we have discussed, this is

25  one of the documents that currently we are proactively



```
 1    providing.
 2         Q.  Is there a way to -- or how can I tell for
 3    Mr. Lizarraga-Davis when this excerpt was created?
 4         A.  You wouldn't be able to tell looking at the
 5    document.  I would have to go back and look at the
 6    account records to determine when it was saved into our
 7    repository.  And then from that date, I can tell why it
 8    was saved there, whether it was a request or whether it
 9    was one of our proactive measures.
10         Q.  But the creation of this would be in the
11    account records?
12         A.  The date that it was saved to our repository
13    would be in the repository.  And then the -- if it was
14    requested by the firm, that request would be in the
15    account notes.
16         Q.  How would that be identified in the account
17    notes?
18         A.  So similar to the other documents that we
19    discussed, there's a code that is sent.  So if that code
20    appears in the account notes, you would be able to tell
21    that it was requested by a vendor agency or firm and
22    then you would have to deduce who had the account at
23    that time in order to determine who made that request.
24         Q.  Do you know off the top of your head what that
25    code is?
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
1    break for lunch?

2             MR. SCHLUTZ:  Okay.  We can do that over a

3    break or something, but he is not going to do it on

4    camera or anything.  I'm sorry.  I just think from a

5    privacy issue.  He can do it on a break and look it up.

6             MS. HEATH:  Okay.

7             But you can look that up over the break?

8             THE WITNESS:  Yes, ma'am.  Yeah.  I'll make a

9    note.  And you want the date that the excerpt was saved?

10   BY MS. HEATH:

11       Q.   That's correct.

12       A.   Okay.  I made a note.

13       Q.   Okay.  Great.  With that note, then let me just

14   ask a couple of final questions before we break for

15   lunch or mid-afternoon snack in Georgia.

16            How is this excerpt created?

17       A.   So the media team will go in, pull up the full

18   schedule, they would identify what schedule it is,

19   similar to how they identify which pool supplement it

20   is, they would go in the account, find the trust, verify

21   the bank.  The schedules are saved similar to the pool

22   supplements.  So there's a folder for each year and

23   trust, and then they would pull up the GMAC schedule.

24   From there they would use the consumer's social security

25   number to identify which loan in the schedule is theirs.
```



1   Then what they would do is they would copy over that

2   line item of data along with -- they would copy the

3   headers so you know what each piece of data relates to,

4   and then they format it -- in this case they format it

5   in a five-by-five format, that way it fit on one sheet

6   of paper, then they would PDF it, redact it, and then

7   save that to the repository.

8            Q.   When you say copy and paste, are they copying

9   and pasting into a blank Excel -- is it -- first of all,

10  is this in an Excel format?

11           A.   This schedule is, yes.   In Excel.

12           Q.   And is the excerpt in Excel?

13           A.   So it is -- in its initial form it is in Excel,

14  but then they do PDF it.   And what is saved in the

15  repository is the PDF.

16           Q.   The one-page PDF of the excerpt?

17           A.   Yes, ma'am.

18           Q.   And the Excel file that the data gets copied

19  into, is that a blank Excel file, or is there some kind

20  of template?

21           A.   It is blank.

22           Q.   Are you aware that Patenaude & Felix attached

23  the pool supplement to their state court complaint

24  against Mr. Lizarraga-Davis?

25                MR. SCHLUTZ:   Objection.



```
1        A.   No, ma'am.  I did not.
2        Q.   Okay.  And do you understand you are still
3   under oath?
4        A.   Yes, ma'am.
5        Q.   Okay.  So before the break, you said you were
6   going to take a look at the creation date for that
7   excerpt in Exhibit 6.
8             Did you have the opportunity to do that?
9        A.   Yes, ma'am.  I did.
10       Q.   What was the creation date of that document?
11       A.   It was saved into our media repository on
12  March 16th of 2017.
13       Q.   Okay.  Thank you for taking a look at that.
14            The other thing I wanted to address from before
15  the break, you had mentioned that you could not remember
16  the code that was used in the account notes --
17       A.   Correct.
18       Q.   -- to refer to this document.
19            Okay.  So I sent over a couple of different
20  PDFs during the break.  Can you go ahead and pull up the
21  PDF labeled L -- and I'm not going to mark this as an
22  exhibit, but I'm just going to ask if this refreshes
23  your recollection as to what that particular code was?
24       A.   No.  So these are actually internal CRS codes.
25  The code glossary I would look for is the eRecoverEase
```



 1   notes?

 2              MR. SCHLUTZ:  Object to the form.

 3              THE WITNESS:  I don't recall the exact

 4   percentage listed, but I recall that generally being

 5   something in the audit about that.

 6   BY MS. HEATH:

 7        Q.  And does that surprise you?

 8        A.  No, ma'am.

 9        Q.  And why not?

10        A.  Once again, AES wasn't obligated to maintain

11   those documents, and as we discussed previously when we

12   were talking about the origination packets, that lender

13   copy that was returned at origination did not include

14   terms and conditions, it was just the signature page,

15   which is what AES kept on behalf of the trust.

16        Q.  I know we discussed Patenaude & Felix a couple

17   of times.  Do you know when Mr. Lizarraga-Davis -- first

18   of all, let me ask a more foundational question.

19              Is Patenaude & Felix in TSI's attorney network?

20        A.  Yes, ma'am.  They are.

21        Q.  And did TSI refer Mr. Lizarraga-Davis's account

22   to Patenaude & Felix?

23        A.  Yes.  They did.

24        Q.  Do you know when that happened?

25        A.  Yes, ma'am.



Case 5:18-cv-04081-BLF   Document 63-2   Filed 03/31/22   Page 56 of 78

BRADLEY LUKE on 03/30/2021                    30(b)(6)
                                              Page 107

1      Q.  And when was that?
2      A.  We discussed that earlier on deposition
3  Exhibit 3.  It was on March 7th of 2017.
4      Q.  Oh.  Thank you.  And I don't intend to ask a
5  question twice, but feel free to call me on it if I do.
6      A.  No worries.
7          MS. HEATH:  Okay.  I'm going to ask that you
8  open up PDF H, and we are going to mark this as
9  Exhibit 9.
10          (DEPOSITION EXHIBIT 9 WAS MARKED.)
11          THE WITNESS:  Okay.
12  BY MS. HEATH:
13      Q.  And I'm going to do the same.  And actually, I
14  should mention too, for the court reporter, this exhibit
15  is marked confidential.  So unless -- I don't know if
16  Mr. Schultz wants to mark this part of the deposition as
17  confidential but . . .
18          MR. SCHLUTZ:  We'll deal with that when we see
19  where the questioning goes.
20  BY MS. HEATH:
21      Q.  Okay.  All right.  To make sure my screen
22  sharing is working correctly, do you see this Exhibit 9
23  up on my screen?
24      A.  Yes, ma'am.  I do.
25      Q.  Okay.  Do you recognize these records?



1           Are you aware that TSI responded to discovery

2    requests in the state court case against

3    Mr. Lizarraga-Davis?

4       A.  Yes, ma'am.  They responded on behalf of the

5    2006-4 trust.

6       Q.  Would those discovery responses be reflected in

7    these account notes anywhere?

8           MR. SCHLUTZ:  Object to the form.

9           THE WITNESS:  Generally, no, other than

10   sometimes the law firms will note receipt and sending

11   and receiving of the discovery responses and service of

12   such.

13   BY MS. HEATH:

14      Q.  So do you know who James Cummins is?

15      A.  Yes, ma'am.

16      Q.  Are you aware that he signed TSI's discovery

17   responses in the state court case?

18      A.  Yes, ma'am.  I'm aware of that.

19      Q.  Who is James Cummins?

20      A.  He is an employee of TSI.  I believe his role

21   was legal account specialist.

22      Q.  How many legal account specialists does TSI

23   have?

24          MR. SCHLUTZ:  As of now or when are we talking?

25          MS. HEATH:  We can limit that to 2017.



1    he would appear at trial?

2         A.   It depends.  Cases come in different volumes.

3    But I would say, in 2017, he was appearing at least once

4    if not two, three, four times per month.

5         Q.   Were you appearing at trials in 2017?

6         A.   I had the ability to.  I'm not sure if I ever

7    testified at a trial in 2017 or not.  I don't recall.

8    But I was able to.

9         Q.   Anybody else at TSI whose job it was to testify

10   at trial in 2017?

11        A.   Yes, ma'am.

12        Q.   Who is that?

13        A.   It would be the other members that shared the

14   same job as Mr. Cummings.

15        Q.   So the other legal account specialists?

16        A.   Yeah.  If that was their title at that time --

17   that role changed titles at some point.  So I don't know

18   if it was legal account specialist at that time.

19        Q.   I understand.

20             And that was -- and there were two to six

21   people in that role, whatever the title was, in 2017?

22        A.   From my recollection, I believe it was

23   somewhere in the two to six range.

24        Q.   Was there anybody whose job it was to appear at

25   trial that did not also respond to discovery requests?



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1        A.   I believe there were people that didn't respond
 2   to discovery requests, but they all had the ability to.
 3   The discovery just wasn't assigned to them based on
 4   other in-office tasks.
 5        Q.   Have you ever testified at a trial in
 6   California?
 7        A.   I'm not sure.
 8             MS. HEATH:  Let's open up PDF labeled I.
 9             THE REPORTER:  Do you want to mark this one as
10   Exhibit 10?
11             MS. HEATH:  Yes, please.
12             (DEPOSITION EXHIBIT 10 WAS MARKED.)
13             THE WITNESS:  Okay.
14   BY MS. HEATH:
15        Q.   Do you recognize this document?
16        A.   Yes, ma'am.
17        Q.   And what is this?
18        A.   This is a consent order that was entered
19   between Transworld Systems, Incorporated, and the
20   Consumer Financial Protection Bureau.
21        Q.   Did you participate in any way in the CFPB's
22   investigation of TSI?
23             MR. SCHLUTZ:  Object to the form.  Also object
24   to the extent it would call for any sort of
25   attorney-client communication.
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

```
 1              ::: CERTIFICATE OF REPORTER :::

 2         I, SARAH J. MACDEVITT, a Certified Shorthand
   Reporter, holding a valid and current license issued
 3 by the State of California, CSR No. 14175, duly
   authorized to administer oaths, do hereby certify:

 4
           That the witness in the foregoing deposition
 5 was administered an oath to testify to the whole truth
   in the within-entitled cause.

 6
           That said deposition was taken down by me in
 7 shorthand at the time and place therein stated and
   thereafter transcribed into typewriting, by computer,
 8 under my direction and supervision.

 9 (X) Reading and signing was requested/offered.

10 ( ) Reading and signing was waived.

11 ( ) Reading and signing was not requested/offered.

12

13         I further certify that I am neither counsel
   for nor related to any party in the foregoing
14 deposition and caption named nor in any way interested
   in the outcome thereof.

15

16
   DATED:  April 12, 2021
17

18

19
   _____
20 SARAH J. MACDEVITT, RPR, CSR
   California Certified Shorthand Reporter 14175
21 Registered Professional Reporter

22

23

24

25
```



EXCEEDING YOUR EXPECTATIONS
COMBS REPORTING, INC.
DEPOSITION REPORTERS • LEGAL VIDEO

1  ERIKA HEATH (SBN 304683)
2  (erika@heathlegal.com)
   **ERIKA HEATH, ATTORNEY AT LAW**
3  369 Pine Street, Suite 410
   San Francisco, CA 94104
4  Tel.:   (415) 426-7850

5

6  Attorneys for Plaintiff
7  OSKAR LIZARRAGA-DAVIS

8              **UNITED STATES DISTRICT COURT**
9            **NORTHERN DISTRICT OF CALIFORNIA**

10

11  OSKAR LIZARRAGA-DAVIS,              Case No. 5:18-cv-4081-BLF

12          *Plaintiff*,                **PLAINTIFF'S NOTICE OF**
                                         **DEPOSITION OF DEFENDANT**
13  v.                                   **TRANSWORLD SYSTEMS, INC.**
                                         **PURSUANT TO FED. R. CIV. P. 30(b)(6)**
14  TRANSWORLD SYSTEMS, INC.,

15          *Defendant*.

16

17

18          PLEASE TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 30(b)(6),

19  Plaintiff will take the deposition of Defendant Transworld Systems, Inc. ("Defendant" or

20  "TSI") through one or more of its corporate representatives before an officer authorized by

21  law to administer oaths on March 30, 2021 at 9:00 a.m. PDT.  The deposition will take place

22  via remote videoconferencing and will be recorded by stenographic and audiovisual means.

23  All attendees (including the court reporter) will join the deposition from separate locations.

24  Attendees will receive a link by email in advance of the deposition, which they will use to

25  join the videoconference.

26                                    Sarah MacDevitt, CSR 14175
                                      B. Luke, 30(b)(6)
27                                    03/30/2021
                                      **Exhibit 1**
28

---

PLAINTIFF'S NOTICE OF DEPOSITION OF DEFENDANT        1        ERIKA HEATH, ATTORNEY AT LAW
TRANSWORLD SYSTEMS, INC. PURSUANT TO FED. R.                  369 Pine Street, Suite 410
CIV. P. 30(b)(6)                                             San Francisco, CA 94104
                                                      Tel: (415) 426-7850 | Fax: (415) 449-6556

Deponent(s) provided by Defendant shall be knowledgeable and prepared to answer questions in the above-referenced matter, including:

1. The nature of TSI's relationship with GMAC Bank; National Collegiate Student Loan Trust 2006-4; American Education Services (AES); U.S. Bank, N.A.; The National Collegiate Funding LLC; The First Marblehead Corp., The Education Resources Institute, Inc.; Pennsylvania Higher Education Assistance Agency (PHEAA); Patenaude & Felix APC; and any other entity in relation to OLD's account.

2. All account notes, collection logs, miscellaneous notes, debtor work cards, or other documentation methods, if any, whether computerized, manual, or other, of all activities related to loans in the name of Oskar Lizarraga-Davis.

3. The servicing of Plaintiff's account(s).

4. TSI's communication with prior beneficiaries and servicers with respect to Plaintiff or his account(s).

5. Documents and information received by TSI at the time Plaintiff's accounts were referred to it for servicing.

6. The purported assignments of Plaintiff's account(s) to National Collegiate Student Loan Trust 2006-4.

7. The state court litigation commenced in the name of National Collegiate Student Loan Trust 2006-4 against Oskar Lizarraga-Davis (San Benito County Case No. CU-17-00083), including the allegations raised, TSI's discovery responses, documents produced by TSI, and the dismissal of the action.

8. The manner and method by which TSI has imaged, stored, archived, retrieved, and created business records of accounts since 2006, with relation to Plaintiff's account(s).

PLAINTIFF'S NOTICE OF DEPOSITION OF DEFENDANT
TRANSWORLD SYSTEMS, INC. PURSUANT TO FED. R.
CIV. P. 30(b)(6)

2

ERIKA HEATH, ATTORNEY AT LAW
369 Pine Street, Suite 410
San Francisco, CA 94104
Tel: (415) 426-7850 | Fax: (415) 449-6556

9.  TSI's knowledge of any audits on loan documentation performed on any of Plaintiff's prior servicers, including Pennsylvania Higher Education Assistance Agency (PHEAA) and American Education Services (AES).

10. TSI's document retention and/or document-destruction policies and procedures, including but not limited to collection letters, promissory notes, assignment documents, disbursements, trust documentation, indemnification indication documents, guaranty documents, and securitization documents.

11. TSI's policies, practices, and procedures related to the litigation of National Collegiate Student Loan Trust accounts to litigation.

12. The effects of the Consent Order with the Consumer Financial Protection Bureau on TSI's policies, practices, and procedures related to National Collegiate Student Loan Trust accounts, including Plaintiff's.

13. TSI's responses to Plaintiff's discovery requests in this case, including any documents produced pursuant to those requests.

Pursuant to Fed. R. Civ. P. 30(b)(6), Defendant must designate one or more persons to testify on its behalf and set forth, for each person designated, the matters on which the person will testify.  The persons so designated shall testify as to matters known or reasonably available to Defendant.

Dated: March 9, 2021              ERIKA HEATH, ATTORNEY AT LAW

By:     */s/ Erika Heath*
        Erika A. Heath
        369 Pine Street, Suite 410
        San Francisco, CA 94104
        Tel: (415) 426-7850
        erika@heathlegal.com

        *Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, Erika A. Heath, declare:

I am a citizen of the United States, am over the age of eighteen years, and am not a party to or interested in the within entitled cause.  My business address is 369 Pine Street, Suite 410, San Francisco, CA 94104.

On March 9, 2021, I served the following document(s) on the parties in the within action:

- **PLAINTIFF'S NOTICE OF DEPOSITION OF DEFENDANT TRANSWORLD SYSTEMS, INC. PURSUANT TO FED. R. CIV. P. 30(b)(6)**

| | |
|---|---|
| X | **By E-mail.**  Pursuant to the parties' agreement regarding electronic service, I transmitted by e-mail the document(s) listed above from erika@heathlegal.com to the e-mail address(es) listed below.  I did not receive, within a reasonable time after the submission, any electronic message or other indication that the transmission was unsuccessful. |
| X | **By mail.**  I am familiar with the business practice for collection and processing of mail.  The above-described document(s) will be enclosed in a sealed envelope, with first class postage thereon fully prepaid, and deposited with the United States Postal Service at San Francisco, CA on this date, addressed as follows: |

| | |
|---|---|
| James K. Schultz<br>Debbie Kirkpatrick<br>Sessions, Fishman, Nathan & Israel, LLP<br>1545 Hotel Circle South, Suite 150<br>San Diego, CA 92108-3426<br>jschultz@sessions.legal<br>dkirkpatrick@sessions.legal | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is a true and correct statement.

By: ___/s/ Erika Heath_____
Erika Heath

PLAINTIFF'S NOTICE OF DEPOSITION OF DEFENDANT TRANSWORLD SYSTEMS, INC. PURSUANT TO FED. R. CIV. P. 30(b)(6)

4

ERIKA HEATH, ATTORNEY AT LAW
369 Pine Street, Suite 410
San Francisco, CA 94104
Tel: (415) 426-7850 | Fax: (415) 449-6556

(Page 2 of 2)

56206 065315

---

**\* Cosigned \* Loan Request/Credit Agreement – Signature Page**

**NON-NEGOTIABLE CREDIT AGREEMENT – THIS IS A CONSUMER CREDIT TRANSACTION**

**LOAN PROGRAM INFORMATION**

GMAC Bank Undergraduate Loan

Academic Period: 05/2006-12/2006

Lender: GMAC Bank

School: UNIVERSITY OF CALIFORNIA DAVIS

Loan Amount Requested: $25000.00
Deferral Period Margin: 4.75

Repayment Option: Interest Only
Repayment Period Margin: 4.75

Loan Origination Fee Percentage: 5.00
This fee may vary – see paragraph F, page 3 –
Bank will always assess the fee at origination.

---

**STUDENT BORROWER INFORMATION** (Must be old enough to enter into a binding contract)

Borrower Name: Oskar A Lizarragadavis
Social Security #: ████4043
Home Address: ████████ San Diego, CA 92103
Date of Birth: ████1983
Home Telephone: ████4267

Student Citizenship (check one box): ☒ U.S. Citizen    ☐ Eligible Non-Citizen(Attach front & back copy of CIS or student visa card)
Note: Personal reference name and address cannot match that of the Cosigner.
Personal Reference Name: Magdalena Anderson
Reference Street Address:
Reference City/State/Zip: La Mesa, CA 91942
Reference Home Tel #: ████7152    Work Tel #: ████8616

---

**COSIGNER INFORMATION** (Must be old enough to enter into a binding contract)

Cosigner Name: Consuelo B Hayes
Social Security #: ████-0110
Have you ever defaulted on a student loan or declared bankruptcy? ☒ No   ☐ Yes
Current Employer: UNITED STATES FEDERAL GOVERNME
Current Position: Retired
Years at Previous Employment: 30 Years
Home Address: ████████ San Diego, CA 92139
Date of Birth: ████1924
Home Telephone: ████8368

Years There: 30 Years
Employer Telephone: 6194708388

Alimony, child support, or separate maintenance incomes do not have to be revealed if you do not want them considered for repaying this
obligation. If you are relying on such additional income, please provide details on a separate sheet of paper.

Cosigner Citizenship (check one box): ☒ U.S. Citizen    ☐ Eligible Non-Citizen (Attach front & back copy of CIS)
Note: Personal reference name and address cannot match that of the Student.
Personal Reference Name: Esther Goodwall
Reference Street Address:
Reference City/State/Zip: National City, CA 91950
Reference Home Tel #: ████2221    Work Tel #: ████9998

---

By my signature, I certify that I have read, understand and agree to the terms of and undertake the obligations set forth on all four (4) pages of this Loan Request/Credit
Agreement GM.05-06.CSX1.20.0406 ("Credit Agreement"). I understand that any person who knowingly makes a false statement or misrepresentation on this form is
subject to penalties, which may include fines or imprisonment. This Credit Agreement is signed under seal. I understand that I am not required to fax my signature on
nor to sign electronically this Credit Agreement and any related notices that require signature. If I choose to fax my signature on or to sign electronically this Credit
Agreement and any related notices that require signature, I intend: (i) my fax or electronic signature to be an electronic signature under applicable federal and state law,
(ii) any fax printout or printout of Lender's electronic record of this Credit Agreement and related notice to be an original document, (iii) to conduct business with the
Lender by electronic records and electronic signatures, and (iv) that this Credit Agreement will not be governed by Article 3 of the Uniform Commercial Code, and my
obligations under this Credit Agreement will not be subject to, but any transfer of my obligations will be subject to, Article 9 of the Uniform Commercial Code.

**PLEASE SIGN BELOW – RETURN** This Page With Proof of Income and Other Information (if applicable) – **FAX TO:** 800-704-9406

Signature of Borrower *[signature]*                    Date 6-10-06

**BY SIGNING THIS CREDIT AGREEMENT BELOW, I CERTIFY THAT I INTEND TO (i) APPLY FOR
JOINT CREDIT AND (ii) BE JOINTLY LIABLE WITH THE BORROWER FOR THIS LOAN.**

Signature of Cosigner *Consuelo B Hayes*                    Date 6-15-06

Sarah MacDevitt, CSR 14175
B. Luke, 30(b)(6)
03/30/2021
**Exhibit 4**

GM.05-06.CSX1.20.0406                    LENDER COPY
PN01_GM_05-06_CSX1_F_X_LIZARRAGAD_A103826471.pdf                    GMCUIO

In this Credit Agreement, the words "I", "me", "my", and "mine" mean the person(s) who signed this Credit Agreement as Borrower and Cosigner. The words "you", "your", "yours", and "Lender" mean GMAC Bank, its successors and assigns, and any other holder of this Credit Agreement. "School" means the school named at the top of the first page of this Credit Agreement. The "servicer" means the Lender or any entity it designates to service my loan.

**A. PROMISE TO PAY:** I promise to pay to you the principal sum of the Loan Amount Requested shown on the first page of this Credit Agreement, to the extent it is advanced to me or paid on my behalf, and any Loan Origination Fee added to my loan (see Paragraph F) ("Principal Sum"), interest on such Principal Sum, interest on any unpaid interest added to the Principal Sum and late fees (see Paragraph E.6).

**B. IMPORTANT – READ THIS CAREFULLY:**
1. When you receive my signed Credit Agreement, you are not agreeing to lend me money. If you decide to make a loan to me, you will electronically transfer the loan funds to the School for me, mail a loan check to the School for me, or mail a loan check directly to me. You have the right to not make a loan or to lend an amount less than the Loan Amount Requested. I agree to accept an amount less than the Loan Amount Requested and to repay that portion of the Loan Amount Requested that you actually lend to me. You have the right to disburse my loan through an agent. At your option, you may also make any loan check co-payable to me and the Cosigner.
2. **HOW I AGREE TO THE TERMS OF THIS LOAN.** By signing this Credit Agreement, and submitting it to the Lender, I am requesting that you make this loan to me in an amount equal to the Loan Amount Requested plus any Loan Origination Fee described in Paragraph F of this Credit Agreement. If you approve this request and agree to make this loan, you will notify me in writing and provide me with a Disclosure Statement, as required by law, at the time the Loan proceeds are disbursed. The Disclosure Statement is incorporated herein by reference and made a part hereof. The Disclosure Statement will tell me the amount of the loan which you have approved, the amount of the Loan Origination Fee, and other important information. I will let you know that I agree to the terms of the loan as set forth in this Credit Agreement and in the Disclosure Statement by doing either of the following: (a) endorsing or depositing the check that disburses the loan proceeds; or (b) allowing the loan proceeds to be used by or on behalf of the Student without objection. Upon receipt of the Disclosure Statement, I will review the Disclosure Statement and notify you in writing if I have any questions. If I am not satisfied with the terms of my loan as disclosed in the Disclosure Statement, I may cancel my loan. To cancel my loan, I will give you a written cancellation notice within ten (10) days after I receive the Disclosure Statement. If loan proceeds have been disbursed, I agree that I will immediately return the loan proceeds to you, will not endorse any check which disburses the loan proceeds and will instruct the School to return any loan proceeds to you. If I give notice of cancellation but do not comply with the requirements of this Paragraph B.2, this Credit Agreement will not be canceled and I will be in default of this Credit Agreement. (See Paragraph I.)

**C. DEFINITIONS:**
1. "Disbursement Date" means the date or dates on which you lend money to me in consideration for my Credit Agreement and will be the date(s) shown on any loan check you prepare or the date(s) you initiate any electronic funds transfer.
2. The "Deferment Period" will begin on the Disbursement Date and end on the Deferment End Date.
3. "Deferment End Date" means the date specified below for the applicable loan program (the applicable loan program is stated on the first page of this Credit Agreement).

(a) *Undergraduate Alternative Loan Program:* If I have elected the "Immediate Repayment" option (the applicable repayment option is stated on the first page of this Credit Agreement), there is no Deferment Period, and my first payment will be 30-60 days after the disbursement of my loan. If I have elected the "Interest Only" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then interest payments will begin 30-60 days after the disbursement of my loan, the "Deferment End Date" will be the date the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this loan program), and principal and interest payments will begin 30-60 days after that date. In any event, if I have elected the "Interest Only" repayment option, the Deferment End Date will be no more than 5 years after the Disbursement Date. If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), then the "Deferment End Date" will be 180 days after the Student graduates or ceases to be enrolled at least half-time in the School (or another school participating in this Loan Program). In any event, if I have elected the "Full Deferral" repayment option, the Deferment End Date will be no more than 5½ years after the Disbursement Date.

(b) *Graduate Professional Education Loan Program:* 180 days after the Student graduates or ceases for any other reason to be enrolled at least half-time in the School (or another school participating in this Loan Program), but no more than 4½ years after the Disbursement Date; provided, however, that if the Student begins a medical residency or internship during the Deferment Period, then the Deferment Period will end 180 days after the day the residency or internship ends, but no more than 8½ years after the Disbursement Date.

4. The "Repayment Period" begins the day after the Deferment Period ends. If there is no Deferment Period for my loan, the Repayment Period will begin when my loan is fully disbursed. The Repayment Period is 20 years unless monthly payments equal to the minimum monthly payment amount (see Paragraph E.2) will repay all amounts

owed in less than 20 years, in which case the Repayment Period will be the number of months necessary to pay in full the amount I owe at the minimum payment.

**D. INTEREST:**
1. Accrual – Beginning on the Disbursement Date, interest will be calculated at the Variable Rate (Paragraph D.2) and charged on the Principal Sum, and on any unpaid interest later added to the Principal Sum according to Paragraph D.3. During the Repayment Period, interest will be calculated at the Variable Rate and charged on the outstanding balance of this Credit Agreement until all amounts are paid in full. Interest will be calculated on a daily simple interest basis. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by the number of days in that calendar year.
2. Variable Rate – The "Variable Rate" is equal to the Current Index plus a Margin. The Margins for both the Deferment Period and the Repayment Period are shown on the first page of this Credit Agreement. In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the Commonwealth of Pennsylvania. The Variable Rate will change quarterly on the first day of each January, April, July and October (the "Change Date(s)") if the Current Index changes. The "Current Index" for any calendar quarter beginning on a Change Date (or for any shorter period beginning on any Disbursement Date and ending on the last day of a calendar quarter) is based on the one-month London Interbank Offered Rate ("LIBOR") as published in the "Money Rates" section of *The Wall Street Journal*. The index for each calendar quarter (or for any shorter period beginning on a Disbursement Date and ending on the last day of a calendar quarter) will equal the average of the LIBOR rates published on the first business day of each of the three (3) immediately preceding calendar months, rounded to the nearest one-hundredth percent (0.01%). If *The Wall Street Journal* is not published or the Current Index is not given on that date, then the Current Index will be determined by using the immediately preceding published Current Index. If the Current Index is no longer available, you will choose a comparable index.
3. Capitalization – If I have elected the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), I am not obligated to make any payments until the loan enters the Repayment Period and you will add unpaid accrued interest to the principal loan balance as of the last day of each calendar quarter (the last day of December, March, June and September) during the Deferment Period and as of the last day of my Deferment Period. Interest that is added to principal is called "Capitalized" interest. Capitalized interest will be treated as principal. In addition, **if** I am in default (see Paragraph I) and the loan has been sold to TERI (see Paragraph L.12), TERI may capitalize accrued and unpaid interest as of the date it purchases my loan. I understand that you will also add all accrued and unpaid interest to the principal balance of my loan at the end of any forbearance period (see Paragraph H).

**E. TERMS OF REPAYMENT:**
1. Deferment Period – If I have elected either the "Interest Only" repayment option or the "Full Deferral" repayment option (the applicable repayment option is stated on the first page of this Credit Agreement), you will send statements during the Deferment Period (showing the total outstanding principal balance of my loan and the interest that has accrued on my loan). You reserve the right to send statements or notices to either the Borrower or the Cosigner. Statements will be sent to the address shown on your records. If I have elected the "Interest Only" repayment option, I agree to make payments each month during the Deferment Period equal to the accrued interest on the outstanding balance of this Credit Agreement. If I have elected the "Full Deferral" repayment option I may, but am not required to make payments during the Deferment Period. You will add any interest that I do not pay during the Deferment Period to the principal balance, as described in Paragraph D.3.
2. Repayment Period – The amount of my monthly payment ("Monthly Payment Amount") will be established based on the rules in this Credit Agreement when my Repayment Period begins. During the Repayment Period, you will send me monthly statements that show the Monthly Payment Amount and the payment due dates, and I will pay the Monthly Payment Amount shown on my monthly statement, which amount will in no event be less than $25 or the unpaid balance, whichever is less. I understand that the Monthly Payment Amount is due each month. I may pay more than my Monthly Payment Amount at any time without penalty or charge. If my loan is in paid-ahead status, I may, but will not be required to make monthly payments. You reserve the right to send monthly statements to the Borrower and/or the Cosigner. Even if I do not receive monthly statements, I will make consecutive monthly payments in amounts at least equal to the Monthly Payment Amount by the applicable payment due dates until I have paid all of the principal and interest and any other charges I may owe under this Credit Agreement.
3. Repayment Terms - My Monthly Payment Amount will be calculated as of the day the Repayment Period begins ("Repayment Date"). It will be recalculated (a) once each year prior to the anniversary of the Repayment Date, (b) if the Variable Rate changes between anniversaries of the Repayment Date to the extent that the Monthly Payment Amount would not pay in full the accrued monthly interest on my loan, (c) following any subsequent deferment or forbearance period or (d) following any request by the Borrower to the servicer to change the monthly payment due date (each of which events is a new "Repayment Date"). As of any Repayment Date, my Monthly Payment Amount will be recalculated. My new Monthly Payment Amount will be disclosed to me by the servicer. The new Monthly Payment Amount will equal the amount necessary to pay in full, over the number of months remaining in the Repayment Period, the amount I owe in equal monthly installments of principal and interest at the Variable Rate in effect at the time of the calculation. I understand that

this may result in a reduction or increase in my monthly payment as calculated as of each Repayment Date. I understand that during the Repayment Period (and, if I have elected the "Interest Only" repayment option, during the period of interest payments) the servicer may change the monthly payment due date of future payments to a later date for the convenience of the servicer in processing payments or in order to coordinate the due dates of all of my loans processed by the servicer.

4. Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late fees, I will also owe additional amounts for those late fees. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my loan in full.

5. Payments – Payments will be applied first to late fees, other fees and charges, accrued interest, and the remainder to principal.

6. Other Charges - If any part of a monthly payment remains unpaid for a period of more than 15 days after the payment due date, I will pay a late fee not exceeding $5.00 or 5% of the overdue payment amount, whichever is less. To the extent permitted by law, I agree to pay you all amounts you incur in enforcing the terms of this Credit Agreement, including reasonable collection agency and attorney's fees and court costs and other collection costs.

**F. LOAN ORIGINATION FEE:** If you charge me, I will pay you a Loan Origination Fee at the time my loan is disbursed. The dollar amount of any Loan Origination Fee will be determined by multiplying the Principal Sum times the Loan Origination Fee Percentage shown on the first page of this Credit Agreement. The percentage would be higher if computed only on the amount advanced rather than on the entire Principal Sum (Loan Origination Fee plus the loan amount advanced). For example, a nominal Loan Origination Fee of 6.5% on the entire principal amount would equal 6.9519% of the amount advanced. The Loan Origination Fee I will pay, if any, will be shown on my Disclosure Statement and included with the Principal Sum. To the extent permitted by law, and unless I timely cancel this Credit Agreement (see Paragraph B.2), I will not be entitled to a refund of any Loan Origination Fee after my loan has been disbursed.

**G. RIGHT TO PREPAY:** I have the right to prepay all or any part of my loan at any time without penalty.

**H. FORBEARANCE:** If I am unable to repay my loan in accordance with the terms established under this Credit Agreement because of a hardship such as financial or medical difficulty, I may request that you modify these terms. I understand that such modification would be at your option. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you will add any interest that I do not pay during any forbearance period to the principal balance, as described in Paragraph D.3.

**I. WHOLE LOAN DUE:** To the extent permitted by applicable law, I will be in default and you have the right to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under the terms of this Credit Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure my default) if: (1) I fail to make any monthly payment to you when due, (2) I die, (3) I break any of my other promises in this Credit Agreement, (4) any bankruptcy proceeding is begun by or against me, or I assign any of my assets for the benefits of my creditors, or (5) I make any false written statement in applying for this loan or any other loan or at any time during the Deferment or Repayment Periods. If I default, I will be required to pay interest on this loan accruing after default. The interest rate after default will be subject to adjustment in the same manner as before default. Upon default, you may also capitalize any interest and fees (i.e., add accrued and unpaid interest and fees to the principal balance), and increase the Margin used to compute the Variable Rate by two percentage points (2%).

**J. NOTICES:**

1. I will send written notice to you, any subsequent holder of this Credit Agreement, and the servicer within ten days after any change in name, address, or enrollment status (for example, if the Borrower withdraws from the School or transfers to another school participating in this loan program).

2. Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me. Unless required by applicable law, you need not give a separate notice to the Cosigner, if any.

**K. INFORMATION:**

1. I must update the information I provided to you whenever you ask me to do so.

2. I authorize you from time to time to request and receive from others credit related information about me (and about my spouse if I live in a community property state).

3. CREDIT BUREAU REPORTING

> **You may report information about my account to credit bureaus. Late payments, missed payments, or other defaults in my account may be reflected in my credit report.**

I understand that the reporting of information about my account to credit bureaus may adversely affect my credit rating and my ability to obtain other credit. You may also report the status of my loan and my payment history, including information about a late payment, missed payment or other defaults, to the School and others in accordance with applicable law.

**L. ADDITIONAL AGREEMENTS:**

1. I understand that you are located in Pennsylvania and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO CONFLICT OF LAW RULES.

2. The proceeds of this loan will be used only for my educational expenses at the School. The Cosigner, if any, will not receive any of the loan proceeds.

3. My responsibility for paying the loan evidenced by this Credit Agreement is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. Without losing any of your rights under this Credit Agreement you may accept (a) late payments, (b) partial payments or (c) payments marked "paid in full" or with other restrictions. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Credit Agreement to me for payment or make protest of non-payment to me before suing to collect on this Credit Agreement if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. I WILL NOT SEND YOU PAYMENTS MARKED "PAID IN FULL", "WITHOUT RECOURSE" OR WITH OTHER SIMILAR LANGUAGE UNLESS THOSE PAYMENTS ARE MARKED FOR SPECIAL HANDLING AND SENT TO THE ADDRESS IDENTIFIED FOR SUCH PAYMENTS ON MY BILLING STATEMENT, OR TO SUCH OTHER ADDRESS AS I MAY BE GIVEN IN THE FUTURE.

4. I may not assign this Credit Agreement or any of its benefits or obligations. You may assign this Credit Agreement at any time.

5. The terms and conditions set forth in this Credit Agreement and Instructions and the Disclosure Statement constitute the entire agreement between you and me.

6. If any provision of this Credit Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Credit Agreement without affecting the validity or enforceability of the remainder of this Credit Agreement.

7. A provision of this Credit Agreement may only be modified if jointly agreed upon in writing by you and me. Any modification will not affect the validity or enforceability of the remainder of this Credit Agreement.

8. To the extent permitted by law, you have the right to apply money from any of my deposit account(s) with you to pay all or a portion of any amount overdue under this Credit Agreement. I hereby authorize you to obtain from the School all amounts which may be owed to me by the School, including any refund due to overpayment, early termination of enrollment, or otherwise.

9. If this Credit Agreement is executed by more than one Borrower, each Borrower agrees that any communication between you and any of the Borrowers will be binding on all of the Borrowers. I intend to be treated as a principal of this Credit Agreement and not as a surety. To the extent I may be treated as a surety, I waive all notices to which I might otherwise be entitled as such by law, and all suretyship defenses that might be available to me (including, without limitation, contribution, subrogation and exoneration). I agree that the Borrower may agree to any forbearance or other modification of the repayment schedule and that such agreement will be binding on me. It shall not be necessary for you to resort to or exhaust your remedies against the borrower before calling upon me to make repayment. For purposes of this paragraph only, "I" and "me" refer to the Cosigner only.

10. All dollar amounts stated in this Credit Agreement are in United States dollars. I will make all payments in United States Dollars with no deduction for currency exchange.

11. If the Student fails to complete the education program paid for with this loan, the Cosigner and I are not relieved of any obligation within or pursuant to this Credit Agreement.

12. I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523 (a) (8) of the United States Bankruptcy Code. Specifically, I understand that you have purchased a guaranty of this loan, and that this loan is guaranteed by The Education Resources Institute, Inc. ("TERI"), a non-profit institution.

13. I authorize any school that I may attend to release to you, and any other persons designated by you, any requested information pertinent to this loan (e.g., enrollment status, prior loan history, and current address).

14. I authorize the Lender, any subsequent holder of this Credit Agreement, and their agents to: (1) advise the School or the status of my application and my loan, (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Credit Agreement and related documents, (3) release information and make inquiries to the persons I have given you as references, for the purposes of learning my current address and telephone number, (4) check my credit and employment history and to answer questions about their credit experience with me, and (5) disclose to TERI, the Borrower, and/or the Cosigner either in connection with this transaction or any future transaction all information (including status information and non-public personal information) of the Borrower and/or the Cosigner provided in connection with this Credit Agreement. If in the future I apply for a loan that is guaranteed by TERI and funded by another lender, I also authorize the sharing of application information for this loan (other than information in a consumer report) with the other lender and TERI and the reuse of such information by such new lender and TERI in my new application.

15. Waiver by Lender: You waive (give up) any right to claim a security interest in any property to secure this Credit Agreement. This does not affect any right to offset as a matter of law.

16. If I fax my signature(s) on the first page of this Credit Agreement back to you and keep the copy I signed, I understand that under federal law the fax you receive will be an original of the first page of this Credit Agreement. You and I agree that all copies of

this Credit Agreement (including the fax you receive and the copy I retain), taken together, shall constitute a single original agreement.

17.  If any Borrower or Cosigner elects to sign electronically an electronic record of this Credit Agreement, then the following will apply as between Lender and such person: (a) Lender will keep a non-modifiable electronic record of this document and provide a copy to me upon request, (b) I can and have downloaded and/or printed a copy of this document for my records or notified the Lender to mail me a copy of this document, and (c) the Lender's electronic record of this document and any printout from that record shall be an original for all purposes, including any lawsuit to collect amounts that I owe.  If I physically sign a copy of this document that has been electronically signed by any other Cosigner or Borrower, as between me and the Lender the copy I sign (and any fax of that copy I may send to Lender) will be an original.  However, the electronic signature of another party to this Credit Agreement and the Lender's electronic record of this document containing that signature will be as valid against me as an original, physical document that is physically signed by all parties.

**M.  DISCLOSURE NOTICE**

---

**ALL APPLICANTS:**
**IMPORTANT FEDERAL LAW NOTICE—**

*Important information about procedures for opening a new account:*
**To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.**

*What this means for you:*
**When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.**

---

**N. BORROWER'S CERTIFICATION:**  I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that all information I provided to you in connection with this loan, including without limitation, the information contained in this Credit Agreement, is true, complete and correct to the best of my knowledge and belief and is made in good faith.  I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the School for the academic period stated.  I certify that I am not now in default on a Federal Perkins Loan, a Federal Stafford Loan, a Federally Insured Student Loan, a Federal Supplemental Loan for Students (SLS), a Federal PLUS Loan, an Income Contingent Loan, a Federal Consolidation Loan, a Federal Ford Direct Loan, or any other education loan received for attendance at any school.

## FEDERAL COSIGNER NOTICE

For the purposes of these Notices, the words "you" and "your" refer to the Cosigner, not the Lender.

**NOTICE TO COSIGNER:**
You are being asked to guarantee this debt. Think carefully before you do. If the borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The holder of the loan can collect this debt from you without first trying to collect from the borrower. The holder of the loan can use the same collection methods against you that can be used against the borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become part of your credit record.

This notice is not the contract that makes you liable for the debt.

## 2006-4 POOL SUPPLEMENT
## GMAC BANK

This Pool Supplement (the "Supplement") is entered into pursuant to and forms a part of that certain Note Purchase Agreement (the "Agreement") dated as of May 30, 2003, as amended or supplemented from the date of execution of the Agreement through the date of this Supplement, by and between The First Marblehead Corporation and GMAC Bank (the "Program Lender"). This Supplement is dated as of December 7, 2006. Capitalized terms used in this Supplement without definitions have the meanings set forth in the Agreement.

Article 1: Purchase and Sale.

In consideration of the Minimum Purchase Price set forth below, the Program Lender hereby transfers, sells, sets over and assigns to The National Collegiate Funding LLC (the "Depositor"), upon the terms and conditions set forth in the Agreement (which are incorporated herein by reference with the same force and effect as if set forth in full herein), each GMAC Bank Conforming Loan described in the attached Schedule 1 (the "Transferred GMAC Bank Loans") along with all of the Program Lender's rights under the Guaranty Agreement, and any agreement pursuant to which TERI granted collateral for its obligations under the Guaranty Agreement, relating to the Transferred GMAC Bank Loans. The Depositor in turn will sell the Transferred GMAC Bank Loans to The National Collegiate Student Loan Trust 2006-4 (the "Trust"). The Program Lender hereby transfers and delivers to the Depositor each GMAC Bank Note evidencing such GMAC Bank Conforming Loan and all Origination Records relating thereto, in accordance with the terms of the Agreement. The Depositor hereby purchases said GMAC Bank Notes on said terms and conditions.

Article 2: Price.

The amount paid pursuant to this Supplement is the Minimum Purchase Price, as that term is defined in Section 2.04 of the Agreement.

Article 3: Representations and Warranties.

3.01. By Program Lender.

The Program Lender repeats the representations and warranties contained in Section 5.02 of the Agreement for the benefit of each of the Depositor and the Trust and confirms the same are true and correct as of the date hereof with respect to the Agreement and to this Supplement.

3.02. By Depositor.

The Depositor hereby represents and warrants to the Program Lender that at the date of execution and delivery of this Supplement by the Depositor:

(a) The Depositor is duly organized and validly existing as a limited liability company under the laws of the State of Delaware with the due power and authority to own its

{F0001033.1 }

Sarah MacDevitt, CSR 14175
B. Luke, 30(b)(6)
03/30/2021
**Exhibit 6**

properties and to conduct its business as such properties are currently owned and such business is presently conducted, and had at all relevant times, and has, the power, authority and legal right to acquire and own the Transferred GMAC Bank Loans.

      (b)    The Depositor is duly qualified to do business and has obtained all necessary licenses and approvals in all jurisdictions in which the ownership or lease of property or the conduct of its business shall require such qualifications.

      (c)    The Depositor has the power and authority to execute and deliver this Supplement and to carry out its respective terms; the Depositor has the power and authority to purchase the Transferred GMAC Bank Loans and rights relating thereto as provided herein from the Program Lender, and the Depositor has duly authorized such purchase from the Program Lender by all necessary action; and the execution, delivery and performance of this Supplement has been duly authorized by the Depositor by all necessary action on the part of the Depositor.

      (d)    This Supplement, together with the Agreement of which this Supplement forms a part, constitutes a legal, valid and binding obligation of the Depositor, enforceable in accordance with its terms.

      (e)    The consummation of the transactions contemplated by the Agreement and this Supplement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the governing instruments of the Depositor or any indenture, agreement or other instrument to which the Depositor is a party or by which it is bound; or result in the creation or imposition of any lien upon any of its properties pursuant to the terms of any such indenture, agreement or other instrument; or violate any law or any order, rule or regulation applicable to the Depositor of any court or of any federal or state regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties.

      (f)    There are no proceedings or investigations pending, or threatened, before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Depositor or its properties: (i) asserting the invalidity of the Agreement or this Supplement, (ii) seeking to prevent the consummation of any of the transactions contemplated by the Agreement or this Supplement, or (iii) seeking any determination or ruling that is likely to materially or adversely affect the performance by the Depositor of its obligations under, or the validity or enforceability of the Agreement or this Supplement.

Article 4: Cross Receipt.

      The Program Lender hereby acknowledges receipt of the Minimum Purchase Price. The Depositor hereby acknowledges receipt of the Transferred GMAC Bank Loans included in the Pool.

{F000103J1}

### Article 5: Assignment of Origination, Guaranty and Servicing Rights.

The Program Lender hereby assigns and sets over to the Depositor any claims it may now or hereafter have under the Guaranty Agreement, the Origination Agreement, and the Servicing Agreement to the extent the same relate to the Transferred GMAC Bank Loans described in Schedule I, other than any right to obtain servicing after the date hereof. It is the intent of this provision to vest in the Depositor any claim of the Program Lender relating to defects in origination, guaranty or servicing of the loans purchased hereunder in order to permit the Depositor to assert such claims directly and obviate any need to make the same claims against the Program Lender under this Supplement. The Program Lender also hereby assigns and sets over to the Depositor any claims it may now have or hereafter have to any collateral pledged by TERI to the Program Lender to secure its obligations under the Guaranty Agreement that relates to the Transferred GMAC Bank Loans, and Program Lender hereby releases any security interest it may have in such collateral. Program Lender hereby authorizes the Depositor, its successors and assigns, to file in any public filing office where a Uniform Commercial Code Filing with respect to collateral pledged by TERI is of record, any partial release or assignment that it deems necessary or appropriate to reflect in the public records the conveyance and assignment effected hereby.

[Remainder of page intentionally blank]

{F0001033.1}

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: _____
    John A. Hupalo
    Senior Executive Vice President

GMAC BANK

By: _____
    Name:
    Title:

THE NATIONAL COLLEGIATE FUNDING LLC

By:    GATE Holdings, Inc., Member

By: _____
    John A. Hupalo
    President

{F0001033.1}

IN WITNESS WHEREOF, the parties have caused this Supplement to be executed as of the date set forth above.

THE FIRST MARBLEHEAD CORPORATION

By: _____
     John A. Hupalo
     Senior Executive Vice President

GMAC BANK

By: _____
    Name:
    Title:

THE NATIONAL COLLEGIATE FUNDING LLC

By:     GATE Holdings, Inc., Member

By:_____
     John A. Hupalo
     President

{F0001033.1}

| National Collegiate Student Loan Trust 2006-4 | | | | |
|---|---|---|---|---|
| Roster: | 0 | | | |
| Lender | Lender Code | Marketer | Loan Product | BSSN |
| GMAC BANK | 900005IP | GMAC Bank | DTC - Undergraduate | ▆▆▆-4043 |

| GUARREF | Disb. Date | Tier | Repay Type | Margin |
|---|---|---|---|---|
| 03826471 | 26-Jun-06 | 1 | IO | 0.0475 |

| Fee to Borrower | TERI Admin Fee | Marketing Fee | Total Gross Disbursed | Total Net Disbursed |
|---|---|---|---|---|
| 0.05 | 0.015 | 0.05 | $26,315.79 | $25,000.00 |

| Total Net Principal | Total Capitalized Interest | Total Outstanding Gross Principal | Total Outstanding Unpaid Interest | Administrative Fee Reimbursement on 0% Fee Loans |
|---|---|---|---|---|
| $24,917.50 | $0.00 | $26,228.95 | $174.18 | $0.00 |

| Final Reconciliation Settlement Figures | | | | |
|---|---|---|---|---|
| Origination Fee Reimbursement Due Bank | Total Marketing Fees | Marketing Fees Due FMC | Marketing Fees Due Bank | Total Amount Due Bank |
| $100.00 | $1,245.88 | $747.53 | $498.35 | $27,001.48 |

# EXHIBIT 11

 Gmail

**Erika Heath <erika@heathlegal.com>**

---

## Lizarraga-Davis v. Transworld (5:18-cv-4081-BLF)

**Erika Heath** <erika@heathlegal.com>
To: dkirkpatrick@sessions.legal, jschultz@sessions.legal

Fri, Sep 6, 2019 at 8:25 AM

Good morning Debbie and John,
It appears that Damian has left the firm already, so I wanted to reach out to you to introduce myself and cover some outstanding issues (re: discovery and ADR) in the Lizarraga-Davis case after last week's summary judgment denial.

Maybe we can schedule a call for next week to discuss some of these issues further?  Let me know when your availability.

First, here are some outstanding discovery issues:

1. **Privilege log** - the privilege log that was previously produced is insufficient.  It just contains a single line stating that documents related to the CFPB case are privileged.  But my two concerns are that: (a) privileges were asserted to more requests for production than just those requests covering the CFPB case, so it appears the log is incomplete; and (b) even the scant information that is on the log is insufficient for me to evaluate the claims of privilege.  Please advise when I can get an updated log.
2. **RPDs 8, 9** - more complete assignment records, as opposed to just selected parts, per the summary judgment order.  For example, we need to see the Note Purchase Agreement of which the 2006-4 Pool Supplement is part, along with any attached schedules.  We also need to see the Appendix A that is incorporated into the Deposit and Sale Agreement, and whatever main document that the Deposit and Sale Agreement is "Exhibit 99.5" to.  Any other documents referenced in, or forming part of, either agreement should be produced too, so that we have full documentation of those assignments.
3. **RPDs 10, 11** -  servicing agreements.  If TSI is going to continue to assert that it is not a debt collector, then we need to see the documents covered by these requests, including the relevant servicing agreements.
4. **RPD 16** - employment file of James Cummins.  I have been unable to reach Mr. Cummins on my own to ask for a release, so I will need to insist on its production, as he is the only witness from state court who made any statements about having familiarity with TSI's documents.
5. **RPDs 18, 19 and 20** - communications regarding the loan and plaintiff (i.e., internal communications, communications with third-parties, etc.)
6. **RPD 25** - documents reflecting policy changes after the CFPB consent order.  These documents have not been produced.
7. **RFAs 7-13** - Defendant objections that these requests for admission are "disputed conclusion[s] of pure law" are not proper objections for requests for admission.
8. **Interrogatories 4-8:** these responses reference documents, but those documents do not actually answer these interrogatories.  I need to have either responses, or I need to be pointed to documents that answer these questions.
9. **Interrogatories 10, 11, 13, 14** - these are hugely relevant interrogatories, and I do not understand the primary objection to these interrogatories, and why we have not gotten responses.

Second, the timing of ADR:

Per the ADR order, we're required to mediate the matter within four months of the summary judgment order.  Given that this deadline will fall over the holidays, I thought it may make sense to go ahead and get something on the calendar, so we don't get log jammed at the end of the year.  Let me know what you think.

Many thanks,
Erika

**Erika Heath** Attorney at Law
*Pronouns: she/her*

369 Pine Street, Suite 410  |  San Francisco, CA 94104
(415) 426-7850  |  erika@heathlegal.com

***Confidentiality Notice:*** This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure.  If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, including attachments. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.